**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| PERFORMANCE PRICING, INC., | CASE NO. 2:07-cv-432 (LED) |
| Plaintiff, | **Jury trial demanded** |
| v. | |
| GOOGLE INC., AOL LLC, MICROSOFT CORP., YAHOO! INC., IAC SEARCH & MEDIA, INC., and A9.COM, INC., | |
| Defendants. | |

**<u>Plaintiff Performance Pricing, Inc.'s Claim Construction Brief</u>**

# Table of contents

I.     "Price-Determining-Activity" ..............................................................................1

     A.    Issue 1: "competition or entertainment activity" or "any activity" versus "inherently entertaining activity" ...........................................................1

          1. Claim language. .........................................................................1

          2. Specification ...............................................................................2

          3. Prosecution history......................................................................4

     B.    Issue 2: "other than proposing or accepting a price" versus "collateral to its sale." ......................................................................................................5

II.    "price being . . . scaled to the performance of the buyer" ....................................7

     A.    Issue 1: "standard (defined by a ratio, table, or other algorithm)" versus "predetermined set of graduated prices and corresponding performance levels." ..........................................................................................................7

          1. Claim language ............................................................................8

          2. Specification ...............................................................................9

          3. Prosecution history....................................................................10

     B.    Issue 2: "than would otherwise apply" versus "always." ..........................................................................................................12

III.   "accepting"......................................................................................................14

     A.    Issue 1: "receiving with consent or approval" vs. "accepting"...............14

          1. Claim language ..........................................................................14

          2. Specification .............................................................................14

     B.    Issue 2: Defendants' additional "selection of the product" limitation ..................15

          1. Claim language ..........................................................................15

          2. Specification .............................................................................17

          3. Prosecution history....................................................................18

IV.   "first" and "second" / ordering of steps ..........................................................18

     A.    Governing legal standard .........................................................................19

     B.    Claim language ........................................................................................20

     C.    Specification ............................................................................................21

V.    "auction" ........................................................................................................23

     A.    Issue 1: Defendants' "highest bidder," "public," and "sale of property" limitations ...............................................................................................23

i

                1. Claim language ................................................................................23

                2. Specification and prosecution history............................................24

    B.      Issue 2: "an auction is not a PDA"..................................................25

VI.    "performance of the buyer" ........................................................................26

    A.      Claim language ..............................................................................26

    B.      Specification ..................................................................................27

VII.    "master controller"....................................................................................27

    A.      Claim language ..............................................................................28

    B.      Specification ..................................................................................28

VIII.    "description of a product"/ "data representing a plurality of products" ............29

IX.    "price range" .............................................................................................29

X.    Conclusion ................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1370 (Fed. Cir. 2003) ..........................................19

*Amgen Inc. v. Hoechst Marion Roussel*, 314 F.3d 1313, 1326
(Fed. Cir. 2003) .....................................................................................................................17

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342, 1346
(Fed. Cir. 2008) ...........................................................................................................1, 16, 22

*Cat Tech LLC v. TubeMaster, Inc*., 528 F.3d 871, 884 (Fed. Cir. 2008).....................................2, 8

*Charles E. Hill & Assoc. v. Amazon.com*, 2005 U.S. Dist. LEXIS 45414, 44-45 (E.D. Tex. Oct. 7, 2005) ......................................................................................................................................16

*Connectel, LLC v. Cisco Sys*., 428 F. Supp. 2d 564, 573 (E.D. Tex. 2006) ..................................19

*Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1348
(Fed. Cir. 2005)......................................................................................................................21

*Gwin, Inc. v. Don Best Sports*, 548 F. Supp. 2d 342, 349 (E.D. Tex. 2008) ..................................19

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys*., 381 F.3d 1111, 1120
(Fed. Cir. 2004).........................................................................................................................2

*Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1328, 1343-44
(Fed. Cir. 2001)..................................................................................................................16, 19

*Johnston*, 435 F.3d 1381, 1384 (Fed. Cir. 2006) ...........................................................................2

*Kao Corp. v. Unilever United States, Inc.*, 334 F. Supp. 2d 527, 545
(D. Del. 2004) ...........................................................................................................................2

*Phillips v. AWH Corp*., 415 F.3d. 1303, 1322 (Fed. Cir. 2005) ....................................................24

*Respironics, Inc. v. Invacare Corp*., 2008 U.S. App. LEXIS 25270
(Fed. Cir. Dec. 16, 2008) .......................................................................................................20

*Schumer v. Lab. Computer Sys*., 308 F.3d 1304, 1311-1312 (Fed. Cir. 2002)...............................29

*Superspeed, L.L.C. v. IBM Corp*., 2009 U.S. Dist. LEXIS 10124, 16-17
(E.D. Tex. Feb. 11, 2009) .......................................................................................................22

*TorPharm Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003) ...........................5

*Verizon Servs. Corp. v. Vonage Holdings Corp*., 503 F.3d 1295, 1303 (Fed. Cir. 2007) ................4

*Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008) ........................................................11

**Note regarding citations.**

Citations to exhibits are in the form "Ex. __, [page number]."

Citations to U.S. patent No. 6,978,253 ("'253") are in the form "[column number]:[line numbers]"

The steps of claim 1 of the '253 patent are identified by using letters [a] through [e] as follows:

    1.  A method of doing business over a global communications network comprising the steps:

    [a] communicating to a buyer via the global communications network, a description of a product;

    [b] accepting a first request from the buyer to buy the product for a price to be determined within a price range;

    [c] accepting a second request from the buyer to allow the price to be determined based upon a performance of the buyer while participating in a Price-Determining-Activity (PDA);

    [d] receiving data from the buyer over the global communications network, said data representing the performance of the buyer during the PDA;

    [e] and determining the price of the product based at least partially upon the data received, said price being within the price range and scaled to the performance of the buyer.

Plaintiff Performance Pricing, Inc. presents the following opening claim construction brief.

## I.     "Price-Determining-Activity"

| Phrase | Plaintiff's proposal | Defendants' proposal |
|---|---|---|
| "Price-Determining-Activity" and "PDA" | Alternative 1: "any activity or combination of activities, other than offering or accepting a price, that is used to determine the price paid for the product or service"<br><br>Alternative 2: "any form of competition or entertainment activity or combination of such activities, other than offering or accepting a price, that is used to determine the price paid for the product or service" | "Inherently entertaining activity, such as a game, puzzle or quiz, that is used to set the product's price, but otherwise is collateral to its sale" |

The parties' proposals raise two principal disputes that are addressed below. A third, relatively minor, issue is whether a PDA is limited to a single activity or instead includes a "combination of activities." The claim language uses the indefinite article "a" (*e.g.* "a Price-Determining-Activity"), which means "one or more" such activities. *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008). Moreover, in describing the PDA in the invention, the specification explicitly states: "The activity may be … any other activity or combination of activities." 2:23-35. Accordingly, "combination of activities" should be part of the construction.

### A.     Issue 1: "competition or entertainment activity" or "any activity" *versus* "inherently entertaining activity"

The specification states that the PDA may be an entertaining and/or competitive activity or "any activity," and the Board of Patent Appeals expressly declared that the term PDA encompassed "any activity" in the claims as allowed. Defendants' proposal, however, would eliminate "competitive" activies altogether, would restrict PDA to an "entertaining" activity, and would further restrict it to one that is "inherently entertaining."

### 1. Claim language.

"The appropriate starting point for claim construction is always with the language of the asserted claim itself.  In general, words used in a claim are accorded their ordinary and customary meaning." *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 884 (Fed. Cir. 2008) (internal quotes and cites omitted).

