UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| PERFORMANCE PRICING, INC., | |
| Plaintiff, | Civil Action No. 2:07-CV-432-LED |
| v. | |
| GOOGLE INC.; AOL LLC; MICROSOFT CORP.; AND YAHOO! INC. | JURY TRIAL REQUESTED |
| Defendants. | |

**DEFENDANTS' JOINT RESPONSE BRIEF ON CLAIM CONSTRUCTION**

Dockets.Justia.com

# TABLE OF CONTENTS

Background ..................................................................................................................1

I.      THE ASSERTED PATENT. .............................................................................1

II.     DURING PROSECUTION, THE APPLICANT AMENDED THE CLAIMS TO
        REQUIRE SCALING. ......................................................................................3

III.    THE ACCUSED ADVERTISING SERVICES. ...............................................3

Argument ....................................................................................................................4

I.      "PRICE-DETERMINING-ACTIVITY" ("PDA") (CLAIMS 1[C, D], 18[B], 30[B]). ......4

        A.      The Coined Term PDA Refers to a "Collateral" Activity........................5

                1.      The specification shows the PDA is a collateral activity..................5

                2.      The specification and prosecution history contradict Plaintiff's "other than
                        offering or accepting a price" language. ..........................7

        B.      The PDA Must Be an Inherently Entertaining Activity...........................8

                1.      The specification and prosecution history show the PDA is inherently
                        entertaining. ................................................8

                2.      Plaintiff's arguments that the PDA need not be inherently entertaining are
                        without merit. ...............................................10

        C.      Plaintiff's Overbroad Constructions of "PDA" Would Render the Patent
                Invalid Under 35 U.S.C. § 112 for Insufficient Written Description. ...................11

II.     "PERFORMANCE OF THE BUYER" (CLAIM 1[C, D, E], 18[B, C, D], 30[B,
        C, D]). ..........................................................................................................12

III.    "PRICE BEING . . . SCALED TO THE PERFORMANCE OF THE BUYER"
        (CLAIM 1[E], 18[D], 30[D]). .........................................................................13

        A.      Defendants' Construction Properly Defines the Disputed Term.............13

                1.      The specification describes that the price is assigned from a predetermined
                        set of prices and corresponding performance levels in which a lower price
                        always corresponds to a better performance in the PDA (and vice versa). ....13

                2.      The modifier "always" in Defendants' construction appropriately defines
                        the correlation between price and performance. ..........................15

                3.      The extrinsic evidence further supports Defendants' construction. ...............16

                4.      Plaintiff's arguments against Defendants' construction are without merit. ......17

B.  Plaintiff's construction is inconsistent with the intrinsic evidence and renders the scaling limitation meaningless and indefinite...................................................19

IV.  "DESCRIPTION OF A PRODUCT" (CLAIM 1[A])/"DATA REPRESENTING A PLURALITY OF PRODUCTS" (CLAIMS 18[A], 30[A]); "ACCEPTING A FIRST REQUEST FROM THE BUYER TO BUY THE PRODUCT" (CLAIM 1[B])/"ACCEPT[ING] ACKNOWLEDGMENT FROM THE BUYER REPRESENTING AN INTENT OF THE BUYER TO BUY THE FIRST PRODUCT" (CLAIM 18[B], 30[B])....................................................22

A.  The Claims Show that the Buyer Selects a Particular Product that Is Communicated to the Buyer. ..................................................................22

B.  The Specification Further Shows that the Buyer Selects the Particular Product Communicated. ....................................................................23

C.  Plaintiff's Constructions for the "Description of a Product" and "Data Representing . . ." Limitations Are Without Merit. ....................................25

D.  Plaintiff's "Receiving with Consent or Approval" Constructions Improperly Seek to Require a Binding Contract Before the PDA...........................25

V.  ORDERING OF THE STEPS OF THE ASSERTED CLAIMS (CLAIMS 1, 18, 30) / "FIRST" AND "SECOND" (CLAIM 1[B, C])..................................................26

VI.  "PRICE RANGE" (CLAIM 1[B, E], 11).............................................................27

VII.  "AUCTION" (CLAIMS 13, 22). ....................................................................28

VIII.  "MASTER CONTROLLER" (CLAIM 12).........................................................30

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Bid for Position, LLC v. AOL LLC et al.*, 2008 WL 5784151 (E.D. Va. 2008)............................ 16

*Bright Solutions, Inc. v. Tire Seal, Inc.*, 2008 WL 5428163 (E.D. Tex. 2008) ........ 6, 9, 13, 14, 24

*Carnegie Mellon Univ. v. Hoffmann La Roche Inc.*, 541 F.3d 1115 (Fed. Cir. 2008) ................. 11

*E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213 (Fed. Cir. 2007) ........................................... 27

*Free Motion Fitness, Inc. v. Cybex Intern., Inc.,* 423 F.3d 1343, (Fed. Cir. 2005). ......... 17, 26, 30

*Genzyme Corp. v. Transkaryotic Therapies, Inc.*, 346 F.3d 1094 (Fed. Cir. 2003) ...................... 6

*GWIN, Inc. v. Don Best Sports*, 548 F.Supp.2d 342 (E.D. Tex. 2008)........................................ 26

*Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244 (Fed. Cir. 2008) ............................ 21

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332 (Fed. Cir. 2003)............................. 21

*ICU Med. v. Alaris Med. Systs., Inc.*, 558 F.3d 1368 (Fed. Cir. 2009)........................................ 12

*Kao Corp. v. Unilever United States, Inc.*, 334 F. Supp. 2d 527 (D. Del. 2004)............................ 9

*Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*, 554 F.3d 1010 (Fed. Cir. 2009).......... 10, 15

*LifeNet, Inc. v. Musculoskeletal Transplant Found.*, 2007 WL 1815629 (E.D. Va. 2007).......... 26

*Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340 (Fed. Cir. 2004).............................. 6, 10

*MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372 (Fed. Cir. 2007) ......................................... 5, 10

*Pause Tech., LLC v. TIVO*, 419 F.3d 1326 (Fed. Cir. 2005) ....................................................... 15

*Respironics, Inc. v. Invacare Corp*, 303 Fed. Appx. 865 (Fed. Cir. 2008)................................... 27

*ResQNET.Com, Inc. v. Lansa, Inc.*, 382 F. Supp. 2d 424  (S.D.N.Y. 2005) ............................... 14

*SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262 (Fed. Cir. 2007)........................... 10, 15

*Techradium, Inc. v. Blackboard Connect Inc.*, 2009 WL 1152985 (E.D. Tex. 2009)................. 29

*TorPham, Inc. v. Ranbaxy Pharmaceuticals*, 336 F.3d 1322 (Fed. Cir. 2003) ...................... 8, 10

*White v. Dunbar*, 119 U.S. 47 (1886) ........................................................................................... 8

# NOTE ON CITATIONS

1. References to *Plaintiff Performance Pricing Inc.'s Claim Construction Brief* (April 15, 2009) are indicated by the abbreviation "Br.," followed by the page number being cited. "Br. 5" therefore refers to page 5 of Plaintiff's opening brief.

2. The patent-in-suit, U.S. Patent. 6,978,253, is attached to the *Declaration of Antonio Sistos* (May 15, 2009) ("Sistos Declaration") as Exhibit 1. References to the patent-in-suit are indicated by column and line number. A reference to "Col. 3:15" therefore means column 3, line 15 of the patent-in-suit.

3. The cited portions of the prosecution history of the patent-in-suit are attached to the Sistos Declaration as Exhibit 2. Citations to individual pages are indicated using document identification numbers (P___).

4. Other exhibits are attached to the Sistos Declaration as Exhibits 3 through 8. Defendants' other exhibits are referred to with the prefix "Ex." followed by the number of the exhibit in question. "Ex. 3" therefore refers to Exhibit 3 of the Sistos Declaration.

5. The full text of the asserted claims appears in Appendix A with the disputed terms identified.

The '253 patent describes a method in which a buyer selects a specific product (such as a baseball card) and may receive a published discount from the advertised price scaled to how well the buyer performs in an entertaining, collateral activity (such as a video game or trivia quiz). The patentee represented in the patent and before the Patent Office that this "marketing incentive" of allowing the buyer to obtain a reduced price corresponding to the performance in such an entertaining activity is what distinguished the patent from the prior art. Plaintiff, however, now urges constructions of the patent so broad as to cover systems in which the <u>seller</u> selects the product, the buyer pays <u>more</u> than the advertised price, and <u>any</u> activity other than offering or accepting a price can be used to set the price. Plaintiff's constructions purposely depart from the claimed invention in an improper attempt to ensnare Defendants' advertising systems – systems that are far afield from anything disclosed in the '253 patent. Accordingly, Defendants' constructions should be adopted and Plaintiff's constructions rejected.

## Background

### I.    THE ASSERTED PATENT.

The '253 patent has three independent claims. Of these, Claim 1 is illustrative:

1.    A method of doing business over a global communications network comprising the steps:

   (a)    communicating to a buyer via the global communications network, a description of a product;

   (b)    accepting a first request from the buyer to buy the product for a price to be determined within a price range;

   (c)    accepting a second request from the buyer to allow the price to be determined based upon a performance of the buyer while participating in a Price-Determining-Activity (PDA);

   (d)    receiving data from the buyer over the global communications network, said data representing the performance of the buyer during the PDA; and

   (e)    determining the price of the product based at least partially upon the data received, said price being within the price range and scaled to the performance of the buyer.