Nothing about the claim language "Price Determining Activity" supports a limitation of "inherently entertaining."  There is no context where the words "price" or "determining" have the meaning "inherently entertaining."  Accordingly, the limitation "inherently entertaining" may be inserted only if it is found in a special definition or clear disavowal in the intrinsic record. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1120 (Fed. Cir. 2004) ("subject to any clear and unmistakable disavowal of claim scope, the [claim] term . . . takes the full breadth of its ordinary meaning").

### 2. Specification.

The specification supports Plaintiff's proposal and precludes Defendants' for four reasons.

(1)  In describing PDAs, the specification <u>never</u> states that they are limited to activities that are "inherently entertaining."  The Defendants cite to lists of examples of games as PDAs.  But such lists are always preceded by the word "may" (*e.g.* Abstract, 4:3-11; 5:23-28), which means that the listed features are permissive and not required limitations.  *In re Johnston*, 435 F.3d 1381, 1384 (Fed. Cir. 2006) ("this additional content did not narrow the scope of the claim because these limitations are stated in the permissive form 'may'"); *Kao Corp. v. Unilever United States, Inc.*, 334 F. Supp. 2d 527, 545 (D. Del. 2004) ("the specification, through the use of the term 'may,' offers these two formulations as examples only.… This permissive 'may' language does not restrict the claimed invention").

Moreover, such lists do not conclude with "or other inherently entertaining activities"; rather, the lists conclude with "or <u>any other</u> activity."  Abstract; 4:3-11; 5:22-28.  The phrase "or

any other" suggests a very broad scope.

(2) Most significantly, the specification expressly states that the PDA in the invention includes activities that are <u>not</u> inherently entertaining:

- "The present invention relates … more particularly to systems and methods wherein various forms of <u>competition and/or entertainment</u> are used to determine transaction prices between buyers and sellers." 1:8-13 (emphasis added)

- The "present invention comprises [a method where] [v]arious forms of electronic <u>competition and/or entertainment</u> are used as intermediary activities between said buyers and sellers to ultimately determine a contract price." 2:15-20. *See also* 1:57-59 ("a competitive/ entertaining collateral price-determining activity (PDA)"); 2:4-8 ("competitive/entertaining activities.").

By stating that the invention comprises PDAs that are a form of competition "and/or" entertainment, the specification declares that the PDA may be:

(i) competition that is <u>not</u> entertainment,

(ii) competition that is entertainment, *or*

(iii) entertainment that is not competition.

Thus, the specification explicitly states that the invention includes activities that are <u>not</u> <u>entertainment</u>.

These passages could support a limitation that the PDA must be a form of competition <u>or</u> entertainment, but that is a far cry from Defendants' limitation. First, it is not just "entertainment." Second, when a PDA is entertaining, there is no requirement that it be *inherently*" entertaining. A ready example is a "quiz" (which Defendants admit is a PDA). Most people taking quizzes do not find them "entertaining," but rather find them anxiety-producing, frustrating, or challenging. Thus, while a quiz that may be entertaining to some, it is not "inherently" entertaining.

(3) The specification includes examples of PDAs that are not inherently entertaining. One example is the quiz discussed above. Another is "a simulated investment in a stock market." 7:54-65. Picking stocks can have entertainment value, or it can instead be frustrating and taxing.

It is not "inherently" entertaining.

(4)  The specification mentions the concept of "inherent entertainment" in only one place. In detailing embodiments of what the invention "may" be, it describes PDAs where the buyer may face an opponent and, if so, the opponent may be a person rather than a computer, and, if so, the opponents "may even be people who are not buyers, but are merely players, participating in the PDA merely for the inherent entertainment value thereof."  8:64-67.  Thus "inherent" appears only in a phrase identifying an optional feature (among many), of a particular type (among several) of what one of the preferred embodiments "may even be."  The claim language may not be restricted by limitations found in specification embodiments, particularly those identified with the permissive "may." *Verizon Servs. Corp. v. Vonage Holdings Corp*., 503 F.3d 1295, 1303 (Fed. Cir. 2007) ("This court has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification." (internal quotes omitted)).

### 3.     Prosecution history.

The prosecution history also undermines Defendants' "inherently entertaining" limitation.

In the applicant's appeal briefs to the BPAI, the applicant argued to distinguish prior art because "Competition and/or entertainment qualities are inherent in the Appellant's recitation of the use of a PDA, in Claim 1."  Exh. 6 [P230-261].  This directly undermines Defendants' "inherently entertaining" limitation for three reasons.

First, this passage explicitly states that a PDA may have "competition and/or entertainment qualities", *i.e.* that a PDA may be competition that is <u>not</u> entertaining.

Second, the patentee did not assert that the PCA must be "inherently" competitive and/or entertaining.  Rather, the patentee argues that competition and/or entertainment are inherent in (*i.e.* must be found in) the recitation in the specification.

Third, and perhaps most significantly, the BPAI expressly rejected the patentee's argument and issued the patent with a claim scope where a PDA is "any other activity or combination of

activities." Exh. 7 [P317]. The Board reasoned:

> "We find nothing in claim 1 that limits the claim to only 'competitive or entertainment based' activity. Rather, the claim merely recites 'a Price-Determining-Activity (PDA).' Nothing in the claim requires that the PDA be read as competitive or entertainment-based." Exh. 7 [P317].

A patentee's prosecution arguments about claim interpretation are generally binding, even if the examiner does not rely upon those argumens. However, when the PTO expressly states an interpretation, and the patentee does not thereafter dispute that interpretation, the PTOs' interpretation is deemed to have been adopted by the patentee. "Whether the patentee chooses to dispute the examiner's view of matters is relevant to claim interpretation, for there a court may need to <u>ascertain exactly what subject matter was actually examined and allowed by the PTO</u>. Patent examination would serve little purpose unless <u>the scope of the exclusive patent right correlated with the matter allowed by the PTO</u>." *TorPharm Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003) (internal citations omitted, emphasis added).

Accordingly, a PDA is not limited to "inherently entertaining" activities. It should be construed as either "any other activity" as the PTO ruled, or "any form of competition or entertainment activity," as the patentee asserted in the specification and prosecution history.

**B. Issue 2: "other than proposing or accepting a price"** *versus* **"collateral to its sale"**

Both sides agree that the construction of "price-determining-activity" must include the concept of a "collateral" activity because the specification repeatedly uses the phrase "collateral activity" as a substitute for PDA. For example:

- The Abstract states that the invention "allow[s] buyers to reduce the price of the selected product/service based on the buyer's performance <u>during a collateral activity</u>…. The ultimate price is within the agreed upon range, but is determined based upon the buyers performance <u>during the collateral activity</u>." Abstract.

- The summary of invention states: "The ultimate price (within the range) is determined based upon the buyer's performance rating, or score, which the buyer receives from participating in a <u>collateral activity</u>." 2:23-25.

*First*, when used in this context, "collateral" means "situated or running side by side" something else or "coinciding in tendency or effect but extrinsic to another consideration." *The Amer. Heritage Dict.* 362 (4th ed. 2000) (Exh. 9 [P 22635]) ("Situated or running side by side; parallel" or "coinciding in tendency or effect; concomitant or accompanying"); *Random House Webster's Dict.* 138 (4th ed. 2001) (Exh. 11 [P 22766A]) ("Accompanying; auxiliary" or "Situated or running side by side; parallel"); *Webster's Third New Inter'l Dict.* 444 ((4th ed. 2001) (Exh. 10 [P 22742]) ("1. A: accompanying as a secondary fact, activity, or agency but usu. extrinsic to a main consideration: similar but subordinate. B: Indirect. C. serving to support or reinforce. … 3. Placed or regarded as side by side: parallel, coordinate, or corresponding in position, order, time, or significance").