Claim 18 has similar, though slightly different steps than claim 1. Claim 30 adds a "computer server" programmed to perform the steps of claim 18. (Col. 11:15-16.) Plaintiff also

asserts several dependent claims reciting well-known e-commerce steps, such as accepting payment information (Claim 2), using an auction (Claim 13), and using the Internet (Claim 14). Plaintiff asserts that Defendants infringe claims 1-2, 9-15, 18, 20-23 and 30.

From the very first line of the Abstract, the '253 patent describes a business model "for conducting business transactions over the Internet, allowing buyers to reduce the price of the selected product/service based on the buyer's performance during a collateral activity." It purports to improve on existing business models, such as eBay, Amazon.com, and Priceline, that according to the patent, do not "allow a potential buyer to engage in a competitive/entertaining collateral price-determining activity (PDA) which ultimately determines the price of the product or service to be secured, depending on the buyer's performance during the collateral activity." (Col. 1:57-62.) The Summary of Invention asserts that by adding such a collateral activity to an e-commerce transaction, sellers can "attract buyers using the marketing incentive that buyers can reduce the price of the offered product or service by performing well at the specified activity." (Col. 2:44-47.) Buyers "are willing to accept the possibility of paying the highest price within [a] range, in exchange for the opportunity to pay the lowest price (or any lower price) within the range if they can achieve a certain level of performance at the specified activity." (Col. 2:52-56.) Buyers also receive "a side benefit of the entertainment value of the activity." (Col. 2:56-59.)

The specification provides an example of "Buyer Bobby" buying a baseball card. He goes to a website "and finds that he can buy a Mark McGwire rookie card in mint condition, if he is willing to pay anywhere between $500.00 to $575.00." (Col. 5:44-47.) He selects the card by clicking "on the Mark McGwire image to proceed (step 110)." (Col. 5:47-48; Fig. 1 (step 110) ("buyer selects product or service to buy").) "He is then presented with a pull-down menu of five different 'games' (PDAs) to choose from," a trivia quiz, bridge, keno, sports bet, and a video game. (Col. 5:49-60.) Buyer Bobby chooses the trivia quiz, and is presented with a set of graduated prices and corresponding performance levels associated with this quiz. (Col. 5:60-67.) According to this predetermined set of price-to-performance correlations, if Buyer Bobby answers 5 out of 10 questions correctly, "he will get the card for $560.00." (*Id.*) However, if

"[h]e gets 9 answers correct, . . . according to the predetermined algorithm as presented to him at the start of the game, his performance locks in the price at $500.00." (Col. 6:13-6:16.)

The specification also describes a video game with a published set of graduated prices and corresponding performance levels. In this example, "a score of less than 100,000 points may correspond to the $575.00 price, 100,000 to 199,999 may correspond to a $550.00 price; 200,000 to 299,999 may correspond to a $525.00 price; and a score of 300,000 or more may correlate to the lowest price available, $500.00." (Col. 7:44-49.) In another example, the seller configures a "horse racing PDA" with a published set of graduated prices and performance levels "such that three horses with the best times will receive the widget for only $75.00; numbers 4-6 will pay $100.00, and numbers 7-9 will pay $125.00." (Col. 8:19-22.)

## II.     DURING PROSECUTION, THE APPLICANT AMENDED THE CLAIMS TO REQUIRE SCALING.

The Examiner initially rejected all of the independent claims as anticipated by U.S. Patent 5,855,008 to Goldhaber et al. (P 00079-81.) To avoid the prior art, the applicant amended the independent claims to require that the price be "scaled to the performance of the buyer" in the PDA. (P 00105.) The Examiner, however, still rejected the claims and the applicant appealed to the Board of Appeals and Interferences. (P 00229-61.)

On appeal, the applicant raised several arguments to distinguish U.S. Patent. 4,850,007 to Marino. For example, the applicant argued "[a]ppellant's invention uses PDAs such as a video game, electronic board game, gambling game, sports bet, etc. to encourage customers to engage in the activity of buying products." (P 00239.) And the applicant explained that "the buyer also receives a side benefit of the entertainment value" of the PDA. (*Id*.) The Board found Marino did not teach "scaling," but rejected the applicant's other arguments. (P 00210-25.)

## III.     THE ACCUSED ADVERTISING SERVICES.

Defendants all sell advertising in connection with Internet search results. Advertisers submit ad text, choose "keywords" that trigger their ads, and submit how much they are willing to pay when a user clicks on their ads. When an end user search query matches a keyword

chosen by an advertiser (e.g., "digital camera"), the search engine may display that advertiser's ad (e.g., for a website selling digital cameras) on top of or next to the search results.

Each Defendant displays ads according to a different and complex analysis, although there are some common operations. Defendants each compute a multiplier associated with each ad, which is calculated using a variety of factors such as historical end user responses. Defendants then apply the multiplier to the bid to compute a rank number, and display the ads according to rank number. Advertisers are typically charged either if ads are displayed or clicked by a user. Charges per display or per click are computed based on the multiplier for the next-lower ad. No advertiser can opt out of the rules used to rank ads and calculate ad cost.

No advertiser performs a collateral activity of any kind to set, or get a discount on, the price paid per click or display. No Defendant assigns click prices based on a published set of prices provided to advertisers corresponding to performance in a collateral, entertaining activity. And no Defendant allows an advertiser to select a particular ad space that has been communicated to the advertiser. These differences between the accused advertising services and the claimed methods of the '253 patent underlie the parties' claim construction disputes.

## Argument

### I. "PRICE-DETERMINING-ACTIVITY" ("PDA") (CLAIMS 1[C, D], 18[B], 30[B]).

| Defendants' Construction | Plaintiff's JCCS Construction | Plaintiff's New Construction |
|---|---|---|
| inherently entertaining activity, such as a game, puzzle or quiz, that is used to set the product's price, but otherwise is collateral to its sale | any activity or combination of activities, other than offering or accepting a price, that is used to determine the price paid for the product or service | Alternative 1: JCCS Construction<br><br>Alternative 2: any form of competition or entertainment activity or combination of such activities, other than offering or accepting a price, that is used to determine the price paid for the product or service |

"PDA" is the admittedly-coined term for the collateral activity that determines the amount of the discount, if any, that the buyer will receive. Defendants submit this coined term should be interpreted – consistent with each embodiment disclosed in the specification and the

expressed purpose of driving sales in e-commerce transactions – as an entertaining activity that may provide a price discount, but is otherwise collateral to the sales transaction. Plaintiff argues the PDA can be (1) "<u>any</u>" activity that affects the price as long as it is not an offer or accepting of a price (JCCS construction) or (2) any form of competition or entertainment activity that affects the price other than offering or accepting a price (new construction).[1]

### A.    The Coined Term PDA Refers to a "Collateral" Activity.

#### 1.    The specification shows the PDA is a collateral activity.

There is no dispute that "PDA" is a coined term for the '253 patent. Accordingly, reference to the specification is necessary to determine its meaning. *See MyMail, Ltd. v. Am. Online, Inc*., 476 F.3d 1372, 1376 (Fed. Cir. 2007) (finding that because "the term NSP is a coined term," the court "look[s] to the specification to determine what the NSP must do").

The patent describes the PDA as a "collateral" activity that determines the level of discount and, hence, the final price for the purchased product. The Summary of Invention says "[t]he ultimate price (within the range) is determined based upon the buyer's performance rating, or score, which the buyer receives from participating in a <u>collateral</u> activity." (Col. 2:23-25. (emphasis added).) The purpose of the PDA is to "attract buyers using the marketing incentive that buyers can reduce the price of the offered product or service by performing well at the specified activity." (Col. 2:44-47.) Because these statements appear in the "Summary of the Invention," the reader can properly conclude that they are "not limited to describing a preferred embodiment, but more broadly describe the overall inventions." *Microsoft Corp. v. Multi-Tech*

---

[1]    On February 12, 2009, the parties filed a Joint Claim Construction Statement pursuant to Patent Local Rule 4-3, in which each party included its proposed constructions of the disputed terms. (Dkt. 166.) Less than 48 hours before filing its Opening Brief, Plaintiff proposed new constructions for 5 of the 13 terms, and added a sixth new construction in its actual briefing. Plaintiff now relies on these new constructions in its brief. Due to Plaintiff's failure to comply with the requirements of Patent Local Rule 4-3(b), Defendants were unable to present intrinsic or extrinsic evidence as to them in the filing of the JCCS. Defendants objected to Plaintiff's eleventh hour change, yet Plaintiff did not disclose in its brief that these constructions were not in the JCCS. In light of Plaintiff's failure to comply with the requirements of Patent Local Rule 4-3, its proposed new constructions should be excluded from consideration.

*Sys.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004), *cert. denied*, 543 U.S. 821 (2004); *Bright Solutions, Inc. v. Tire Seal, Inc.*, 2008 WL 5428163, at *13 (E.D. Tex. 2008) ("This description is not merely referring to a preferred embodiment; rather, as part of the 'Summary of the Invention,' it is 'commensurate with the invention as claimed.'") (*quoting Wireless Agents LLC v. Sony Ericsson Mobile Communications AB*, 189 Fed. Appx. 965, 967 (Fed. Cir. 2006)). The Abstract similarly says that "[s]ellers offer the product/service within a specified price range, and buyers accept the offer, in exchange for the opportunity to close the transaction at the lowest price by achieving a high score during the <u>collateral</u> activity." (Abstract (emphasis added).) *See Genzyme Corp. v. Transkaryotic Therapies, Inc.*, 346 F.3d 1094, 1099 (Fed. Cir. 2003) (finding that statements in a patent's "Summary of the Invention" and "Abstract" portions limited the scope of a phrase in the patent's claims to a specific technique).