The key question, therefore, is what is the main activity to which the PDA is collateral? The claim language and specification establish that Plaintiff's proposal ("other than offering or accepting a price") is correct and Defendants' proposal ("collateral to its sale") is not.

*First*, because the collateral activity is a price determining activity, it logically follows that it must be secondary to a main activity that determines price, *i.e.* secondary to directly proposing a price or accepting an offer of a price. Because a direct price-determining activity is proposing or accepting a price, it follows that a collateral price-determining activity is an activity other than proposing or accepting a price.

By contrast, Defendants' proposal of "collateral to <u>its sale</u>" makes no sense. The PDA is not parallel to and separate from the "sale." Rather, the PDA is a component of the sale (along with other components such as an agreed upon price range, submitting payment information, etc.). Moreover, the PDA is not something that accompanies (and is separate from) a "sale" with the two coinciding in their effects to produce some third result. Rather, the PDA accompanies a proposed base price or price range and both of those coincide to produce a resulting price (which, in turn, is a component of the "sale"). The PDA is collateral to direct price setting activity and, therefore, is

something other than proposing or accepting a price.

*Second*, the structure of claim 18 further supports Plaintiff's construction. If a PDA could simply be proposing or agreeing to a price, then any competitive auction would be a PDA and any of the prior art Internet auction sites would meet the limitations of claim 18. Therefore, if a PDA could simply be proposing or agreeing to a price, then claim 18 would make no sense because it would not describe an invention.

*Third*, the specification supports Plaintiff's proposal. It distinguishes the invention from "e-commerce business … wherein the seller offers a specified product at a specified price," and from sites such as "Onsale.com and eBay.com [which] use auction models" where "buyers then bid on" products. 1:41-44. The specification explains that none of these allowed a buyer to determine price "depending on the buyer's performance during the collateral activity." 1:57-62. That is, the specification contrasts acts of proposing or accepting a price with a "collateral activity," which strongly suggests that for a PDA to be "collateral" means that it is an activity other than proposing or accepting a price.

## II. "price being . . . scaled to the performance of the buyer"

| Phrase | Plaintiff's proposal | Defendants' proposal |
|---|---|---|
| "price being … scaled to the performance of the buyer" | "price being adjusted to a standard (defined by a ratio, table, or other algorithm) according to the performance of the buyer, such that achieving a better performance level results in a lower price than would otherwise apply" | "price being assigned from a predetermined set of graduated prices and corresponding performance levels, in which a lower price always corresponds to a better performance in the PDA and a higher price always corresponds to a worse performance in the PDA" |

Plaintiff's proposal is consistent with the intrinsic record and ordinary meaning; Defendants' proposal seeks to add limitations not found in the claim language and is contrary to the intrinsic record. There are two areas of dispute, which are addressed in turn.

7

**A.     Issue 1:** "**standard (defined by a ratio, table, or other algorithm)**" *versus* "**predetermined set of graduated prices and corresponding performance levels**"

The crux of this issue is whether the standard for scaling the price can be a formula (for example, price inversely proportional to the buyer's score: [base price] / [buyer score]), or whether the standard must consist of a "predetermined set" of prices and corresponding performance levels (*i.e.* a table or list).

**1.     Claim language.**

Because the term "scaled" is not a term of art with "a specially defined meaning in the field … the ordinary and customary meaning attributed to this term . . . 'involves little more than the application of the widely accepted meaning of commonly understood words.'" *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 884 (Fed. Cir. 2008) (quoting *Phillips*, 415 F.3d at 1314)).

The term "scaled" appears in the context of a process for "determining the price … based at least partially upon the [performance] data." 9:43-45. In this context, "scaled" has the "widely accepted meaning" of adjusted to a standard, in particular by using a proportion or ratio. *The Am. Heritage Dictionary of the English Language* 1553 (4th ed. 2000) (Exh. 9 [P 22650]) ("2. To make in accord with a particular proportion or scale; 3. To alter according to a standard or by degrees; adjust in calculated amounts"); *Webster's Third New Int'l Dictionary* 2023 (2002) (Exh. 10 [P 22753B]) ("to measure by or as if by a scale … to pattern, make, regulate, set, or estimate according to some proportion, rate, standard, or control: increase or reduce according to a fixed ration"); *Random House Webster's Dictionary* 641 (4th ed. 2001) (Exh. 11 [P 22766B) ("the proportion that a represention bears to what it represents … to adjust to a standard or measure"); *Dictionary.com Unabridged* (v 1.1) (Exh. 14 [P 22723]) ("to adjust in amount according to a fixed scale or proportion").

Significantly, each of the definitions quoted above identifies a primary method of scaling as using a "proportion," "rate," or "ratio." For example, when a model is scaled 1:32, the model's dimensions are not found by looking them up in a table; they are based on calculating a ratio of

1 unit of the model for every 32 units of the original.  Thus, the ordinary meaning of "scaled" does not require a table of performance levels and prices; it includes adjusting to a standard using a formula, most commonly a ratio or proportion.

The claim context and certain dependent claims further establish that "scaled" cannot be limited to a predetermined set of prices and performance levels.

*First*, the claim states that determination of price may include factors other than the performance data: "determining the price … based at least <u>partially</u> upon the data."  9:43-45.  In such a case, price determination would have to account for one or more additional factors and could not be assigned based on a set of prices and corresponding performance levels.  The determination would need a formula or algorithm that includes the additional factors.

*Second*, dependent claims identify two added factors that preclude price determination based on a predetermined set of prices and performance scores.  Claims 13 and 22 add that "the price is determined at least partially upon results of an auction."  (We explain below in analyzing the term "auction," that the auction is something other than a PDA.)  Thus, for these claims price determination <u>must</u> make use of a ratio or other algorithm that considers both auction results and buyer's performance.  It is impossible to do this using only a set of performance levels and corresponding prices.  An example would be price = [auction price] x [standard score] / [buyer score].

Similarly, claims 10 and 28 add the limitation of "determining the price based at least partially upon a competition between the buyer and [another] participant using the PDA."  To determine price partially by the buyer's performance and partially by a competitor's performance requires an algorithm that includes both.  This cannot be done with a "predetermined set" of prices and buyer performance levels.  An example of such a formula would be Price = [base price] x [other participant score] / [buyer score].  Thus, if the base price were $10, Buyer scored 2000, and another participant scored 1000, then the price for Buyer would be $5 ($10 x 1000 / 2000).

9

Thus, Defendants' proposed "predetermined set" limitation is precluded by the express language of the dependent claims. And because the independent claims must be broader than the dependent claims, this also precludes importing the limitation into the independent claims.

### 2. Specification.

For four reasons, the specification reinforces that scaling of price to performance is not limited to a "set of prices" and may instead be based on an algorithm such as a ratio or proportion.

*First*, the specification refers to the mechanism for determining price based on performance as "a price determining algorithm associated with a PDA." 8:11. And it says that such an algorithm "may involve considerations of the number of players or buyers involved, and the skill level of those players" (8:11-13), *i.e.* it is <u>not</u> limited to a set of prices and corresponding performance levels. Similarly, the specification describes an embodiment that makes use of a "predetermined algorithm" to determine the price based on performance. 6:14.