As the patent explains, once the buyer knows the price (e.g., as determined by an eBay auction or Priceline reverse auction), "the buyer may be entitled to a further discount of the auction or reverse auction price, which discount may be greater if the buyer performs well at the PDA, and not so great if the buyer performs poorly." (Col. 4:39-43.) Indeed, the purported inventive contribution of the patent, the PDA, is an activity added to the prior art systems and their sale transactions to establish the amount of the discount. The PDA (and any discount that entails) serves as a marketing incentive, but is not otherwise part of a conventional sales transaction. If the buyer decides not to engage in the PDA, he would pay the advertised price as he normally would. Accordingly, Defendants' construction includes "collateral," a readily understandable word used consistently as a determining characteristic of the PDA. Indeed, even Plaintiff admits the specification shows the PDA is a "collateral" activity.[2] (Br. 5.)

---

[2] Plaintiff argues because the PDA is used to set the price, it cannot be collateral to a sale as Defendants' construction provides. (Br. 6-7.) But Plaintiff ignores that Defendants' construction provides that the PDA is "used to set the price," but is "<u>otherwise</u> collateral to its sale."

2. <u>The specification and prosecution history contradict Plaintiff's "other than offering or accepting a price" language.</u>

Plaintiff's JCCS construction provides that the PDA can be "<u>any</u> activity or combination of activities, <u>other than offering or accepting a price</u> that is used to determine the price paid for the product or service." There is no support in the patent for including Plaintiff's "other than offering or accepting a price" language. It never appears in the specification. Plaintiff nevertheless argues "because the collateral activity is a price determining activity, it logically follows that it must be secondary to a main activity that determines price, *i.e.* secondary to directly proposing a price or accepting an offer of a price." (Br. 6.) But Plaintiff does not explain why the only "main" activity that would determine a price in a typical transaction is offering or accepting a price, such that <u>any</u> other price-affecting activity is "collateral."

In fact, Plaintiff's proffered construction would include as "collateral activities" customary, essential steps in sales transactions, including those that typically control the price in the absence of any PDA. For example, under Plaintiff's construction, a buyer's selection of a product could be a PDA, as it is not an offer or acceptance of a price. But typically, the selection of a product would be the "main" activity that determines price as different products often have different prices. Similarly, entering payment information could be a PDA under Plaintiff's construction, as some merchants offer discounts to customers who pay immediately or who do not pay with credit. The specification, however, never suggests that a buyer has performed a PDA by selecting a product or by entering payment information. Instead, it treats the buyer's selection of a product and entry of payment information as <u>separate</u> and predecessor steps to the PDA. (*See e.g.,* Fig. 1 (separately describing selection of product as step 110, entering payment information as step 130, and the price determining process as steps 140 and 150); *see also* Col. 4:27-30, 5:4-5).) Nor could the ability to select a product or enter payment information drive sales of that product, as the patent urges the PDA does.[3] (Col. 2:44-59.) Other steps in a

---

[3]   Plaintiff argues that the specification "contrasts acts of proposing or accepting a price with a 'collateral activity.'" (Br. 7.) This is untrue. As discussed above, the specification alleged that the prior art lacked the "marketing incentive" created by the collateral activity and that this (footnote continued)

sales transaction that potentially impact a product's price, but that still qualify as a "PDA" under Plaintiff's construction include entering the quantity of products desired; entering one's delivery address; and selecting the shipping method. Yet, none are "collateral" to a sales transaction, and none promote the patent's purpose of serving as a "marketing incentive" to drive sales.

Plaintiff's construction also contradicts the applicant's representations during prosecution. In an attempt to distinguish the Marino reference, the applicant represented that the PDA "excluded" "listening to advertisements to earn credit or value towards purchase" disclosed in Marino. (P 00228) However, listening to ads <u>would</u> qualify as a PDA under Plaintiff's JCCS construction. It is not an offer or acceptance of a price and it was used to determine the price in Marino. (P 00245.) A patentee may not "adopt a position contradictory to that adopted before the PTO and <u>expect to be believed</u>." *TorPham, Inc. v. Ranbaxy Pharmaceuticals*, 336 F.3d 1322, 1329 (Fed. Cir. 2003) (cited by Plaintiff) (emphasis added); *see also White v. Dunbar,* 119 U.S. 47, 51-52 (1886) (patent claim is not a "nose of wax" to be twisted one way to preserve a patent's validity and another way to catch an alleged infringer).

The addition of the phrase "any form of competition or entertainment activity" to Plaintiff's new "Alternative 2" construction does not cure the flaws in its JCCS construction. Indeed, Plaintiff's inclusion of the phrase "competitive **or**" in its Alternative 2 construction adds nothing to its original JCCS construction. Any activity involving multiple buyers could be argued to be "competitive," even if it is not "collateral" at all.

    **B.**    <u>**The PDA Must Be an Inherently Entertaining Activity.**</u>

        1.    <u>The specification and prosecution history show the PDA is inherently entertaining.</u>

The Summary of the Invention explains that buyers are attracted to a website offering a PDA due to "a side benefit of the <u>entertainment value</u> of the activity." (Col. 2:56-57 (emphasis

---

activity (e.g., a game or quiz) "attracts buyers." (Col. 2:44-47, 2:56-59, 5:49-52, 7:40-42, 8:6-10.) The specification does not state or suggest that the PDA can be any activity at all, including activities that lack any marketing incentive, so long as it is something other than "offering or accepting a price."

added).)  This reinforces that a PDA is collateral to the sales transaction, but further shows that a PDA must be an inherently entertaining activity to provide the intended marketing incentive of the PDA.  *See Bright Solutions*, 2008 WL 5428163, at *13.

Indeed, the specification repeatedly touts the "entertaining" aspect of the PDA.  The specification explains that people may participate in the PDA "merely for the <u>inherent entertainment value</u> thereof."[4]  (Col. 8:66-67 (emphasis added).)  The specification also describes a "PDA database" that contains "data regarding the available PDAs."  (Col. 6:48-49.)  Figure 2 makes explicit that the PDAs in the database are "<u>Entertainment</u> Enabled":



*Fig. 2*

(Fig. 2; Col. 6:48-49) (emphasis added).)

The specification also directly equates a PDA to games.  It explains that a buyer is "presented with a pull-down menu of five different '<u>games' (PDAs)</u> to choose from."  (Col. 5:49-52 (emphasis added).)  Correspondingly, each PDA example in the specification is an inherently entertaining activity:  a video game, sports bet, cribbage, black jack, poker, bridge, trivia quiz, craps, roulette, Trivial Pursuit, Monopoly and electronic board games such as chess, backgammon, and checkers.[5]  (Abstract; Col. 2:28-30, 4:3-5, 5:23-24, 8:6-11.)  The patentee's repeated and consistent reference to the "entertainment" and "game" aspect of the PDA, coupled with the attempt to distinguish the patent from the prior art on this basis, shows that the coined

---

[4]  Plaintiff correctly notes that this excerpt concerns an optional feature involving more than one participant in the PDA.  But the excerpt in no way suggests that it is optional for the PDA to be inherently entertaining.  Instead, the excerpt describes the PDA as inherently entertaining in absolute terms.

[5]  Although the specification refers to "any other activity" after listing these games, even Plaintiff's constructions recognize that the PDA cannot be just "any activity."  Further, Plaintiff's emphasis on the specification's use of the "may" language and its case citations are misplaced.  For example, *Kao Corp. v. Unilever United States, Inc.*, 334 F. Supp. 2d 527, 545 (D. Del. 2004), was decided prior to *Phillips* and disregarded language in the specification in favor of broad dictionary definitions.  These cases have no bearing on the construction of a coined term.

term PDA, in addition to being collateral to the sales transaction, must be an inherently entertaining activity. *See Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*, 554 F.3d 1010, 1018-19 (Fed. Cir. 2009) (construing the term "wound" as limited to skin wounds because "[a]ll of the examples described in the specification involve skin wounds.") (citations omitted); *SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1270 (Fed. Cir. 2007) ("[B]ecause the specification repeatedly emphasizes that the motor of the patented invention applies a pushing force, not a pulling force, [t]he inventor makes clear that this attribute of the invention is important in distinguishing the invention over the prior art.").

During prosecution, the applicant similarly touted the use of the "entertainment value" of the PDA to attract customers. For example, in his Supplemental Appeal Brief, the applicant stated, "[t]he buyer also receives a <u>side benefit of the entertainment value</u> of the activity or even motor skill enhancement via video game play or similar activities." (P 00239 (emphasis added).) He further explained, "[a]ppellant's invention uses PDAs such as a video game, electronic board game, gambling game, sports bet, etc. to encourage customers to engage in the activity of buying products." (*Id*.) Again, a patentee may not "adopt a position contradictory to that adopted before the PTO and expect to be believed." *TorPham*, 336 F.3d at 1329.[6]

2.  <u>Plaintiff's arguments that the PDA need not be inherently entertaining are without merit</u>.