*Second*, the specification describes embodiments where the scaling of price to performance is based on percentage and not a set table. 8:53-54 ("The decrease in price can be in dollar amount or percentage points"); 7:62-65 ("The difference … in percentage … points … may then be used to determine the price"). Similarly, it describe embodiments where price determination requires comparing the buyer's score to either a base score or to the score of another. 7:59-62 ("being compared to a raw score or the score of other players and/or buyers to determine the price he is entitled to pay for the specified product or service"). This cannot be accomplished using a set table that includes only the buyer's performance and resulting prices.

*Third*, the specification states that the actual price "<u>may</u> be a scaled set of prices (e.g. $1000.00, $1100.00, $1200.00, etc.)." 2:35-37. Thus, when the patentee referred to a "set of prices," the patentee used the permissive term "may," which means a set is one way of scaling, but is not the only way.

*Fourth*, most signficantly, at no point does the specification state that (i) "scaled" does not

encompass its core meaning of adjusting based on a proportion or ratio, or (ii) that "scaled" requires, or is limited to, a set of prices and performance levels.

### 3. Prosecution history.

"This court has emphasized … that in order to disavow claim scope during prosecution a patent applicant must clearly and unambiguously express surrender of subject matter." *Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008) (internal cites omitted). The prosecution history contains no disavowal that scaling of price to performance is limited to a "set of prices" or that it may not be based on a ratio or other algorithm. Two portions are relevant.

(1) The limitation "scaled to the performance of the buyer" was added by amendment. Exh. 3 [P105]. As support for the amendment, the applicant cited to "original specification at, e.g., page 3, line 22; and page 14, lines 1-9" Exh. 3 [P96], which corresponds in the issued patent to 2:35-37 and 7:42-44. Significantly, the applicant identified these two passages as <u>examples</u> ("e.g.") which means that other examples of scaling in the specification (*e.g.* by percentage or comparison) are not excluded. Moreover, the second of the cited examples scales by using an <u>algorithm</u> that produces lower prices for better performance rather than a predetermined set of prices and scores. 7:42-44 ("The score is then used to determine the price of the product or service at issue, in accordance with a mapping algorithm.").

What is of crucial importance, however, is not the specific content of these examples. Not even Defendants contend that the prosecution history means that the claims are limited to the exact details of the two examples. Rather, the decisive question is what feature from the examples did the applicant identify as distinguishing prior art? Significantly, the applicant did <u>not</u> say "the amendment distinguishes prior art that scaled by means of algorithm or ratio." Rather, the applicant stated that the claims are "patentable over the cited references, <u>because none of the references disclose determining a price scaled to a buyer's performance</u> during a PDA." Exh. 3 [P96]. Thus, the crucial feature identified by the applicant was that price was "scaled to the

buyer's performance" (*i.e.* "scaled" with its ordinary meaning), not that the claims were limited to scaling by means of a predetermined set of prices and scores.

(2) In an appeal to the BPAI, the patentee used the scaled limitation to distinguish prior art:

"Thus, the price of the product is determined based upon the performance of the buyer during the PDA. That is, the performance has a direct effect on the determination of the price of the product. Furthermore, the price is scaled to the performance of the buyer during the PDA, such that the better the buyer performs during the PDA, the lower the price will typically be of the product being purchased." Exh. 6 [P243]; *see also* Exh. 5 [P181].

Once again the patentee asserts that the significance of "scaled" is that better performance results in lower price (for example, a ratio formula with price inverse to the buyer's score), <u>not</u> that a predetermined set of prices and performance levels is used for scaling.

The claim language, specification, and prosecution history preclude Defendants' proposal and support Plaintiff's.

**B.      Issue 2: "than would otherwise apply" *versus* "always"**

Defendants include as a limitation that "a lower price <u>always</u> corresponds to a better performance," rather than that "a better performance level results in a lower price than would otherwise apply." The distinction is significant because, in all cases, a scaled price will be lower than it would have been without the better performance level. But if price determination is <u>partially</u> (*i.e.* not exclusively) based on buyer performance, then those other price determining factors may push up the price such that a better performance still yields a higher absolute price.

For example, assume a system that sets price partially based on the buyer's performance and partially on a competitor's performance. Assume it uses the algorithm: [price] = [base price] x ([B2 score] / [B1 score]), where B1 is the Buyer and B2 is the competitor. Assume that during the first iteration, with a base price of $10, Buyer 1 scores 200 and Buyer 2 scores 100. The price would be $5 ($10 x 100 / 200). Assume that in the next iteration, Buyer 1 improves its score to 300. Even though Buyer 1 has a better performance than before, if Buyer 2 also improves its score to 300, the price will go <u>up</u> to $10 ($10 x 300 / 300). However, that price is lower *than it*

*otherwise would have been.* If Buyer 1 had the same score as before (200), the price would have been $15 ($10 x 300 / 200). Thus, by improving its performance, Buyer 1 gets a better price ($10) relative to the price that otherwise would have applied ($15).

The claim language, specification, and prosecution history confirm that Defendants' "always" limitation is improper.

*First*, as discussed above, the claim language expressly includes that the price may be determined only "partially" by scaling to the buyer's performance in the PDA. 9:44. Dependent claims 10 and 28 include "determining the price based at least partially upon a competition between the buyer and [another] participant." As shown in the example above, these claims are incompatible with Defendants' "always" limitation, but fully consistent with "than otherwise would apply." Similarly, dependent claims 13 and 22 add a limitation of determining price "at least partially" upon an auction. If the effects of the auction push the price up, then better performance will result in a lower price than would otherwise apply, but the price may be higher due to the countervailing effects of the auction.

*Second*, the specification does not require an "always" limitation. In fact, the specification includes an example where price is determined partially by the performance score and partially by other factors such that the exact same score can result in a higher price: "Thus, upon execution of a PDA in one case, a score of 100,000 may entitle the buyer to a $500.00 price, whereas the same PDA may entitle a different buyer to a price of only $525.00 for the same product." 7:16-24. And it includes an example where a relatively better score can still result in a higher price, because the buyer's score is "compared to … the score of other players and/or buyers to determine the price he is entitled to pay." 7:59-62.

In a particularly telling example, the specification states: "the buyer may be entitled to a further discount of the auction or reverse auction price, which discount may be greater if the buyer performs well at the PDA." 4:38-43. In this embodiment, the buyer does not always get a lower

absolute price for better performance, because price paid is also a function of the auction price. But the buyer does receive a discount off of the auction price based on better performance -- *i.e.* it is lower than it otherwise would be.

*Third*, the prosecution history contains no disavowal that would justify Defendants' limitation. In fact, the patentee said that price being scaled to the performance of the buyer, gives a result "such that the better the buyer performs during the PDA, the lower the price will typically be," *i.e.* not "will always be." Exh. 6 [P243]; Exh. 5 [P181].

## III.     "accepting"

| Phrase | Plaintiff's proposal | Defendants' proposal |
|---|---|---|
| "accepting a first request from the buyer to buy the product" | "receiving with consent or approval a request from the buyer to buy the product or service" | "accepting from the buyer a selection of the product to buy" |
| "accepting a second request from the buyer to allow the price to be determined" | "receiving with consent or approval a second request from the buyer to allow the price to be determined" | "accepting a request from the buyer that the price of the selected product be determined" |
| "accepting acknowledgement from the buyer representing an intent of the buyer to buy the first product" | "receiving with consent or approval an acknowledgment from the buyer representing an intent of the buyer to buy the first product or service" | "accepting from the buyer a selection of the first product to buy" |

### A.     Issue 1: "receiving with consent or approval" vs. "accepting"

Defendants have declined to offer any construction of the word "accepting."