To try to dispute Defendants' construction, Plaintiff offers examples of non-entertaining activities that can be "anxiety producing and frustrating." (Br. 3-4.) But Plaintiff's examples only confirm Defendants' construction. A quiz that is "anxiety producing and frustrating" would

---

[6] Plaintiff urges the Court to ignore these statements because they were unsuccessful. (Br. 4-5.) But as Plaintiff concedes, "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation." *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004). Nor does *TorPham* suggest that this Court should ignore the applicant's statements because the applicant did not contest the BPAI's rejection of them. *TorPham* dealt with whether the patentee could make arguments in favor of patentability beyond those made to the PTO, which is not at issue here. 336 F.3d at 1330-31. Regardless, the BPAI was required to give Plaintiff's claims their "broadest reasonable interpretation." Courts are not so bound in infringement proceedings. *See In re Trans Texas Holdings Corp.*, 498 F.3d 1290, 1298 (Fed. Cir. 2007).

discourage buyers from buying a product by forcing them to engage in a tedious or painful procedure. Such a quiz would not provide the "marketing incentive" discussed in the specification. By contrast, a quiz that entertains and therefore boosts sales would qualify as a PDA. This is consistent with the Mark McGwire "trivia quiz" PDA example in the specification, which promotes the sale of the Mark McGwire rookie card. (Col. 5:49-57). Similarly, while real-life stock picking can be stressful (Br. 3-4), the risk-free stock picking simulation described in the specification as a PDA would be entertaining (Col. 7:53-62). Defendants' construction of the PDA as "entertaining" thus appropriately acknowledges the PDA's purpose of driving sales.[7]

Moreover, as Plaintiff provides in its "Alternative 2" construction, a PDA can be competitive. But an activity being competitive alone does not provide the "entertainment value" that the patentee represented in the Summary of Invention and to the Patent Office was a critical aspect of the alleged invention. (Col. 2:56-59; P 00239.) Indeed, Plaintiff offers no explanation as to how its "competitive or entertaining" construction would meet the stated purpose of increasing traffic to an e-commerce site through the PDA.

C.     **Plaintiff's Overbroad Constructions of "PDA" Would Render the Patent Invalid Under 35 U.S.C. § 112 for Insufficient Written Description.**

To satisfy the written description requirement, "the description must clearly allow persons of ordinary skill in the art to recognize that he or she invented what is claimed.'" *Carnegie Mellon Univ. v. Hoffmann La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008). Plaintiff's construction that any activity can be a PDA as long as it is not "offering or accepting a price" expands the potential scope of the claim language far beyond the disclosure of the specification. The specification gives no clue that the patentee possessed any "invention" beyond appending some game-like activity to e-commerce transactions to provide a potential discount and drive further user traffic. Thus, Plaintiff's constructions would render the patent

---

[7]   Plaintiff's argument that nothing in the claim language supports a limitation of inherently entertaining (Br. 2) ignores that the PDA is a coined term. Indeed, Plaintiff's argument would apply equally to counter its own constructions.

invalid for lack of written description. *See ICU Med. v. Alaris Med. Systs., Inc.*, 558 F.3d 1368, 1378 (Fed. Cir. 2009) (finding claims that did not include a spike invalid for lack of written description because based on the specification, "a person of skill in the art would not understand the inventor . . . to have invented a spikeless medical valve.").

## II. "PERFORMANCE OF THE BUYER" (CLAIM 1[C, D, E], 18[B, C, D], 30[B, C, D]).

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| the buyer's level of success (at the Price-Determining-Activity) | the buyer's actions or deeds in the Price-Determining-Activity |

In the claims, the buyer's level of success in the PDA — the "performance of the buyer" — is the basis for scaling the price of the product. For example, claim 18[a] requires "assigning a price to the product, said price being scaled to the performance of the buyer." As the claim language makes clear, the price is not discounted merely because the buyer did some physical acts (e.g., keystrokes on a computer), as Plaintiff's construction provides. Instead, it is the assessment of how well an act was done — the "level of success" from that act in the PDA.[8]

The Summary of Invention makes this clear stating "[b]uyers are willing to accept the possibility of paying the highest price within the range, in exchange for the opportunity to pay the lowest price (or any lower price) within the range if they can achieve a certain <u>level of performance</u> at the specified activity." (Col. 2:52-57 (emphasis added).) It also states that "if a buyer <u>performs poorly</u> at the activity, the price will be higher, whereas if the buyer <u>does well</u>, the price will be lower." (Col. 2:26-28 (emphasis added).) Further, just as in the claims, in <u>every</u>

---

[8] Plaintiff concludes that in this context, "the ordinary meaning of 'performance' is 'actions or deeds.'" (Br. 26.) But rather than discussing the alleged invention at issue, Plaintiff points to an example of "observing a pianist's performance," that has nothing to do with the patent. (Br. 26-27.) Plaintiff also argues that because the claims include embodiments where the PDA takes place at the buyer's location, the transmitted "data representing the performance of the buyer" in claim 1[d] must be the actions of the buyer during the PDA. (Br. 27.) But there is no reason why the buyer's level of success cannot be calculated on the user's computer and communicated to the system. Nor is there any reason why the level of success cannot be determined during the PDA as Plaintiff argues. (Br. 26-27.) For example, the price could be updated for each correct answer by the buyer in a ten question trivia game.

embodiment in the specification, the price is set according to one's level of success — i.e. how well one "performs" — in the PDA. (*See* Col. 5:44-6:6 (trivia game), 7:44-49 (video game), 8:19-22 (horse race).) Accordingly, Defendants' "level of success" language should be adopted and Plaintiff's "actions or deeds" language rejected.

### III. "PRICE BEING . . . SCALED TO THE PERFORMANCE OF THE BUYER" (CLAIM 1[E], 18[D], 30[D]).

| Defendants' Construction | Plaintiff's JCCS Construction | Plaintiff's New Construction |
|---|---|---|
| price being assigned from a predetermined set of graduated prices and corresponding performance levels, in which a lower price always corresponds to a better performance in the PDA and a higher price always corresponds to a worse performance in the PDA | price being adjusted to a standard according to the performance of the buyer, such that achieving a better performance level results in a lower price and achieving a worse performance level results in a higher price | price being adjusted to a standard (defined by a ratio, table, or other algorithm) according to the performance of the buyer, such that achieving a better performance level results in a lower price than would otherwise apply |

The applicant added the "scaling" limitation to avoid prior art. The claim construction dispute again concerns whether this phrase should be interpreted consistent with the claim language and every disclosed embodiment, as Defendants' construction provides, or interpreted using Plaintiff's amorphous and indefinite constructions.

### A. Defendants' Construction Properly Defines the Disputed Term.

1. The specification describes that the price is assigned from a predetermined set of prices and corresponding performance levels in which a lower price always corresponds to a better performance in the PDA (and vice versa).

As the Summary of Invention explains, a purported benefit of the PDA is that "[s]ellers are able to attract buyers using the marketing incentive that buyers can reduce the price of the offered product or service by performing well at the specified activity." (Col. 2:43-47.) *See Bright Solutions,* 2008 WL 5428163, at *13. There would be no incentive to buy a product using the claimed methods if a better performance in the PDA could <u>increase</u> a buyer's price. The Summary further explains that "[t]he ultimate price (within the range) is determined based upon the buyer's performance rating, or score, which the buyer receives from participating in a collateral activity." (Col. 2:23-27, *see also* Abstract.) It then discloses a graduated, "scaled set

of prices" that make up the range: "$1000.00, $1100.00, $1200.00, etc."[9] (Col. 2:35-37.) *See Bright Solutions,* 2008 WL 5428163, at *13. It is this "scaled set of prices" that the applicant cited when adding the scaling limitation during prosecution. (P 00096, citing P 00022.) *See ResQNET.Com, Inc. v. Lansa, Inc.*, 382 F. Supp. 2d 424, 443 (S.D.N.Y. 2005) (holding that the applicants' citation to the specification describing the generation of an ID number, as support for an amendment made during the prosecution to distinguish prior art, is further proof that the claims require generating an ID number).

In accordance with the disclosed purpose of the invention to draw buyers with the opportunity to reduce the price of the product by engaging in a PDA, in each disclosed embodiment, a lower scaled price always corresponds to a better performance in the PDA. For example, the specification discloses an embodiment with the following predetermined, graduated set of prices and corresponding performance levels in the game:

| Video Game Points | Mark McGwire Rookie Card Price |
|---|---|
| Less than 100,000 | $575.00 |
| 100,000 to 199,999 | $550.00 |
| 200,000 to 299,999 | $525.00 |
| 300,000 + | $500.00 |

(Col. 7:44-49.) In each price point, a lower price corresponds to better performance. The applicant referred to this example as well during prosecution when adding the scaling limitation. *See ResQNET.Com,* 382 F. Supp. 2d at 443.

The specification similarly discloses a horse racing game which provides a predetermined, graduated set of prices and corresponding performance levels (i.e., place in horse race) in which a lower price always corresponds to a better performance:

---

[9] Plaintiff's argument that the specification says the actual price "may be a scaled set of prices" fails. The applicant specifically referred to this section when adding the "scaling" limitation when he amended the claims to require scaling. (P 00096.)

| Place in Horse Race | Widget Price |
|---|---|
| 1 - 3 | $ 75 |
| 4 - 6 | $100 |
| 7 - 9 | $125[10] |

(Col. 8:19-22.)[11]  The specification's repeated and exclusive use of predetermined, graduated sets of prices and corresponding performance levels in which a lower price always corresponds to a better performance in the PDA to demonstrate scaling confirms Defendants' construction is correct. *See Kinetic Concepts*, 554 F.3d at 1018-19; *SafeTCare Mfg., Inc.*, 497 F.3d at 1270.