#### 1.     Claim language.

In the claims, the context for "accepting" is something that occurs to a "request from the buyer" to buy, or to an "acknowledgement from the buyer representing an intent … to buy." In this context, the ordinary meaning of "accepting" is "receiving with consent or approval." *Webster's Third New Int'l Dictionary* 10-11 (4th ed. 2001) (Exh. 10 [P 22736-22737]) ("to receive with consent (something given or offered); assent to the receipt of"); *The Am. Heritage Dictionary of the English Language* 10 (4th ed. 2000) (Exh. 9 [P 22629]) ("To receive (something offered),

esp. with gladness or approval"); *Random House Webster's Dictionary* 5 (4th ed. 2001) (Exh. 11 [P 22764]) ("To receive willingly or with approval").

### 2. Specification.

The specification reinforces that "accepting" means more than just "receiving," but connotes receiving with approval. The specification explained that the invention was not merely allowing someone to participate in a PDA as a means of giving them the option to buy or not buy after seeing the results of the PDA; rather, the claimed method would create a binding contractual obligation on the buyer before the buyer knows the results of the PDA.

<u>First</u>, the inventor explained that the invention was an improvement on "systems [that] typically do not <u>bind the player to a contract</u>, but merely provide an offer to the player/buyer to enter into a contract on the specified terms." 1:63-2:3. The inventor explained that "[t]he present invention comprises" a system where "Sellers offer a product or service within a specified price range and buyers <u>enter into a contract</u> to buy the product or service within that price range." 2:15-23.

*Second*, the concept of a contractual obligation was further emphasized in many of the described embodiments:

- "The present invention thus may be used independently of other business models, or in combination therewith, to form binding contracts," 4:36-43;

- "by beginning the PDA, he or she has entered into a binding contract," 5:18-22;

- "facilitate the creation of a binding contract upon the buyer," 7:37-39.

Because express or implied assent is a prerequisite to a binding contract, the "accepting" steps should be construed as more than receiving, but rather as receiving with approval, so as to "facilitate the creation of a binding contract upon the buyer." *Id*.

### B. Issue 2: Defendants' additional "selection of the product" limitation.

Defendants seek to add as a limitation to claim 1 that the buyer communicates a selection of a product. The intrinsic evidence precludes that limitation.

## 1.     Claim language.

A system could be designed that calls upon the buyer to select a PDA, select a price range, select a product, select none of these, or select any combination of these. The patent claims include various combinations of these three types of selection. Defendants, however, propose constructions that would import selection of a product into all of the claims, even where the claim language itself does not contain – or even precludes – that limitation.

*First*, in claim 1, step [a] requires communicating "a description of a product" to the buyer. The word "a" means one or more. *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008). Accordingly, this step may be satisfied by communicating a single product description, and, in such a case, no product selection would be made by a buyer. This unambiguous claim language precludes Defendants' proposal to add "selection of a product" as a limitation.

*Second*, unlike claim 1, claim 18 requires presentation of a plurality of products to the buyer. In such a system, selection by the buyer would have to take place. Nevertheless, even in claim 18 selection by the buyer is <u>not</u> a <u>claim limitation</u>. It is improper to add an unclaimed step even if it is one that would necessarily occur. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1343-44 (Fed. Cir. 2001) (even though the process would logically require an intervening step of "IMM sends the request reproduction code to the ICM" that step is "not claimed"); *Charles E. Hill & Assoc. v. Amazon.com*, 2005 U.S. Dist. LEXIS 45414, 44-45 (E.D. Tex. Oct. 7, 2005) (Ward, D.J.) (because "the claims do not explicitly require the step … [t]he court is not persuaded to engraft another step into the sequence").

*Third*, Defendants' construction would turn step [b] of claim 1 on its head. Step [b] entails acceptance of a "request from the buyer to buy the product for a price to be determined within a price range." As discussed above "the product" may be the only product presented (with no selection by the buyer provided for). The step thus concerns acceptance of a price range from the

buyer (and product selection is either not done or is done in an unclaimed step). Defendants' proposal turns step [b] into acceptance of a product selection. That has it backwards.

Similarly, although product selection will take place in a system using the method of claim 18, that product selection <u>need not take place in step [b]</u>, which is where Defendants seek to import it. It could, for example, take place immediately prior to step [b].

*Fourth*, step [b] in claim 18 concerns accepting "acknowledgement from the buyer [of] an intent of the buyer to buy" a product at a price determined by a PDA. The core concept in this step of the buyer's acknowledgment of an intent to buy is <u>utterly missing</u> from Defendants' construction. In its place Defendants insert a new limitation of getting from the buyer "a selection of the first product." Defendants' construction would thus delete important claim language and add a limitation not found in the claim.

*Fifth*, when the patentee desired to include "selected by the buyer" as a claim limitation, the buyer explicitly included that language. This is shown in claims 16, 19, and 24 which add the limitation of a PDA "selected by the buyer." It is improper to import the "selected by the buyer" limitation into claims that do not contain this language. *Amgen Inc. v. Hoechst Marion Roussel*, 314 F.3d 1313, 1326 (Fed. Cir. 2003) ("when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former").

## 2. Specification.

Nothing in the specification alters the analysis of the claim language above. In particular, the embodiments plainly show (i) product selection, (ii) price range selection, and (iii) selecting a PDA as three different steps and do not require that product selection be combined with the other steps.

For example, Figure 1 shows what is labeled a "typical" embodiment that includes the step of product selection. However this embodiment <u>does not include</u> a buyer's request to buy the product for a price to be determined within a price range, as found in step [b] of claim 1. This is

inconsistent with Defendants' construction for claim 1, which would import product selection into step [b]'s acceptance of a buyer's request to buy in a price range.

Similarly, Figure 1 also explicitly separates the step of a buyer's selection of a product from the step of the buyer selecting a PDA. This is inconsistent with Defendants' construction of claim 18, which would import product selection into a step whose claim language is focused on a buyer's acknowledgment to use a PDA.

The separation of product selection from both the acceptance of a price range and PDA selection is further illustrated in the embodiment of Figure 2, where the system includes a "goods offered database" that may be separate and distinct from the "price acceptance database," and from the "price determining mechanism" database.

### 3. Prosecution history.

The prosecution history further undermines Defendants' proposal. Application claim 1 originally included a limitation of a PDA "selected by the buyer." Exh. 2 [P37]. During prosecution, the patentee removed this limitation and explained: "The amendment was made to eliminate the requirement that the PDA is selected by the buyer." Exh. 3 [P98].

This gives rise to two corollary inferences. First, this further demonstrates that when the patentee desired to limit a claim with "selected by the buyer," the patentee would include such express language. Second, the patentee expressly stated that the absence of "selected by the buyer" language is intended to signal that such a limitation is not found in the claim. Accordingly, because the claims do not contain an express "product selected by the buyer" limitation, that limitation is not found in the claims.

## IV. "first" and "second" / ordering of steps

| Phrase | Plaintiff's proposal | Defendants' proposal |
|---|---|---|
| "first" and "second" | "The terms 'first' and 'second' are used to distinguish one instance of the same thing from another.  For example, the phrase 'second request' means a request other than the 'first request.'  The terms 'first' and 'second' do not refer to time sequence." | "the 'first' request must precede and is separate from the 'second' request" |
| ordering of the steps | "The steps of claim 1 may be performed before, at the same time as, or after any other step, except that steps [b], [c], and [d] must occur before step [e].  The steps of claim 18 must be performed in order." | "the steps of the asserted claims must be performed in order" |

### A.  Governing legal standard.

_Basic test_: "Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." _Altiris, Inc. v. Symantec Corp._, 318 F.3d 1363, 1370 (Fed. Cir. 2003) (internal quotes omitted).  The court uses "a two-part test for determining if the steps of a method claim that do not otherwise recite an order, must nonetheless be performed in the order in which they are written.  First, we look to the claim language to determine if, as a matter of logic or grammar, they <u>must be performed</u> in the order written.  If not, we next look to the rest of the specification to determine whether it directly or implicitly <u>requires</u> such a narrow construction.  If not, the sequence in which such steps are written is not a requirement." _Id_. (emphasis added).