      2.    The modifier "always" in Defendants' construction appropriately defines the correlation between price and performance.

The Federal Circuit has recognized that "in clarifying the meaning of claim terms, courts are free to use words that do not appear in the claim so long as the resulting claim interpretation accord[s] with the words chosen by the patentee to stake out the boundary of the claimed property." *Pause Tech., LLC v. TIVO*, 419 F.3d 1326, 1333 (Fed. Cir. 2005) (quotation marks, citation, and ellipses omitted).  The modifier "always" in Defendants' construction recognizes that, in the scale used to set the price, a lower price "always" corresponds to a better performance in the PDA and a higher price "always" corresponds to a worse performance in the PDA.  Indeed, even Plaintiff represents to the Court that "in all cases, a scaled price will be lower than it would have been without the better performance level."  (Br. 12 (emphasis added).)

In a recent case against Google, AOL, and Microsoft, the court similarly construed a phrase to include "always" to clarify the meaning of the disputed terms.  *Bid for Position, LLC v.*

---

[10]   It should be noted that as seen in the charts above, an increase in <u>performance</u> does not necessarily result in better price.  Instead, a range of performance levels may yield the same price (i.e. first and second place get the same $75 price).  However, in every embodiment in the patent, a lower <u>price</u> always correlates to a better performance, and a higher <u>price</u> always correlates to a lesser performance in the PDA, as Defendants construction provides.  This is why the applicant stated during prosecution, as Plaintiff cites, that "the better the buyer performs during the PDA, the lower the price will <u>typically</u> be" (Br. 14 (emphasis in Plaintiff's brief)).  This is also another reason that Plaintiff's construction that requires that "better performance level results in a lower price" is incorrect.

[11]   This also shows that despite Plaintiff's argument to the contrary (Br. 9-10), Defendants' construction is consistent with examples in the specification (and dependent claims) that set the price based on competition against another participant in the PDA.

*AOL LLC et al.*, 2008 WL 5784151, at *13-14 (E.D. Va., July 11, 2008).[12]  The patent in *Bid for Position* concerned an auction bid management system.  The pertinent claim language required that in the auction for which the patent is used, "the relative position of priority for providing the service for the first bidder [be] dependent upon whether the value of the first bid exceeds the value of the second bid." *Id.* at *14.  The court construed this phrase to require that "the bidder that bids the greater amount <u>always</u> gets priority over the bidder that bids the lower amount." *Id.* at *14 (emphasis added).  The court reasoned "[w]hile the word 'always' may not appear in the claim language, in reading the patent, it is clear that the first bidder, whose first bid amount is greater than the second bidder's bid amount, will always get priority over that bidder." *Id.* at *13. "After examining the patent, the court [found] that at no point in the patent is the possibility mentioned that the bidder, whose first bid is greater than the second bidder's bid, would not get priority. The inclusion of the modifier 'always' in the claim construction is in line with the patent's boundaries and explains that the priority of the bids is based upon their values, or amounts, and that the higher bid will have a higher priority than the lower bid." *Id.* at 14.

As in *Bid for Position*, the '253 patent never mentions the possibility that a lower price would <u>not</u> correspond to a better performance in the PDA or that a higher price would <u>not</u> correspond to a worse performance in the PDA.  To the contrary, the purpose of the invention – to incentivize the buyer to buy a product by being able to reduce his price by performing well in a PDA – requires that a lower price always corresponds to a better performance in the PDA. Thus, the inclusion of the modifier "always" in Defendants' construction is consistent with, and properly clarifies, the claimed invention's boundaries.

### 3.  The extrinsic evidence further supports Defendants' construction.

As the Federal Circuit explained in *Free Motion Fitness, Inc. v. Cybex Intern., Inc.,* "in those circumstances where reference to dictionaries is appropriate, the task is to scrutinize the

---

[12]  *Bid for Position* is the "recent lawsuit concerning an electronic auction patent" identified in Plaintiff's brief, in which Plaintiff's lead counsel Dovel & Luner was also the lead counsel for plaintiff.  (Br. 24.)

intrinsic evidence in order to determine the most appropriate definition."  423 F.3d 1343, 1348-49 (Fed. Cir. 2005).  To the extent reference to dictionaries is necessary here, several dictionary definitions support Defendants' construction.  *Webster's Third New Int'l Dictionary*, cited by Plaintiff, defines "scale" as "a <u>graduated</u> or ordered series of degrees, stages, or classes," and the verb form of scale as "to rise in a graduated series."  (Ex. 4, 2023 (emphasis added).)  *Random House Unabridged Dictionary* similarly defines the noun "scale" as "a table of <u>graduated rates, as of prices</u> or wages," and the verb "scale" as "to adjust in amount according to a <u>fixed scale</u> or proportion."[13]  (Ex. 5, 1709.) (emphasis added).)  Similarly, *The American Heritage Dictionary* defines the verb form of scale as "to rise in steps or stages" (Ex. 6, 1553), and Dictionary.com defines it as "to progress in a <u>graduated</u> series" (Ex. 7, P 22725).

Unlike Defendants, in trying to justify its standard/ratio/table/algorithm language, Plaintiff tries to get the broadest dictionary definition possible by taking "scaled" out of the context it is used in the patent by using the following example:  "when a model is scaled 1:32, the model's dimensions are not found by looking them up in a table; they are based on calculating a ratio of 1 unit of the model for every 32 units of the original."  (Br. 8-9.)  But the patent is not about "scale models"; it is about scaled <u>prices</u>.  Plaintiff's attempt to define "scaled" divorced from its context to get the broadest dictionary definition it can find should be rejected.  *Free Motion Fitness*, 423 F.3d at 1348-49.

### 4. <u>Plaintiff's arguments against Defendants' construction are without merit.</u>

Plaintiff argues that Defendants' limitation of this phrase to a predetermined set of graduated prices and corresponding performance levels is inappropriate because the specification refers to "a price determining algorithm associated with a PDA."  (Br. 10 (citing Col. 8:11).)  But this actually <u>supports</u> Defendants' construction.  The "algorithm" used in the patent is a "mapping algorithm."  (Col. 7:42-44.)  The specification explains that this mapping algorithm assigns a

---

[13]  Plaintiff's definitions also support that the scaling requires a <u>predetermined</u> set of prices.  *See, e.g., Dictionary.com Unabridged* (v 1.1) (Exh. 7, P 22725) ("to adjust in amount according to a fixed scale or proportion") (emphasis added).

price by "mapping" the performance in a video game to a corresponding price within the predetermined set of graduated prices shown in the chart above.  (*See supra* Sec. III.A.1; Col. 7:44-49.)  The mapping algorithm disclosed in the specification, and cited by Plaintiff, is one that "may involve considerations of the number of players or buyers involved."  (Br. 10 (citing Col. 8:11-13).)  This is the horse race embodiment shown above, which also uses a set of graduated, predetermined prices and corresponding performance levels.  (Col. 8:14-23.)  Plaintiff further refers to a "predetermined algorithm" disclosed in the specification.  The "predetermined algorithm" is the predetermined set of price-to-performance correlations discussed above in which if Buyer Bobby answers 5 out of 10 questions correctly, "he will get the card for $560.00," but if "[h]e gets 9 answers correct, . . . according to the predetermined algorithm as presented to him at the start of the game, his performance locks in the price at $500.00."  (Col. 5:37-6:16.)  Thus, the predetermined algorithm disclosed in the specification to scale prices is the same predetermined set of graduated prices and corresponding performance levels in Defendants' construction.

Plaintiff also argues that Defendants' construction does not work with the disclosed embodiment of assigning prices according to a percentage difference between the buyer's prediction and the actual closing price of a stock.  (Br. 10 (citing Col. 7:62-65).)  This is false.  This embodiment is practiced using a predetermined, graduated set of prices and corresponding performance levels, for example, as follows:

| Percentage Difference between Prediction and Closing Price | Widget Price |
|---|---|
| 0-10% | $500.00 |
| 10-20% | $525.00 |
| 20-30% | $550.00 |
| 30% + | $575.00 |

Plaintiff further argues that Defendants' construction does not work with the limitation in claim 1 that provides "determining the price of the product based at least partially upon the data

received." (Br. 9.) This is a red herring because <u>that is not the limitation at issue</u>. Instead, the limitation at issue is the one that immediately follows: "said <u>price being</u> within the price range and <u>scaled to the performance of the buyer</u>." (Col. 9:45-46.) Defendants' construction in no way precludes other data being considered in setting the price apart from the scaling. Instead, Defendants' construction just appropriately defines how the separate scaling limitation is supposed to work.

Plaintiff's argument that Defendants construction does not accommodate the auction in dependent claims 13 and 22 is also without merit. The specification describes the use of PDA with an auction as follows: "[U]sing the auction or reverse auction models, the buyer may be entitled to a <u>further discount</u> of the auction or reverse auction price, which discount may be greater if the buyer performs well at the PDA, and not so great if the buyer performs poorly." (Col. 4:39-43.) Thus, the PDA can be conducted <u>after</u> the auction has occurred, such that the predetermined prices are keyed to the auction price.

### B. Plaintiff's construction is inconsistent with the intrinsic evidence and renders the scaling limitation meaningless and indefinite.