The fulcrum of the test, therefore, is whether the step "must be" performed in the order written; not whether it could be or may be performed in that order.  If two steps could logically be performed in either order, they are not construed to require a specific order.  _Gwin, Inc. v. Don Best Sports_, 548 F. Supp. 2d 342, 349 (E.D. Tex. 2008) (Davis, D.J.); _Connectel, LLC v. Cisco Sys._, 428 F. Supp. 2d 564, 573 (E.D. Tex. 2006) (Davis, D.J.).

_Antecedent basis_:  A step that uses antecedent basis and recites "said" or "the," referring to an earlier object, is not required to be performed after the step that first introduces the object; antecedent basis merely means that both steps make use of the _same_ object.  _Interactive Gift Express, Inc. v. Compuserve Inc._, 256 F.3d 1323, 1328, 1343 (Fed. Cir. 2001) (holding that step

one of a method claim can be performed after step four, even though step four referred to "the catalog code" introduced in step one, because "there is no reason why step one[] . . . must occur before step four[]").

For example, the method claim in *Altiris* recited:

"[a] testing automatically for automation boot sequence data, said test including reading a boot selection flag …

[b] setting said boot selection flag; and

[c] booting normally, if said testing automatically step indicates a normal boot sequence."

*Altiris*, 318 F.3d at 1370 (emphasis added). If antecedent basis alone were sufficient to compel order, then the reference to "said boot selection flag" in step [b] would have required that this step occur after step [a]. But the Federal Circuit held that "the 'setting' step can occur before, after, simultaneously with, or between any of the other steps." *Id.* It reasoned that "the claim language … neither grammatically nor logically indicates that the 'setting' step must occur in a particular order." *Id.* The use of antecedent basis meant only that the same "boot selection flag" must be used in both steps. If it is "technologically possible" to perform the steps in either order, then no order is imposed. *Altiris*, 318 F.3d at 1371; *see Respironics, Inc. v. Invacare Corp.*, 2008 U.S. App. LEXIS 25270 (Fed. Cir. Dec. 16, 2008) (non-precedential) ("Thus, in a method claim, a step that recites 'said' or 'the,' referring to an earlier object, does not always have to be performed after the step that first introduces the object.").

**B.      Claim language.**

The parties agree that claim 18 has a required order, but dispute the order in claim 1. We examine each step of claim 1 to see if it makes use of a result from a previous step. Claim 1 is reproduced above in the note regarding citations (pg. iv).

Step [a] can occur before, at the same time as, or after the other steps. The system could be designed such that step [a]'s presentation of one or more products occurs first. Alternatively, the system could be designed such that it accepts a buyer's price range for one or more products (step

[b]) and then presents to a buyer one or more available products (step [a]) that are within that price range. Steps [a] and [b] must relate to the same product or products ("a/the product"), but they may occur in either order.

That same system could similarly accept the buyer's request to use a PDA (step [c]), followed by presenting the buyer one or more products (step [a]). In that same system, step [a]'s presentation of one or more products could take place after the system receives the buyer's PDA performance data (step [d]), and after it determines the price in step [e] based on the PDA performance and price range. Such a system would likely need to present products to the buyer for selection before the determined price is *revealed* to the buyer, but price *determination* itself (step [e]) could certainly precede the presentation of products (step [a]).

Step [b] can occur before, at the same time as, or after steps [c] and [d]. The system can perform step [b]'s accepting of a request to buy in a price range either before or after step [c]'s accepting a request to use a PDA. Both requests relate to determining the same price ("a price/the price"), but accepting the requests may occur in either order. The words "first" and "second" in steps [b] and [c] carry no ordering significance. "As we have previously held, the use of the terms 'first' and 'second' is a common patent-law convention to distinguish between repeated instances of an element or limitation." *Free Motion Fitness, Inc. v. Cybex Int'l,* 423 F.3d 1343, 1348 (Fed. Cir. 2005) (internal quotes omitted). Similarly, step [b]'s acceptance of a price range request could occur before or after receiving the performance of the buyer in step [d]. However, the price range in step [b] must be accepted before step [e] because step [e] must make use of that range when determining price. Therefore, step [b] must occur before step [e].

Step [c] can occur before, during, or after step [d]. The system can receive the buyer's performance data in step [d] before or after it accepts in step [c] the buyer's request to use a PDA. For example, the PDA performance data (step [d]) could be transmitted at the same time as the buyer's request to use a PDA and then followed by the system's *acceptance* of the PDA request

(step [c]).  However, step [c]'s acceptance of a request to use a PDA must occur before step [e], which makes use of the PDA to determine price.  Therefore step [c] must occur before step [e].

Step [d] must occur before step [e], because step [e]'s price determination makes uses of the buyer's performance data received in step [d].

Thus, the only required order in claim 1 is that steps [b], [c], and [d] occur before step [e].

## C.    Specification.

Defendants assert that a particular order is required based on specification statements describing the embodiments of the invention.  That is improper.  "[T]he number of embodiments disclosed in the specification is not determinative of the meaning of disputed claim terms. Nor are claims ordinarily limited in scope to the preferred embodiment. These principles apply with equal force where, as is the case here, the limitation to be imported from the specification is an order of method steps."  *Altiris* at 1371 (citations omitted) ("the district court ran afoul of our prohibition against importing a limitation from the specification into the claims -- here the order of steps used by the sole, preferred embodiment"); *Baldwin Graphic Sys., Inc. v. Siebert, Inc*., 512 F.3d 1338, 1346 (Fed. Cir. 2008) (specification statements must "unequivocally preclude a different order of steps"); *Superspeed, L.L.C. v. IBM Corp*., 2009 U.S. Dist. LEXIS 10124, 16-17 (E.D. Tex. Feb. 11, 2009) ("that the steps happen in a specific sequence in the preferred embodiment is not enough to impose that limitation on the claim.").

Defendants' sole justification for their proposal is to point to specification passages that describe <u>examples</u> of the invention.  Defendants principally point to Figure 1 and the text describing that Figure.  But the text makes clear that Figure 1 does not encompass the full scope of the invention; rather it "illustrat[e]s the steps involved in a <u>typical</u> transaction."  4:26-28.  To be "typical" is to be representative but not the exclusive example.  Moreover, the text describing Figure 1 imposes no explicit requirement of an order.  At one point, the specification appears to suggest a required order for payment: "After the buyer selects a PDA, the buyer may provide

payment information."  5:4-5.  But the specification then clarifies that "This step, of course, <u>may occur at any stage in the process</u>, but preferably occurs prior to allowing the buyer to participate in the PDA."  5:13-15.

Moreover, the steps in Figure 1 prove that it is merely an example of the invention.  Figure 1 includes the step of "Buyer Selects Price Determining Activity."  But this is clearly not a required step of the claimed inventions, because it is found only in dependent claims 16 and 19. Moreover, Figure 1 makes no mention of a price range step, which is an explicit step in Claim 1. Thus Figure 1 illustrates <u>one</u> version of the invention; it does not define the scope of the invention.