Plaintiff admits that "<u>in all cases</u>, a scaled price will be lower than it would have been without the better performance level." (Br. 12 (emphasis added).) While Plaintiff makes this representation, Plaintiff's construction contains no such limitation. Plaintiff only requires that a standard be used to set the price according to the performance of the buyer "such that achieving a better performance level results in a lower price than would otherwise apply." The "than would otherwise apply" limitation is hopelessly indefinite, and thus no limitation at all. Because Plaintiff's construction provides no modifier such as "always," its construction would be met if better performance results in a lower price in just one case. But as Plaintiff concedes, to accomplish the purpose of the patent to drive sales through the use of a PDA to scale the price, a lower price within the set of available prices <u>must</u> always correspond to a better performance. No one would participate in a PDA if his price could increase even if he performed well.

In purported support of its construction, Plaintiff presents a hypothetical formula that Plaintiff says "sets price partially based on the buyer's performance and partially on a competitor's performance." (Br. 12.) Yet, this hypothetical does not describe the scaling required by the patent. When the patent talks about scaling to a buyer's performance in the situation where there are multiple participants, the buyer's performance is not simply the raw score that he gets in the PDA, as Plaintiff suggests. Instead, in the patent, the performance is how well the buyer does in relation to other participants.[14] For instance, in the horse race embodiment, if the buyer has a time of 30 seconds, the 30 second time is not what the price is scaled to in the patent. Instead, the price is scaled to how well the buyer does in relation to the others. First place in one race gets the buyer a price of $75 and seventh place in the next race gets the buyer a price of $125, even if the buyer has a time of 30 seconds in both races. (Col. 8:14-23.) Thus, Plaintiff's hypothetical that focuses on how price changes in relation to the raw score of Buyer 1, rather than outcome of the competition, has no relevant to the patent.[15]

Plaintiff's proposed construction would also render the patent indefinite. Plaintiff's construction provides this limitation is met if "achieving a better performance level results in a lower price than would otherwise apply." But how is one skilled in the art supposed to know what is the price that "would otherwise apply?" The ambiguity in Plaintiff's construction is demonstrated in its hypothetical. After reciting three hypothetical transactions, plaintiff concludes that "by improving its performance, Buyer 1 gets a better price ($10) relative to the price that otherwise would have applied ($15)." (Br. 13 (emphasis added).) But the $15 amount was just one possible result using Plaintiff's formula. Plaintiff's formula also allowed Buyer to

---

[14] Plaintiff's use of "performance" here is not even consistent with its own construction of performance as "the buyer's actions or deeds in the Price-Determining-Activity." Buyer 1's "actions or deeds" may result in a raw score of 200 or 300, but his actions and deeds are not themselves that raw score, but rather the keystrokes or other input that resulted in that raw score.

[15] Plaintiff's hypothetical also reveals the flaws in Plaintiff's construction. For example, in Plaintiff's scenario 3, the price would be $15. This is more than the $10 advertised price. Paying more than the advertised price even if the buyer performs well would not "attract buyers using the marketing incentive that buyers can reduce the price of the offered product or service by performing well at the specified activity," which is the point of the patent. (Col. 2:44-47.)

pay $5.  And depending on the raw scores of Buyer 1 and Buyer 2, it could yield an infinite number of other possible results.  As Plaintiff's construction does not define the price that "would otherwise apply," it is indefinite.  *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1340-41 (Fed. Cir. 2003) (holding a claim indefinite when there are multiple methods of measuring a parameter that must fall within a range according to the claim language, each method of measurement can yield a different result, and the patent gives no indication of which method of measurement should be used).

Plaintiff's attempt to define this limitation by the "result" of the scaling also would render the patent indefinite.  As Plaintiff seems to contend that all that is required to meet the "scaling" limitation is one result in which a lower price results from better performance, in order for a competitor to determine whether its system infringes, it would need to analyze every possible result of any "ratio, table, or other algorithm" used to set the price to determine whether there is even one instance in which in which a lower price results from better performance.  Plaintiff presents no explanation as to how one skilled in the art is supposed to do this, nor does the patent.  *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008) ("When a proposed construction requires that an artisan make a separate infringement determination for every set of circumstances in which the composition may be used, and when such determinations are likely to result in differing outcomes (sometimes infringing and sometimes not), that construction is likely to be indefinite"), *affirming*, *Halliburton Energy Servs., Inc. v. M-I, LLC*, 456 F. Supp. 2d 811 (E.D. Tex., Oct. 18, 2006) (J. Davis).  Accordingly, the court should adopt Defendants' construction and reject Plaintiff's meaningless and indefinite proposal.

**"DESCRIPTION OF A PRODUCT" (CLAIM 1[A])/"DATA REPRESENTING A PLURALITY OF PRODUCTS" (CLAIMS 18[A], 30[A]);**

**"ACCEPTING A FIRST REQUEST FROM THE BUYER TO BUY THE PRODUCT" (CLAIM 1[B])/"ACCEPT[ING] ACKNOWLEDGMENT FROM THE BUYER REPRESENTING AN INTENT OF THE BUYER TO BUY THE FIRST PRODUCT" (CLAIM 18[B], 30[B]).**

| Term | Defendants' Construction | Plaintiff's Constructions |
|------|--------------------------|---------------------------|
| description of a product | information sufficient to identify a particular product | **JCCS:** no construction necessary<br><br>**New construction:** information sufficient to identify a product or service |
| data representing a plurality of products | data sufficient to identify two or more particular products | **JCCS:** data communicating information about two or more products or services<br><br>**New Construction:** data sufficient to identity two or more products or services |
| accepting a first request . . . to buy the product | accepting from the buyer a selection of the product to buy | receiving with consent or approval a request from the buyer to buy the product or service |
| accepting acknowledg-ment . . . to buy the first product | accepting from the buyer a selection of the first product to buy | receiving with consent or approval an acknowledgment from the buyer representing an intent of the buyer to buy the first product or service |

Defendants address these limitations together as they deal with a related dispute. As the patent and Defendants' constructions provide, the claims require a communication to the buyer of information sufficient for the buyer to identify, and then later select, a particular product. Under Plaintiff's view, however, the seller knows what product the buyer wants to buy with no such communication and with no selection of a product. The patent discloses no such method. Accordingly, Defendants' constructions should be adopted.

### A. The Claims Show that the Buyer Selects a Particular Product that Is Communicated to the Buyer.

The claims themselves show that the communication to the buyer must contain information sufficient to identify a particular product, and that the buyer must select that product. For example, the first two steps of claim 18 are "communicating to a buyer via the global communications network**,** data representing a plurality of products available, said plurality

of products including a first product," (18[a]), and "accepting acknowledgement from the buyer representing an intent of the buyer to buy the first product," (18[b]).  The claimed method then describes steps taken in relation to "the first product" such as "assigning a price to the product."  The "acknowledgement" from the buyer of his intent to buy the "first product" in 18[b] must be the selection of a product communicated in 18[a].  Without the buyer's selection, the seller would not know which of the plurality of the products the buyer wants to buy.  Indeed, Plaintiff concedes this point.  (Br. 16.)  The data representing the plurality of products also must contain data sufficient to identify two or more particular products so the buyer can select which product he wants to buy in the next step.  The same is true for the identical steps in claim 30.

Similarly, the first two steps of claim 1 are "communicating to a buyer . . . a description of a product," (1[a]), and "accepting a first request from the buyer to buy the product for a price to be determined within a price range," (1[b]).  The claimed method then describes steps taken in relation to "the product" such as "determining the price of the product."  The "first request" from the buyer of his intent to buy the "product" in 1[b] must be the selection of a product communicated in 1[a].  Again, without the buyer's selection, the seller would not know which product the buyer wants to buy (or if presented only one product, whether the buyer wants that product.)  Further, the description of a product must contain data sufficient to identify a particular product so the buyer can select which (if any) product he wants to buy in the next step.

**B.      The Specification Further Shows that the Buyer Selects the Particular Product Communicated.**

The Summary of Invention explicitly states the buyer must select the product he wants to buy.  It first repeats *verbatim* the claim language at issue:

- "one aspect of the present invention involves . . . <u>accepting a first request from the buyer to buy the product</u>";

- "[a]nother aspect of the present invention involves . . . comprising the steps . . .: <u>accepting acknowledgement from the buyer representing an intent of the buyer to buy the first product</u>"; and

- "[a]nother aspect of the present invention involves a system [programmed to] <u>accept acknowledgement from the buyer representing an intent of the buyer to buy the first product</u>."

(Col., 2:60-65, 3:8-15, 3:22-30 (emphasis added).)  Based on this language, the Summary of Invention concludes:  "[m]ethods are thus described wherein buyers participate in selected activities, the outcomes of which are used to determine the ultimate price the buyer is to pay for a underline(selected) product or service."  (Col. 3:38-41 (emphasis added).)  *See Bright Solutions,* 2008 WL 5428163, at *13.  The first line of the Abstract similarly says, "[a] business model/process is described for conducting business transactions over the Internet, allowing buyers to reduce the price of the underline(selected product/service) based on the buyer's performance during a collateral activity."  ((emphasis added); *see also* (Col. 2:60-65).)