The remaining passages cited by Defendants are also examples.  5:37-67 ("The following example will illustrate…"); 8:14-23 ("For example …").  While the specification may describe embodiments with an order, nowhere "is there any statement that this order is important, [or] any disclaimer of any other order of steps."  *Altiris*,  318 F.3d at 1371 (emphasis added).  Accordingly, no order is imposed in the specification.

## V.     "auction"

| Phrase | Plaintiff's proposal | Defendants' proposal |
|--------|---------------------|---------------------|
| "auction" | "process for selling a product or service by taking bids and selling to the winning bidder; an auction is not a PDA" | "a public sale of property to the highest bidder (as by successive increased bids)" |

### A.     Issue 1: Defendants' "highest bidder," "public," and "sale of property" limitations.

Defendants seek to add three limitations on the term auction: "highest bidder (as by successive increased bids)," "public," and "sale of property."  None of these is appropriate.

#### 1.     Claim language.

The term "auction" appears in the context of determining price of a product at least partially upon "participation of the buyer in an auction" (claim 13) or "results of an auction" (claim 22).  The claim language contains no suggestion that the auction must have the

characteristics of "highest bidder," "public," or "sale of property," and, in fact, precludes those limitations.

For example, Claim 22 refers to determining price based on "<u>results</u> of an auction" rather than "highest bid in an auction."  The broad word "results" plainly encompasses auctions where the winning bid is the lowest bid (*e.g.* competing bids from sellers) as well as those where the winner is the highest bidder.  Similarly, the claims state that an auction is used to determine price for a "product," which the patent defines as "product or service," and is not limited to "property." 9:25-27 ("the word 'product' in the appended claims is intended to include both products and services").

Moreover, the ordinary meaning of "auction" encompasses more than just a highest-bidder, public, sale-of-property auction.  "An auction is a process of buying and selling goods or services by offering them up for bid, taking bids, and then selling the item to the winning bidder." *Wikipedia*, Exh. 15 [P 22887].  The word "auction" encompasses the traditional English auction (a highest bidder, open outcry auction), as well as the Dutch auction, sealed first-price auction, Vickrey auction, reverse auction, and many others.  *Id.* at P 22889-91.

In a recent lawsuit concerning an electronic auction patent, Defendant Google adopted the statements of one of the country's leading auction experts, Dr. Paul Milgrom, who explained:

> "There are many different types of auctions. For example, auctions may be ascending, in which a valid new bid must exceed the last entered bid, or descending, in which a valid new bid must be less than the last entered bid, or neither.  Bids may be open, meaning that bidders are aware of each other's bids, or they may be sealed (as in, 'sealed envelopes'), meaning bidders are not aware of each other's bids. … Auctions vary widely in their formats and rules…."  Exh. 16 at 8 ¶25.

Defendants selectively cite to the narrowest dictionary definitions.  But those same dictionaries typically include broader definitions that are not limited to "highest bidder," "public," or "sale of property."  *Webster's Third New Int'l Dictionary* 142 (4th ed. 2001) ("the act or process of bidding"); *Random House Webster's Dictionary* 45 (4th ed. 2001) ("To sell at auction").  It is improper to choose a narrow dictionary definition when the context of the claim

language shows that a broader definition is appropriate.  *Phillips v. AWH Corp*., 415 F.3d. 1303,

1322 (Fed. Cir. 2005) (en banc) ("the authors of dictionaries or treatises may simplify ideas to

communicate them most effectively to the public and may thus choose a meaning that is not

pertinent to the understanding of particular claim language").

**2.**      **Specification and prosecution history.**

The specification contains no suggestion that the combination of a PDA and auction is

applicable only to a narrow subset of auctions.  In discussing the background of the prior art, the

specification identified auctions where the winning bidder was the lowest bidder (not merely the

"highest bidder"), where each bidder was unaware of the bids of other bidders (not merely

"public" bidding), and where bidding was "for a product or service" (not merely "property").

1:31-35 (e.g. "Priceline.com").  Similarly, in discussing embodiments of the invention, the

specification similarly includes examples of using PDAs with "reverse auction models" and with

"Priceline.com" where the bids of others are not disclosed.  4:34-36.

The prosecution history likewise does not disavow the ordinary meaning of auction.  In a

typical passage, the patentee stated, "Using an auction as an additional factor in determining the

price of a product is not obvious over the cited art, because though auctions were known in the art,

auctions were not used in combination with a PDA in which the price of a product was scaled to

the performance of a buyer while participating in the PDA."  Exh. 4 [P165].  The patentee thus

made no attempt to narrow the type of auction to which the claim applied, or to distinguish

particular auctions known in the prior art.  Instead, the patentee embraced all "auctions … known

in the art."  *Id*.

**B.**      **Issue 2: "an auction is not a PDA"**

The claim language and prosecution history make clear that the auction is not the PDA.

When the patentee sought independent claims to identify the PDA as a particular activity,

the patentee always used the formulation "the PDA is [a certain activity]."  Claims 17, 25, 29.  But

for the auction claims, the price is determined partially based on the results of a PDA and "the price is determined at least partially upon participation of the buyer in an auction." Claims 13, 22. That is, a PDA and an auction are *separate* factors that each *partially* determine price.

Furthermore, the patentee expressly stated in the prosecution history that an auction was "an additional factor" to the PDA and would be used "in combination with a PDA." Exh. 4 [P165].

## VI. "performance of the buyer"

| Phrase | Plaintiff's proposal | Defendants' proposal |
|---|---|---|
| "performance of the buyer" | "the buyer's actions or deeds in the Price-Determining Activity" | "the buyer's level of success (at the Price-Determining-Activity)" |

Plaintiff construes "performance" – consistent with the intrinsic record and ordinary meaning – as "actions or deeds." Defendants, however, define "performance" as "level of success" – *i.e.* as the buyer's score or rating for its performance – which slightly alters the meaning of the claims. While a buyer's level of success is a direct reflection of the buyer's actions or deeds ("performance") in the PDA, the actions and the resulting score are not identical concepts.

### A. Claim language.

The term "performance" appears in the context of the "performance of the buyer during the PDA," or "while participating in the PDA." In this context, the ordinary meaning of "performance" is "actions or deeds." *See Webster's Third New Int'l Dictionary* 543 (4th ed. 2001) ("a particular action or deed") (Exh. 10 [P 22753A]); *The Am. Heritage Dictionary of the English Language* 1306 (4th ed. 2000) ("something performed; an accomplishment") (Exh. 9 [P 22643]); *Dictionary.com Unabridged* (v 1.1) ("a particular action, deed, or proceeding") (Exh. 14 [P 22701]).

Although the quality of a "performance" determines its "level of success," the two concepts are not identical. For example, observing a pianist's performance refers to observing a

pianist's actions or deeds in playing the piano. It does not mean watching the pianists "level of success" while playing. Similarly, it makes perfect sense to refer to the "level of success of a performance" because the "performance" (the actions or deeds) and the "level of success" are separate concepts. Referring to an "excellent performance" refers to the quality of the actions or deeds.

The context of the claim language reinforces this analysis for two reasons.

_First_, the claims read "performance of the buyer <u>during</u> the PDA" and "performance of the buyer <u>while participating in</u> the PDA." The actions or deeds take place "during" and "while participating in." But a level of success is not known "during" or "while participating in" the performance; rather it is known upon completing the performance – it refers to the outcome.