The rest of the specification is in accord.  For example, Figure 1 is "a flow-chart illustrating the steps involved in a typical transaction performed in accordance with the concepts of the present invention."  (Col. 3:48-50.)  As detailed in the specification, Figure 1 states that "[a]t step 110, the buyer underline(selects) a desired product or service to be purchased":



(Fig. 1; Col. 4:25-33 (emphasis added).)[16]

While Plaintiff argues that claim 1, step [a] "may be satisfied by communicating a single product description, and, in such a case, no product selection would be made by a buyer" (Br. 16), that is irrelevant.  Step 1[b], which immediately follows, requires "accept[ance] of a first request from the buyer to buy the product."  As the specification makes clear, this limitation is satisfied by the user's selection of the particular product communicated for purchase.  The specification describes the communication of information sufficient to identify a mint Mark McGwire rookie card to a potential buyer.  (Col. 5:44-47.)  The buyer then clicks on "the Mark

---

[16]  Plaintiff's argument that Defendants' construction should be rejected because dependent claims concern selecting a PDA, (Br. 17), is a red herring.  Defendants do not include this limitation in their constructions.

24

McGwire image to proceed (step 110)."  (Col. 5:47-48.)  In this step 110, the "buyer selects [the] product or service to buy."  (Col. 5:44-48; Fig. 1 (emphasis added).)

Plaintiff agrees that method claim 18 (and by extension claim 30, which has nearly identical steps) requires selection of a product.  (Br. 16.)  Plaintiff nevertheless argues Defendants' constructions improperly incorporate limitations from the specification.  But the intrinsic evidence makes clear that product selection is already in claim 18.  For this reason, Plaintiff's argument and cited cases are inapposite.

### C.    Plaintiff's Constructions for the "Description of a Product" and "Data Representing . . ." Limitations Are Without Merit.

The sum total of Plaintiffs' argument for these limitations is:

> There is little difference between the parties' proposals.  Defendants' rewrite the claims slightly by inserting the word "particular," a concept not found in the claim language.  Plaintiff's proposal is consistent with the ordinary meaning of the claim language and the intrinsic record.

(Br. 30.)

Plaintiff's inability to identify any specific error in Defendants' constructions, which include the word "particular," confirms that Defendants must be correct.  In any event, Plaintiff's constructions are problematic because they do not require the communication of information that allows the buyer to select a "particular" product.  Under Plaintiff's definition, communicating to a buyer that "I have two red items for sale" (where those items are a red house and a red sock), would satisfy this construction.  But that is not the claimed invention.

### D.    Plaintiff's "Receiving with Consent or Approval" Constructions Improperly Seek to Require a Binding Contract Before the PDA.

Through its "receiving with consent or approval" constructions, Plaintiff seeks to improperly limit the patent to require a "binding contractual obligation" before engaging in the PDA.  (Br. 15.)   But the specification specifically states that the system need not require a binding contract prior to engaging in the PDA:

> When the PDA is complete as to the buyer (step 150) the actual price of the product or service at issue is determined (step 160), and if the contract is binding, the transaction may then be completed.  If the contract is not binding, because e.g., the buyer was given the opportunity of engaging the PDA on a no

> commitment basis, then at this point the buyer is asked if he or she wants to close
> the transaction at the determined price.

(*See*, *e.g.*, Col. 5:28-35 (emphasis added).)  And Plaintiff once again improperly points to

dictionary definitions that are inconsistent with the context in which the terms are used.  *See*

*Free Motion Fitness*, 423 F.3d at 1348-49.  "Accept" is not used in the claims in the contractual

sense.  (Br. 14-15.)  It refers to "accepting" inputs over a global communications network.

## V.  ORDERING OF THE STEPS OF THE ASSERTED CLAIMS (CLAIMS 1, 18, 30) / "FIRST" AND "SECOND" (CLAIM 1[B, C]).

| Term | Defendants' Construction | Plaintiff's Construction |
|------|--------------------------|--------------------------|
| order of steps in the asserted claims | the steps of the asserted claims must be performed in order | **JCCS**: N/A<br><br>**New Construction**: the steps of claim 1 may be performed before, at the same time as, or after any other step, except that steps [b], [c], and [d] must occur before step [e]. The steps of claim 18 must be performed in order. |
| first/second | the "first" request must precede and is separate from the "second" request | the terms "first" and "second" are used to distinguish one instance of the same thing from another.  For example, the phrase "second request" means a request other than the "first request."  The terms "first" and "second" do not refer to time sequence." |

Claim 1 is a method claim.  Courts limit method claims "to cover only methods

performed in the order written if the method steps actually recite an order."  *GWIN, Inc. v. Don*

*Best Sports*, 548 F.Supp.2d 342, 348 (E.D. Tex. 2008). "The terms 'first,' 'second,' and 'third,' as

they relate to the steps in the method claims, mean that the steps recited in the claims must be

completed in order."  *LifeNet, Inc. v. Musculoskeletal Transplant Found.*, 2007 WL 1815629, at

*8 (E.D. Va. June 21, 2007).[17]  Here, Claim 1 explicitly describes a "first" request and later

describes a "second" request, and the first request necessarily precedes the second request.

---

[17] *Free Motion* and *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365 (Fed. Cir. 2003), cited by Plaintiff, hold that "first" and "second" do not generally impose spatial ordering within an apparatus claim.

Moreover, where "most of the steps" of a "method claim refer to the completed results of the prior step," the steps must be "performed in order." *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007). Here, the parties agree that the product of element 1[b] is a product communicated in the prior step 1[a]. (JCCS 1.) In order for the system to "accept[] a first request from the buyer to buy the product for a price to be determined within a price range," the product must first be communicated to the buyer in step 1[a]. Similarly, before the system may "determine[] the price of the product" in step 1[e], it must first accept "accept[] a first request from the buyer to buy the product for a price to be determined within a price range" in step 1[b]. Thus, these steps necessarily must be performed in order.[18]

Further, Plaintiff now agrees the steps of claim 18 must be performed in order. As Plaintiff agrees that the steps of claim 18 must be performed in order, it follows that the steps of claim 30 also must be. Claim 30 merely adds a computer server programmed to perform the nearly identical steps as claim 18. In order for the server of Claim 30 to "accept[] acknowledgement from the buyer representing an intent of the buyer to buy the first product" in step 30[b], the product must first be communicated to the buyer in step 30[a]. Similarly, before the server may "assign[] a price to the product" in step 30[d], it must first accept "an acknowledgement from the buyer representing intent to buy the first product" in step 30[b].

## VI.     "PRICE RANGE" (CLAIM 1[B, E], 11).

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| specified upper and lower bounds within which the price may vary | upper and lower bounds within which the price may vary |

---

[18]    That a hypothetical system <u>could</u> be designed to do the steps of claim 1 in a different order as Plaintiff argues, does not overcome that the claims as written <u>require</u> them to be performed in order. (Br. 20-22.) Indeed, in Plaintiff's cited case *Respironics v. Invacare*, the Federal Circuit found that the relevant elements occur in order because the specification did not disclose any other embodiments. *See Respironics, Inc. v. Invacare Corp*, 303 Fed. Appx. 865, 871 (Fed. Cir. 2008) ("The preselection of higher and lower pressure magnitudes is not merely a preferred embodiment; it is the patents' only embodiment.").

Defendants' construction, which includes the modifier "specified," finds repeated support in the intrinsic evidence. For example, the Abstract says: "[s]ellers offer the product/service within a <u>specified</u> price range." (Abstract.) The Summary of Invention also says, "Sellers offer a product or service within a <u>specified</u> price range, and buyers enter into a contract to buy the product or service within that price range." (Col. 2:20-23 (emphasis added).) It continues, "Sellers are willing to put forth the initial offer of a <u>certain</u> price range, in hopes that the average price of the product over time will be a profitable price within <u>the range</u>," and "[b]uyers are willing to accept the possibility of paying the highest price within <u>the range</u>, in exchange for the opportunity to pay the lowest price (or any lower price) within <u>the range</u> if they can achieve a certain level of performance at the specified activity." (Col. 2:44-59 (emphasis added).) "The range" is the certain (i.e. specified) price range Defendants' construction requires. *See Bright Solutions*, 2008 WL 5428163, at *13. And every example in the specification comports with Defendants' construction requiring a specified price range. The Mark McGwire trivia game has a range of "$500.00 to $575.00." (Col. 5:43-48.) The Mark McGwire video game also has a range of $500.00 to $575.00. (Col. 7:44-49.) The horse race has a range of $75 to $125. (Col. 8:19-22.)

Plaintiff's entire argument as to this phrase is as follows:

> The sole difference in the parties' proposals is Defendants' addition of the word "specified," a concept not found in the claim language. Plaintiff's proposal is consistent with the ordinary meaning of the claim language and the intrinsic record.

(Br. 30.) Plaintiff's unsupported argument should be rejected out of hand.

## VII.   "AUCTION" (CLAIMS 13, 22).

| Defendants' Construction | Plaintiff's JCCS Construction | Plaintiff's New Construction |
|---|---|---|
| a public sale of property to the highest bidder (as by successive increased bids) | process for selling a product or service based on bids | process for selling a product or service by taking bids and selling to the winning bidder; an auction is not a PDA |

Defendants' construction is taken directly from *Webster's Third Int'l Dictionary*, which defines an auction as "a public sale of property to the highest bidder (as by successive increased

bids)."  (Ex. 4, 142.)  Plaintiff argues this construction is too narrow because the specification refers to "reverse auctions models," which do not fit this definition.  (Br. 25.)  But the specification treats a "reverse auction" as a <u>different</u> business model than an "auction":

> [a] website may offer the products or services as common offerings always available, <u>auction items</u> (e.g., like eBay.com), <u>reverse auction items</u> (e.g., like Priceline.com), or any other way.  The present invention thus may be used independently of other business models, or in combination therewith, to form binding contracts.  For example, using the <u>auction or reverse auction models</u>, the buyer may be entitled to a further discount of the <u>auction or reverse auction</u> price.