_Second_, the claims state that the system "receiv[es] data [over the Internet] representing the performance of the buyer." The claims include embodiments where the buyer's performance takes place at its location (for example on a buyer's local desktop), and then data representing that performance is transmitted over the Internet to the system, which then assigns a score (*i.e.* a level of performance). Claim 31; 4:10-11; 5:22-27. In these embodiments, it is the actions of the buyer in performing the PDA that are transmitted, not the level of success (*i.e.* score). Thus "data representing the performance" includes embodiments where the data is not the level of success.

### B.  Specification.

In the specification, the patentee often distinguished a buyer's performance (i.e. actions in performing the PDA) from the buyer's level of success or score resulting from that performance. The specification discusses a buyer getting a lower price "if they can achieve a certain level of performance at the specified activity." 2:52-56. Here "performance" means the buyer's actions or deeds at the PDA, and is clearly distinct from the level of performance. Similarly, the patentee refers to the buyer's level of success by using the phrase "the buyer's performance rating, or score." 2:23-25.

## VII. "master controller"

| Phrase | Plaintiff's proposal | Defendants' proposal |
|---|---|---|
| "master controller" | "a device or subsystem that has overall control of other devices or systems" | "centralized server" |

Both sides agree that a "master controller" may take the form of a centralized server. Defendants, however, propose limiting the definition of "master controller" to mean <u>only</u> centralized servers. This is contrary to the claim language and the specification.

### A. Claim language.

The phrase "master controller" appears in claim 12 as something that "perform[s]" the steps of accepting requests from a buyer and receiving performance data over a global communications network. In the computing field, the ordinary meaning of "controller" is a device or subsystem that controls other devices or subsystems. *See Oxford Dictionary of Computing* 114 (5th ed. 2004) (Exh. 12 [P22760]) ("subsystem that governs the functions of attached devices"); *Microsoft Computer Dictionary* 128 (5th ed. 2002) (Exh. 13) [P22756] ("A disk controller, for example, controls access to one or more disk drives"); *WordNet 3.0*, (Exh. 14 [P22667]) ("a mechanism that controls"). The word "master" used as an adjective means something that has overall control of other parts. *See The Am. Heritage® Dictionary of the English Language* 1077-1078 (4th ed. 2000) (Exh. 9 [P22636]) ("controlling all other parts of a mechanism").

Accordingly, the ordinary meaning of the claim language in context is "a device or subsystem that has overall control of other devices or subsystems." The claim language contains no suggestion that a master controller must be a "server" or that it must be a "centralized" device, as opposed to, for example, a subsystem distributed over two or three computers in different locations.

### B. Specification.

The specification precludes Defendants' proposal for three reasons.

<u>*First*</u>, the specification explicitly states that a "server" is only one example of a master

controller, and that a "master controller" can take some other form.

> "FIG. 2 is a block diagram showing <u>one embodiment</u> of an <u>operation controller 206</u> as used in accordance with the present invention. The <u>operation controller may be a computer server</u> which provides content to and manages a website implementing the concepts described herein. The buyer and seller interfaces (202 and 204 respectively) may comprise a PC 216 (see FIG. 3) connected to the <u>master operation controller 206</u>. . ." '253 patent 6:21-30.

This passage states that the depicted example is only "one embodiment" of the master operation controller. It further states that a master operation controller "may be a computer server," which necessarily means that a master controller may be something <u>other than</u> a computer server.

*Second*, the only place the phrase "centralized server" appears is in a passage stating that "[a] centralized server or controller may be implemented to manage all transactions." 4:18-21. Once again this passage includes the permissive "may," which means that it <u>may not</u> be centralized as well. Moreover by using the word "or," this passage explicitly identifies a server as one <u>alternative</u>. *Schumer v. Lab. Computer Sys.*, 308 F.3d 1304, 1311-1312 (Fed. Cir. 2002) ("We have consistently interpreted the word 'or' to mean that the items in the sequence are alternatives.").

*Third*, the specification explicitly states that the controller need not be centralized in a single computer, but rather can be distributed over units housed in separate locations. The specification incorporates by reference the contents of U.S. Pat. No. 5,794,207 ("'207 patent"). 1:35-37. The specification of the '207 patent, therefore, becomes a part of the specification of the '253 patent. It states:

> "While the above embodiment describes a single computer acting as <u>central controller</u> 200, those skilled in the art will realize that the functionality <u>can be distributed over a plurality of computers</u>. In one embodiment, <u>central controller</u> 200 is configured in a distributed architecture, wherein the databases and processors are <u>housed in separate units or locations</u>." 14:30-33 (emphasis added).

The patentee expressly rejected a limitation that a "central controller" must be "centralized."

## VIII.   "description of a product"/ "data representing a plurality of products"

| Phrase | Plaintiff's proposal | Defendants' proposal |
|---|---|---|
| "description of a product" | "information sufficient to identify a product or service" | "information sufficient to identify a particular product" |
| "data representing a plurality of products" | "data sufficient to identity two or more products or services" | "data sufficient to identify two or more particular products" |

There is little difference between the parties' proposals.  Defendants' rewrite the claims slightly by inserting the word "particular," a concept not found in the claim language.  Plaintiff's proposal is consistent with the ordinary meaning of the claim language and the intrinsic record.

## IX.   "price range"

| Phrase | Plaintiff's proposal | Defendants' proposal |
|---|---|---|
| "price range" | "upper and lower bounds within which the price may vary" | "specified upper and lower bounds within which the price may vary" |

The sole difference in the parties' proposals is Defendants' addition of the word "specified," a concept not found in the claim language.  Plaintiff's proposal is consistent with the ordinary meaning of the claim language and the intrinsic record.

## X.   Conclusion.

Plaintiff's proposals should be adopted and Defendants' proposals rejected.


Dated April 15, 2009                                    Respectfully submitted,

                                                   By:     /s/ Christin Cho                          

                                                            Christin Cho
                                                            CA State Bar No. 238173
                                                            Email: christin@dovellaw.com
                                                            Gregory S. Dovel
                                                            CA State Bar No. 135387
                                                            Email:  greg@dovellaw.com
                                                            Sean Luner
                                                            CA State Bar No. 165443
                                                            Email:  sean@dovellaw.com
                                                            Dovel & Luner, LLP
                                                            201 Santa Monica Blvd., Suite 600

Santa Monica, CA 90401
Telephone:  310-656-7066
Facsimile:  310-657-7069

S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
Capshaw DeRieux, L.L.P.
Energy Centre
1127 Judson Road, Ste 220
P. O. Box 3999 (75606-3999)
Longview, Texas 75601-5157
Telephone: (903) 236-9800
Facsimile: (903) 236-8787
Email:  capshaw@capshawlaw.com
Email:  ederieux@capshawlaw.com

Robert M. Parker
State Bar No. 15498000
Email: rmparker@cox-internet.com
Robert Christopher Bunt
State Bar No. 00787165
Email: cbunt@cox-internet.com
Parker & Bunt, P.C.
100 East Ferguson, Ste. 1114
Tyler, TX 75702
Telephone:  903/531-3535
Facsimile: 903/533-9687

Franklin Jones, Jr.
State Bar No. 00000055
Email:  maizieh@millerfirm.com
Jones & Jones, Inc., P.C.
201 W. Houston St.
P.O. Drawer 1249
Marshall, TX 75670

Otis W. Carroll, Jr.
State Bar No. 03895700
Email: fedserv@icklaw.com
6101 S. Broadway, Suite 500
Tyler, TX 75703

ATTORNEYS FOR PLAINTIFF
PERFORMANCE PRICING, INC.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document was served, via E-mil, on counsel for Defendants this 15th day of April, 2009.

<u>/s/ Christin Cho</u>
Christin Cho