(Col. 4:33-41 (emphasis added).)  Thus, the applicant used "auction" to refer to a process like eBay's, in which the highest bidder wins, just as Defendants' construction provides.[19]

In its new, post-JCCS construction, Plaintiff has added the limitation that "an auction is not a PDA."  At the outset, this construction defines "PDA," not "auction."  Moreover, it is inconsistent with Plaintiff's infringement allegations in this case.  Plaintiff alleges that each of the Defendants uses an auction system that satisfies claims 13 and 22.  (Ex. 8, at 36-38, 52-53, 59, 81-82, 95, 127-128, 141.)  Plaintiff contends that these same systems use a PDA to determine the cost of ads.  (*Id.* at 19-22, 59, 71-72, 115-117.)  If an auction cannot be a PDA, then it is unclear how – as Plaintiff alleges – Defendants' system can be both an auction and use a PDA.

To address Plaintiff's objection to the "property" language in Defendants' construction, Defendants would agree to replace "property" with "product," which has already been construed by agreement to be "product or service."

---

[19]  Plaintiff's citations to Wikipedia and to an expert report in *Bid For Position*, neither of which were disclosed pursuant to P.R. 4-2, do not show otherwise.  "Wikipedia disclaims any validity of the content listed on its website, and is therefore not a reliable source of technical information."  *Techradium, Inc. v. Blackboard Connect Inc.*, 2009 WL 1152985, *4 (E.D. Tex. 2009).  And the cited expert report from *Bid For Position* made no attempt to interpret auction in the '253 patent.

## VIII.  "MASTER CONTROLLER" (CLAIM 12).

| Defendants' Construction | Plaintiff's Construction |
| --- | --- |
| centralized server | device or subsystem that has overall control over other devices or systems |

Like "PDA," "master controller" is a coined term the inventor used to describe a "centralized server" that performs the "accepting" and "receiving" steps of claim 1.  The specification confirms that "master controller" simply means "centralized server," consistent with Defendants' construction.  As the specification explains, "transactions may be handled by a master operation controller or content server for efficient processing and marketability. . . . The operation controller may be a computer server which provides content to and manages a website implementing the concepts described herein."  (Col. 6:19-41 (emphasis added).)  The specification continues, "A centralized server or controller may be implemented to manage all transactions, allowing access through various front-ends such as existing Internet portals or e-commerce sites." (Col. 4:17-25 (emphasis added); *see also* Col. 6:60-7:13.)

Plaintiff's construction has no support in the patent.  Instead, Plaintiff cobbles together multiple dictionary definitions to arrive at the broadest definition possible.  (Br. 28.)  But to the extent that dictionary definitions should be used to assist with the interpretation of this phrase, the focus must be on finding definitions that are in accord with the specification and the rest of the intrinsic evidence – not the broadest possible definition.[20]  *See Free Motion Fitness,* 423 F.3d at 1348.  Plaintiff's definitions fail in this regard.

### Conclusion

Defendants respectfully request that the Court adopt their constructions of the disputed claim terms.

---

[20]  Plaintiff cites U.S. Patent No. 5,794,207 to support its definition, even though Plaintiff never identified this patent in its P.R. 4-3 disclosures.  In any event, Plaintiff fails to mention that the '207 patent involves a "central controller" (not a "master controller") that does not employ devices, subsystems, or even any hardware at all.  *See, e.g.*, '207 patent at 9:52-59.  This is not a "master controller," as described in the '253 patent specification.  *See, e.g.*, '207 patent at 7:13-25.

Dated:  May 15, 2009

Respectfully submitted,


By: /s/ David A. Perlson
QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP
   Charles K. Verhoeven
   David A. Perlson
   Jennifer A. Kash
   Antonio R. Sistos
   Emily C. O'Brien
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700
charlesverhoeven@quinnemanuel.com
davidperlson@quinnemanuel.com
jenniferkash@quinnemanuel.com
antoniosistos@quinnemanuel.com
emilyobrien@quinnemanuel.com

BECK REDDEN & SECREST, L.L.P.
   David J. Beck
   Michael Ernest Richardson
One Houston Center
1221 McKinney St. Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720
jbeck@brsfirm.com
mrichardson@brsfirm.com

Attorneys for Defendants Google Inc. and AOL
LLC


By: /s/ Richard A. Cederoth
   Richard A. Cederoth

David T. Pritikin
Richard A. Cederoth
Laura L. Kolb
John W. McBride
Sidley Austin
One South Dearborn St
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Email: dpritikin@sidley.com
     rcederoth@sidley.com
     lkolb@sidley.com

jwmcbride@sidley.com

Eric Hugh Findlay
Ramey & Flock
100 East Ferguson
Ste 500
Tyler, TX 75702
Telephone: (903) 597-3301
Facsimile: (903) 597-2413
Email: efindlay@rameyflock.com

ATTORNEYS FOR DEFENDANT MICROSOFT
CORPORATION


By: /s/ Richard S.J. Hung
     Richard S.J. Hung

Michael A. Jacobs
Rachel Krevans
Richard S. J. Hung
Morrison & Foerster LLP
425 Market St
34th Floor
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522
Email: mjacobs@mofo.com
        rhung@mofo.com
        rkrevans@mofo.com

John Frederick Bufe
Michael Edwin Jones
Potter Minton
P. O. Box 359
Tyler, TX 75710
Telephone: (903) 597-8311
Facsimile: (903) 593-0846
Email: johnbufe@potterminton.com
        mikejones@potterminton.com

ATTORNEYS FOR DEFENDANT YAHOO! INC.

**CERTIFICATE OF SERVICE**

I certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on May 15, 2009.

 /s/ Antonio R. Sistos
Antonio R. Sistos

# Appendix A

The asserted claims are listed below with the disputed claim language emphasized. Letters are added to claims 1, 11, and 18 for convenience.

**1**. A method of doing business over a global communications network comprising the steps:

    (a)    communicating to a buyer via the global communications network, a ***description of a product***;

    (b)    ***accepting a first request from the buyer to buy the product*** for a price to be determined within a ***price range***;

    (c)    accepting a ***second*** request from the buyer to allow the price to be determined based upon a ***performance of the buyer*** while participating in a ***Price-Determining-Activity (PDA)***;

    (d)    receiving data from the buyer over the global communications network, said data representing the ***performance of the buyer*** during the ***PDA***; and

    (e)    determining the price of the product based at least partially upon the data received, said ***price being*** within the ***price range*** and ***scaled to the performance of the buyer***.

**2**. The method of claim **1**, further comprising the step of accepting payment information from the buyer over the global communications network.

**9**. The method of claim **1**, wherein the ***PDA*** requires participation of at least one participant in addition to the buyer.

**10**. The method as in claim **9**, further comprising the step of determining the price based at least partially upon a competition between the buyer and the at least one participant using the ***PDA***.

**11**. The method as in claim **10**, wherein the at least one participant is a second buyer, and further comprising the steps of

    (a)    accepting a second request from the second buyer to buy the product for a second price to be determined within the ***price range***, and

    (b)    determining said second price based at least partially upon the competition.

**12**. The method of claim **1**, wherein the steps of accepting the ***first*** request from the buyer, accepting the ***second*** request from the buyer, and receiving the performance data from the buyer, are performed by a ***master controller***.

**13**. The method of claim **1**, wherein the price is determined at least partially upon participation of the buyer in an ***auction***.

**14**. The method of claim **1**, wherein the global communications network is the Internet.

**15.** The method as in claim **1**, wherein the price is determined at least partially upon an offer received from the buyer.

**18**. A method of determining a price of a product using a global communications network, comprising the steps:

> (a)    communicating to a buyer via the global communications network, ***data representing a plurality of products available***, said plurality of products including a first product;

> (b)    ***accepting acknowledgement from the buyer representing an intent of the buyer to buy the first product*** at a price to be determined upon a ***performance of the buyer*** while participating in a ***Price-Determining-Activity (PDA)***, said acknowledgement being communicated over the global communications network;

> (c)    determining the ***performance of the buyer***; and

> (d)    assigning a price to the product, said ***price being scaled to the performance of the buyer***.

**20.** The method of claim **18**, further comprising the step of accepting payment information from the buyer over the global communications network.

**21.** The method of claim **18** wherein the price is dependent at least partially upon a bid selected by the buyer.

**22.** The method as in claim **18**, wherein the price is determined at least partially upon results of an ***auction***.

**23.** The method as in claim **18**, wherein the price is determined at least partially upon an offer received from the buyer.

**30.** A system for conducting e-commerce over a global communications network, comprising:

> a computer server having access to the global communications network, and being programmed to:

> (a)    communicate to a buyer via the global communications network, ***data representing a plurality of products available***, said plurality of products including a first product;

> (b)    ***accept acknowledgement from the buyer representing an intent of the buyer to buy the first product*** at a price to be determined upon a ***performance of the buyer*** while participating in a ***Price-Determining-Activity (PDA)***, said acknowledgement being communicated over the global communications network;

> (c)    determining the ***performance of the buyer***; and

> (d)    assign a price to the product, said ***price being scaled to the performance of the buyer***.