**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| PERFORMANCE PRICING, INC., | CASE NO. 2:07-cv-432 (LED) |
| Plaintiff, | **Jury trial demanded** |
| v. | |
| GOOGLE INC., AOL LLC, MICROSOFT CORP., YAHOO! INC., IAC SEARCH & MEDIA, INC., and A9.COM, INC., | |
| Defendants. | |

### Plaintiff Performance Pricing, Inc.'s Reply Claim Construction Brief

# TABLE OF CONTENTS

I.    "Price-Determining-Activity" ..........................................................................1

    A.    Issue 1: "competition or entertainment activity" or "any activity" versus "inherently entertaining activity" ..............................................1

    B.    Issue 2: "other than proposing or accepting a price" vs. "collateral to its sale" ................................................................................................3

II.   "price being ... scaled to the performance of the buyer" ......................................6

    A.    Issue 1: "standard (defined by a ratio, table, or other algorithm)" versus "predetermined set of graduated prices and corresponding performance levels" ................................................................................6

    B.    Issue 2: "than would otherwise apply" versus "always" ........................9

    C.    "meaningless and indefinite" ................................................................11

III.  "accepting"  /  "selection of the product" .........................................................14

    A.    "accepting" means "receiving with consent or approval" ....................14

    B.    There is no "selection of the product" limitation .................................14

IV.   "first" and "second" / ordering ..........................................................................16

V.    "auction" ..............................................................................................................16

VI.   "performance of the buyer" .................................................................................17

VII.  The remaining constructions ...............................................................................18

VIII. Conclusion ...........................................................................................................18

i

# TABLE OF AUTHORITIES

**CASES**

*Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363 (Fed. Cir. 2003) .......................................16

*Amgen Inc. v. Hoechst Marion Roussel*, 314 F.3d 1313 (Fed. Cir. 2003) .........................2

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338 (Fed. Cir. 2008) ..................15

*Charles E. Hill & Assoc. v. Amazon.com*, 2005 U.S. Dist. LEXIS 45414
   (E.D. Tex. Oct. 7, 2005)...................................................................................................15

*Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343 (Fed. Cir. 2005).......................16

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111
   (Fed. Cir. 2004) .......................................................................................................11, 18

*Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323
   (Fed. Cir. 2001) ...............................................................................................................15

*Inverness Med. Switz. Gmbh v. Warner Lambert Co.*, 309 F.3d 1373
   (Fed. Cir. 2002).................................................................................................................3

*In re Johnston*, 435 F.3d 1381 (Fed. Cir. 2006) ..............................................................2

*Lifenet, Inc. v. Musculoskeletal Transplant Found.*, 2007 U.S. Dist. LEXIS 45172
   (E.D. Va. June 21, 2007)..................................................................................................16

*Phillips v. AWH Corp.*, 415 F.3d. 1303 (Fed. Cir. 2005) ...................................2, 11, 18

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243
   (Fed. Cir. 1998).............................................................................................................18

*TorPharm Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322 (Fed. Cir. 2003) ...................3

*Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295(Fed. Cir. 2007) .........15

*Voda v. Cordis Corp.*, 536 F.3d 1311 (Fed. Cir. 2008) ...................................................3

**Note regarding citations.**

Citations to Plaintiff's opening brief are in the form "PP__"

Citations to Defendants' response brief are in the form "D__"

Citations to exhibits are in the form "Ex. __, [page number]."

Citations to U.S. patent No. 6,978,253 ("'253 patent") are in the form "[column number]: [line numbers]"

The steps of claim 1 of the '253 patent are identified by using letters [a] through [e] as follows:

   1.  A method of doing business over a global communications network comprising the steps:

   [a] communicating to a buyer via the global communications network, a description of a product;

   [b] accepting a first request from the buyer to buy the product for a price to be determined within a price range;

   [c] accepting a second request from the buyer to allow the price to be determined based upon a performance of the buyer while participating in a Price-Determining-Activity (PDA);

   [d] receiving data from the buyer over the global communications network, said data representing the performance of the buyer during the PDA;

   [e] and determining the price of the product based at least partially upon the data received, said price being within the price range and scaled to the performance of the buyer.

## I.     "Price-Determining-Activity"

Defendants do not dispute Plaintiff's analysis showing that that the construction should include "combination of activities."  PP1.

### A.     Issue 1: "competition or entertainment activity" or "any activity" *versus* "inherently entertaining activity"

Defendants make six arguments on this issue that are rebutted in turn below.[1]

(1)     Defendants assert that the "Summary of the Invention explains that buyers are attracted to a website" because of "entertainment value," that "a PDA must be an inherently entertaining activity to provide the intended marketing incentive," and  a "'competitive or entertaining' construction would [not] meet the stated purpose of increasing traffic."  D8, D11.  This argument fails at three levels.

<u>First</u>, the Summary of the Invention does <u>not</u> identify "entertainment value" as the "intended marketing incentive" to attract buyers.  It states: "Sellers are *able to attract buyers* using the *marketing incentive that buyers can reduce the price* of the offered product."  2:44-47 (emphasis added).  Entertainment is identified as an available "side benefit."  2:56-57. The incentive to buyers from reduced prices is equally available from a PDA that is not entertaining.

<u>Second</u>, the Summary of the Invention states the "present invention comprises … [v]arious forms of … <u>competition and/or entertainment</u> … to ultimately determine a contract price."  2:15-20; *see* 1:8-13 ("various forms of competition and/or entertainment"); 1:57-59 (same); 2:4-8 (same).  Defendants do not dispute that "competition and/or entertainment" necessarily includes activities that are <u>not</u> entertainment.  Defendants simply ignore this unambiguous language.

<u>Third</u>, Defendants' argument is premised on misstating the role of the Summary of

---

[1]     Defendants' complaint (D5 n.1) that Plaintiff offered new proposals after the parties' submitted claim constructions under Rule 4-3 should be rejected.  Defendants do not identify any evidence or argument that they were (or are) precluded from presenting, or any other prejudice; each of Plaintiff's proposals narrowed the gap between the parties' positions; and there is no suggestion that Plaintiff's constructions were not offered in good faith.  Moreover, the Patent Rules contemplate that the parties' disagreements may narrow as the result of briefing, which is one of the reasons for filing a separate claim construction chart <u>after</u> the completion of briefing (Rule 4-5(d)).

Invention: it does not summarize any one underlined claim, it summarizes all facets of the underlined invention. Each claim pulls in combinations of those facets as limitations, but not every facet is a *required limitation* in *every* claim. "It is improper for a court to add extraneous limitations to a claim" or "to include elements not mentioned in the claim in order to limit such claim." *Amgen Inc. v. Hoechst Marion Roussel*, 314 F.3d 1313, 1325 (Fed. Cir. 2003) (internal citations omitted).

For example, the Summary of the Invention includes a "specified price range" (2:20-21; 2:65), competition against "another buyer" (2:33-34), and "a plurality of products" (3:12). But these are not required limitations that must be imported into every claim. Instead, such concepts become limitations only to the extent they are reflected in claim language. *E.g.*, claims 10, 18, 26. To the extent the patentee desired "entertaining" as a required limitation, it is expressed in claim language, such as "wherein the PDA is a videogame" (claims 5, 17, 25, and 29).

(2) Defendants cite extensively to embodiments in the specification. D9-11. It is improper, however, to "confin[e] the claims to those embodiments." *Phillips v. AWH Corp.*, 415 F.3d. 1303, 1323 (Fed. Cir. 2005) (en banc). In particular, Defendants assert that "[t]he specification also directly equates a PDA to games." D9. That is false. The portion Defendants cite for support (5:49-52) is explicitly identified as an "example" of a PDA, not an "equation" (5:36-42).

Moreover, Defendants do not dispute that the list of PDAs they cite is preceded by the permissive "may," which means the list is not limiting. Defendants respond that Plaintiff relies on cases "decided prior to *Phillips*." D9 n.5. That is false. *In re Johnston*, 435 F.3d 1381, 1384 (Fed. Cir. 2006) ("did not narrow the scope of the claim because these limitations are stated in the permissive form 'may'").

(3) Defendants do not dispute that the specification contains examples of PDAs that are not inherently entertaining, such as a quiz and a stock picking activity. Defendants only response is that a quiz "that is 'anxiety producing and frustrating' … would not provide the 'marketing incentive discussed in the specification." D10-11. That is false. The "marketing incentive [is] that buyers can reduce the price," 2:44-47, and this incentive is fully available from a

quiz PDA that is not entertaining.

(4)     From the prosecution history, Defendants quote a passage mentioning "entertainment value" as one (not the exclusive) "side benefit."  D10.  But on that very page of the prosecution history the applicant repeatedly stated, with bold emphasis, that the invention includes "a **competitive or entertainment-based** price determining activity … competitive or entertainment-based PDA … competitive or entertainment-based price determining model."  Exh. 6 at P239 (emphasis in original).  Moreover, the asserted basis for distinguishing prior art was <u>not</u> "entertainment value."  Rather it was that the PDA is "directly connected to the price" whereas in the prior art the "price of the product is fixed."  *Id.* P239-240.

(5)     Defendants assert that "statements during prosecution, whether relied on by the examiner or not are relevant."  D10 n.6.  This assertion has two problems.

<u>First</u>, "to disavow claim scope during prosecution 'a patent applicant must clearly and unambiguously express surrender.'"  *Voda v. Cordis Corp*., 536 F.3d 1311, 1321 (Fed. Cir. 2008) (citations omitted).  Here the patentee repeatedly asserted that the PDA may be competitive and not entertainment and identified "entertainment value" as one "side benefit."  Exh. 6, P239.  This does not clearly and unambiguously disavow that the PDA must be "inherently entertaining."

<u>Second</u>, likewise there is no unambiguous disavowal if a patentee asserts "X" and later asserts "not X."  By acquiescing in the PTO's claim interpretation, the patentee is deemed to have agreed that "Nothing in the claim requires that the PDA be read as competitive or entertainment-based."  Exh. 7, P317; *Inverness Med. Switz. Gmbh v. Warner Lambert Co*., 309 F.3d 1373, 1380 (Fed. Cir. 2002); *TorPharm Inc. v. Ranbaxy Pharms., Inc*., 336 F.3d 1322, 1330 (Fed. Cir. 2003).

(6)     Defendants assert that "Plaintiff's constructions would render the patent invalid for lack of written description."  D11-12.  That is false.  Plaintiff's constructions are directly stated in the specification, which provides that the PDA may be "any other activity or combination of activities" (2:30-31) and may be "various forms of…competition and/or entertainment" (2:15-20).

**B.     Issue 2: "other than proposing or accepting a price" *vs*. "collateral to its sale"**

Defendants do not dispute that "collateral" means that the PDA must be secondary to a

main activity that determines price. Defendants dispute only whether the main activity should be defined as offering or accepting a price. Defendants' four arguments are rebutted below.

(1)     Defendants identify activities that are clearly not PDAs but that they contend would constitute PDAs under Plaintiff's construction. D7-8. Each example fails, however, because it either constitutes "offering or accepting a price" or does not "determine the price" and, therefore, is excluded under Plaintiff's construction:

- A "buyer's selection of a product" (D7) that is offered at a price constitutes accepting that price. If, however, the selected product has no price, then mere selection does not determine price; rather it is the parties' subsequent offers and counter offers that determines price.

- If a seller "offer[s] discounts to customers who pay immediately or who do not pay with credit" (D7) the seller offers the product at one price for credit, and at a lower price for cash. The act of "entering payment information" (D7) then constitutes accepting one of those offered prices.

- A buyer's "entering the quantity of products desired" (D7) is the acceptance of an offer to buy that quantity at the offered price.

- A buyer entering a "delivery address" (D8) where different prices are offered for different geographies is accepting the price offered for his geography.

- A buyer's "selecting the shipping method" (D8) is accepting the price offered for that shipping method.

In addition, each of these would also be excluded because they are not "competition or entertainment activities."

(2)     Defendants incorrectly assert that "collateral" can remain undefined because it is "a readily understandable word." D6. A "collateral" activity is *different* from, while also tending in the *same* direction as, a main activity. PP6. "Collateral" thus incorporates two antagonistic principles – requiring both difference and similarity – and, therefore, is not "readily understandable." If left undefined, it will certainly lead to inconsistent application.

4

Defendants studiously avoid defining "collateral" but use the word as if it meant "apart from." D6. This usage ignores that a "collateral" activity must not only be different from a main activity, it also must coincide in effect with the main activity. Defendants ignore this aspect because, under their construction, "sale" is the main activity, and a PDA does not coincide in effect with a "sale." Rather, a PDA's effects coincide with direct price setting (*e.g.* providing a base price or price range), which is consistent with Plantiff's constructions.

Moreover, Defendants do not dispute that if "collateral to its sale" means "not part of a sale" then it would absurdly exclude all PDAs, because price determination is necessarily part of a sale. D6 n.2. Defendants respond that the word "otherwise" in their construction solves this problem because "it provides that the PDA is 'used to set the price,' but is 'otherwise collateral to its sale'" (D6 n.2), *i.e.* "otherwise" except the identified activity from the requirement that it not be part of the sale. But with this interpretation, the exception swallows the rule. For example, a buyer's negotiation of a lower price is "used to set the price" but is "<u>otherwise</u> collateral to its sale." Therefore, direct price negotiations become PDAs.

Ultimately, Defendants admit that what they really mean is an activity that is "not otherwise part of a conventional sales transaction." D6. If "collateral" were construed in this manner, its results would come very close to Plaintiff's proposal. Such a construction is worthy of consideration; however, Plaintiff's proposal is still slightly preferred because the term "conventional" may lack precision.

(3)     Defendants assert that the specification does not suggest that "the PDA can be any activity at all" including "activities that lack any marketing incentive." D8 n.3. This argument is wrong at two levels. <u>First</u>, the specification expressly states the PDA may be "any other activity or combination of activities." 2:30-31. <u>Second</u>, all of the PDA's encompassed by Plaintiff's construction provide the "marketing incentive that buyers can reduce the price" (2:44-47), which is the relevant incentive.

(4)     Defendants argue that during prosecution the applicant distinguished a reference that involved listening to advertisements, but "listening to ads would qualify as a PDA" under

Plaintiff's construction.  D8.  This argument has two defects.  <u>First</u>, in this portion of the prosecution history the applicant quoted the claim language "performance of the buyer while participating" and argued that this language "requires active participation by the buyer." Dkt.# 192-4 (Exh. 2) P228.  That claim language would exclude passive listening under any construction of PDA.  <u>Second</u>, if this prosecution argument were instead applied to the definition of "PDA," as Defendants suggest, it would refute Defendants' construction, which contains nothing that would exclude passive listening.

## II.     "price being ... scaled to the performance of the buyer"

### A.      Issue 1: "standard (defined by a ratio, table, or other algorithm)" *versus* "predetermined set of graduated prices and corresponding performance levels"

Defendants' six arguments are rebutted in turn.

(1)     Defendants' proposal is precluded by Claim 13, which requires the price to be determined "partially upon participation of the buyer in an auction."  A system that has "price…assigned from a predetermined set of graduated prices and corresponding performance levels" is a function of only one input (the performance level).  It is impossible in such a system for price to be "partially determined" by any factor other than performance level.

Defendants respond that "the PDA can be conducted after the auction has occurred, such that the predetermined prices are keyed to the auction price."  D19.  But having the PDA after the auction makes no difference.  The only possible way for prices to be "keyed" to an auction price is by using an algorithm where the price assigned is a function of the auction price.  For example, the auction embodiment in the specification provides for a discount off of an auction price, which discount is greater or lesser depending on the PDA results (4:39-43).  This requires a system that generates a discount amount (either a percentage discount or a dollar amount) based on PDA performance, which is then applied to an auction amount.  This cannot be accomplished by assigning price from a set of corresponding prices and performance levels.

(2)     Defendants assert that their construction "in no way precludes other data being considered in setting the price apart from the scaling."  D18-19.  That is false.  If "scaling"

requires price to be "assigned" from a set of "prices and corresponding performance levels," then price is solely a function of performance level and no other factor can influence it.

(3)     Defendants point out that the Summary of Invention states that the range of prices may be "a scaled set of prices (e.g. $1000.00, $1100.00, $1200.00, etc.)" (2:35-37).  D13-14.  But the Summary never mentions a set of corresponding prices and performance levels.  The quoted passage is the "actual range" of prices that result from the PDA (2:20-21; 2:35), and which could equally be produced by any number of algorithms (*e.g.* [base price] – [score x $100]).  If scaling based on a set of "prices and corresponding performance levels" were significant to the invention, then it surely would have been mentioned in the Summary.  Its absence is decisive.

Similarly, Defendants point out that the above specification passage was cited "when adding the scaling limitation during prosecution" (D14).  If the applicant had intended this amendment to be only a set of prices and corresponding performance levels, the prosecution history certainly would have so stated.  But the concept is nowhere mentioned in that history.

(4)     Defendants assert that the specification makes "exclusive use of predetermined, graduated sets of prices and corresponding performance levels."  D15.  That is false.  Defendants offer no response to the following four examples.

Example 1 is an embodiment where for "each certain level …of points, the buyer would be entitled to reduce the price" and "[t]he decrease in price can be in … percentage points."  8:50-54.  A PDA system that generates a "percentage point" "decrease in price" cannot be accomplished by assigning price from a set of prices and corresponding performance levels.  A percentage decrease necessarily requires use of a formula or ratio to assign price.  For example, if a buyer earned a 5% discount for each point scored in a PDA, then the price might be found using the formula price = [base price] – ([base price]  x  5%  x  [PDA score]).

Example 2 is "a price determining algorithm" that "may involve considerations of the number of players or buyers involved, and the skill level of those players."  8:11-13.  A "price determining algorithm" that considers the skill level of players cannot be accomplished by assigning a price that corresponds to the buyer's performance level.

Example 3 is a system where a buyer's performance results are "compared to a raw score or the score of other players and/or buyers to determine the price he is entitled to pay." 7:59-62. This cannot be accomplished by assigning price from a set of prices and corresponding performance levels.

Example 4 is the auction embodiment discussed above that provides for a discount off of an auction price (4:39-43). A system that generates a discount amount based on PDA performance cannot be accomplished by assigning price from a predetermined set of prices and corresponding performance levels.

(5)    Defendants assert that "[t]he 'algorithm used in the patent is a 'mapping algorithm'" that uses a set of "predetermined prices and corresponding performance levels." D17-18. That is false. Example 2 above is explicitly identified as a "price determining algorithm" (8:11-13), and it requires (as do all four of the above examples) an algorithm that is not simply a set of performance levels and corresponding prices.

Moreover, "algorithm" means "A step-by-step problem-solving procedure" especially a "recursive computational procedure." *The Am. Heritage Dictionary* 44 (4th ed. 2000). One would never choose the word "algorithm" to describe something that was <u>limited</u> to a preset table of prices and corresponding scores.

Similarly, Defendants incorrectly assert that the Mark McGuire trivia quiz example in the specification uses a "predetermined set of price-to-performance correlations." D18. The specification mentions <u>nothing</u> about this example using a set of prices and corresponding performance levels and describes it only as the result of an "algorithm" (6:14). That algorithm could take a number of different forms and still produce the exact results described in the specification (for example: [price] = [base price] – ($15 x [score]), where the base price for a Mark McQuire card is $635).

(6)    Defendants' citations to dictionaries (D17) fail for two reasons. <u>First</u>, Defendants ignore the core meaning of "scale" (emphasized in all of the dictionaries) of adjusting to a standard using a proportion or ratio. PP8. Moreover, that meaning is the only one that fits the

claim language context of price being partially determined by factors other than performance.

Second, three of the four dictionaries Defendants quote do *not* contain any definition that would suggest or require a preset list or table of corresponding items. The fourth (Random House) mentions "a table" in only one definition for "scale" as a noun, but that same dictionary defines the verb "scale" (which applies here) as "to adjust in amount according to a fixed scale or proportion." Dkt.# 192-7 (Exh. 5) at 1709. That definition fully supports Plaintiff's proposal.

## B.       Issue 2: "than would otherwise apply" *versus* "always"

Significantly, Defendants ignore dependent claim 13, which adds the limitation of "the price is determined at least partially upon participation of the buyer in an auction." Any system that determines price partially based upon an auction can necessarily produce a higher price even though the buyer had the same (or even a better performance) in the PDA. This must occur (as a matter of mathematical necessity) each time that the performance remains the same while the auction pushes the price up, and each time the performance is better, yet the price-increasing effects of the auction are greater than the impact of the better performance. The converse is true when the auction pushes the price lower, yet the buyer's performance is worse. Accordingly, lower price does not "always" correspond to better performance in the PDA, or vice versa – it may result from other factors that "at least partially" determine price.

By contrast, Plaintiff's proposal perfectly fits the claim language under all circumstances. In every case, achieving a better performance level necessarily results in a lower price than would otherwise apply without the better performance level.[2]

Defendants' three arguments are rebutted in turn.

(1)       Defendants challenge Plaintiff's analysis of a PDA that sets price based "partially on a competitor's performance." D20. Defendants argue, "in the patent, the performance is how

---

[2]       Note that Plaintiff's construction requires that the buyer achieve the next better "performance level" to obtain the resulting lower price. This occurs because the system may require a certain degree of performance improvement before rewarding a further price reduction. This point is not in dispute, and Defendants agree that "an increase in performance does not necessarily result in better price." D15 n.10.

well the buyer does in relation to other participants. For instance, in the horse race embodiment, if the buyer has a time of 30 seconds, the 30 second time is not what the price is scaled to in the patent." D20. This argument fails at two levels.

First, "performance" means the actions of the buyer in performing a PDA, not placement relative to competitors. If the buyer has the same performance in two consecutive horse races achieving an identical time of 30 seconds, and if a competitor has a worse time in the first race and a better time in the second race, the buyer will get a higher price in the second, despite having the same performance.

Second, if "performance" meant relative placement, as Defendants contend, then the horse racing PDA would not be an example where price was based "partially" on buyer's performance and "partially" on the competitor's performance. In that example, price is determined solely by the buyer's relative placement (1st, 2nd, 3rd *etc.*) and thus solely by what Defendants label the buyer's "performance." The "performance" (*i.e.* relative placement) of the "competition" does not partially determine price.

    (2)    Defendants argue that the specification describes a "market incentive" of a potential price reduction and "[t]here would be no incentive to buy a product" and "[n]o one would participate in a PDA if his price could increase even if he performed well." D13, D19. That is false.

Under Plaintiff's construction, the better performance level results in a lower price than would otherwise apply, which provides buyers the full and complete market incentive. For example, assume a buyer's performance results in a $5 discount off of an auction price of $20 for a price of $15. Assume the same buyer in a later purchase of the same product performs *better* and achieves a $10 discount off an auction price of $30 for a price of $20. In the second instance, the buyer's incentive to participate in the PDA is just as strong, even though the resulting price is greater, because his price would have increased much <u>more</u> without the better performance. In fact, <u>the degree of incentive a PDA provides is identical</u> whether the final price goes up, down, or stays the same, provided (as Plaintiff proposes), a better performance level results in a lower price

than would otherwise apply but for the performance.

(3)     Defendants repeatedly assert that "in every embodiment in the patent … a higher price always correlates to a lesser performance in the PDA" and the patent "never mentions the possibility that a lower price would not correspond to a better performance in the PDA."  D15-16. That is simply false.

The specification includes an embodiment where the price is determined partially by an auction price (4:39-43), in which a lower price is equally likely to result from a lower auction price, and not better performance.  And in another embodiment, "a score of 100,000 may entitle the buyer to a $500.00 price, whereas the same PDA may entitle a different buyer to a price of only $525.00 for the same product."  7:16-24.  In this example, higher price does not "correlate[] to a lesser performance" and the "lower price would not correspond to a better performance."

Moreover, Defendants' argument is also irrelevant.  "[E]ven where a patent describes only a single embodiment, claims will not be 'read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004), *expressly reaffirmed in Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  Neither the Summary of the Invention nor the prosecution history even mentions Defendants' "always" limitation, much less contains the required clear expression of manifest exclusion.[3]

## C.     "meaningless and indefinite"

Defendants' four arguments that Plaintiff's construction is "meaningless and indefinite" (D19) are rebutted in turn.

---

[3]     Defendants also discuss the very different claim language in the Bid For Position patents (D15-16).  That case concerned the relationship between bid value and position in a multi-positon auction.  It was *undisputed* that higher bid value would never result in lower position in the auction because the claim language *explicitly required* that position be determined based on bid value alone.  The claim language here, however, requires that price be determined partially based on other factors.

(1)     Defendants assert that Plaintiff presents a scenario where "the price would be $15," which "is more than the $10 advertised price," which means buyer will "pay more than the advertised price even if the buyer performs well." D20 n.15. Defendants are simply making it up. Plaintiff's brief <u>nowhere</u> describes $10 as an "advertised price." Rather $10 is a "base price" used in the price calculation algorithm and falling within the range of potential prices. PP12-13. The "advertised price" would either be (i) the range of potential prices that could result from the PDA, or (ii) the price range selected by the buyer if such selection is permitted.

(2)     Defendants appear to agree that a proper construction is that the scaled price "will be lower than it would have been without the better performance level." D19 (quoting P12). Defendants complain, however, that "Plaintiff's construction contains no such limitation." D19. That is false. In Plaintiff's construction – "achieving a better performance level results in a lower price <u>than would otherwise apply</u>" – the underlined phrase plainly means "*than would have occurred without the performance level*." But if the Court believes the underlined phrase is potentially ambiguous, Plaintiff (and apparently Defendants) would have no objection to using the italicized phrase.

(3)     Defendants assert that Plaintiff's "construction would be met if better performance results in a lower price in just one case," which would eliminate any market incentive from the PDA. D19. Both halves of this argument are defective.

<u>First</u>, this assertion is equally true of Defendants' construction. Defendants' construction is satisfied by a PDA using a preset table with two possible scores "1" and "2", which lead respectively to prices of $500 and $250. In this example, there is "just one case" where better performance leads to lower price. And this is no better than setting price using the ratio: price = $500 / [score], where the two possible PDA scores are "1" and "2."

<u>Second</u>, the "just one case" in the above examples results in a 50% price reduction, which is ample "market incentive." (Moreover, no claim contains a limitation that the PDA must provide a market incentive of any particular magnitude.)

(4)     Defendants assert that Plaintiff's construction is indefinite because "how is

one…supposed to know what is the price that 'would otherwise apply?" D20. They assert a "formula…could yield an infinite number of other possible results" and an accused infringer "would need to analyze every possible result." D20-21. This argument fails at every level.

First, to know whether a PDA adjusts price to a standard "such that achieving a better performance level results in a lower price than would otherwise apply," there is no need to know what the price would be without using the PDA. To determine if this claim element is met, one need only know that better performance levels reduce price (regardless of the starting price). For example, assume a system combines an auction and a PDA such that "the buyer may be entitled to a further discount of the auction or reverse auction price, which discount may be greater if the buyer performs well at the PDA, and not so great if the buyer performs poorly." 4:39-43. To determine if the system meets the claim language, there is no need (indeed no benefit) in knowing the results of the auction; one need only know the effects of the PDA.

Second, if scaling is done using a formula, then it is *far easier* to determine the effects of a PDA than if scaling is done using Defendants' set of prices and corresponding performance scores. Determining the effects of a formula merely requires inspecting the properties of a single item: the formula itself. For example, if price = [base price] / [Buyer PDA score], then we readily know that better performance produces a lower price; it is the necessary result of an inverse ratio. And we have that knowledge without examining a single example, much less "every possible result." D21. By contrast, the only way to determine all effects of a "predetermined set" of "prices and corresponding performance levels" is to inspect "every possible" pair of prices and performance levels, which could be hundreds, thousands, or hundreds of thousands.

Third, Defendants incorrectly analyze the hypothetical system that sets price partially based on a competitor's performance, using the algorithm: [price] = [base price] x ([B2 score] / [B1 score]), where B1 is the Buyer and B2 is the competitor. D20-21. We don't need to analyze every possible combination of B1 and B2 score. We simply ask, holding everything else constant, does increasing B1's performance level result in a lower price? It does, because price is inverse to B1 score. Therefore, we know (to a mathematical certainty) that a better performance level results

13

in a lower price than would otherwise apply without the better performance level.

## III.    "accepting" / "selection of the product"

### A.    "accepting" means "receiving with consent or approval"

(1)    Defendants assert that the claim language "context" is accepting "inputs" over a "network" and imply that this amounts simply to receiving data.  D26.  That is false.  The claim language is "accepting" and not merely "receiving."  And the context is *contract formation*, not data transmission:  "accepting: an "acknowledgement from the buyer representing an intent of the buyer to buy," and "accepting" a "request from the buyer to buy."

(2)    Defendants point out that the specification mentions an embodiment where "the contract is not binding."  D25-26.  That embodiment, however, is not a limitation in any of the asserted claims.  Claims that include the step of "accepting" – and not merely receiving – facilitate the creation of a binding contract.  Thus, the applicable portions of the specification are the Summary stating "[t]he present invention comprises" a system where "buyers enter into a contract" (2:15-23), and the embodiments that "facilitate the creation of a binding contract" (7:37-39; 4:36-43; 5:18-22).

### B.    There is no "selection of the product" limitation.

Defendants argue that because the claims include the step of providing product information to a buyer, they must include the step of having the buyer select a product.  This argument rests on two premises: (i) if product information is provided, a buyer must "select" a product, and (ii) if a process must necessarily include an activity, any patent claim covering a version of that process must necessarily include that activity as a claim limitation.  Both premises are wrong.

(1)    Providing product information does not entail receiving product "selection." Defendants admit that a system using the method of claim 1 may present only one product, and that a seller need not know "which product the buyer wants to buy" (*i.e.* selection), but only "whether" the buyer wants to buy.  D23.  That is accomplished in claim 1 by accepting a "request from the buyer to buy the product within a price range," accepting a request to use a PDA, and receiving the buyer's performance data.

(2)     That product selection will take place in a <u>system</u> using the method of claim 18, does not require that product selection be added as a <u>claim</u> limitation.  It is improper to add an unclaimed step as a limitation, even if that step would necessarily occur.  *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1343-44 (Fed. Cir. 2001) (even though the process would logically require an intervening step of "IMM sends the request reproduction code to the ICM" that step is "not claimed"); *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1344-45 (Fed. Cir. 2008) (the district court improperly "bootstrap[ped] a temporal restraint on the occurrence of a winding step … even though winding is not even explicitly recited in either claim"); *Charles E. Hill & Assoc. v. Amazon.com*, 2005 U.S. Dist. LEXIS 45414, 44-45 (E.D. Tex. Oct. 7, 2005) ("The court is not persuaded to engraft another step" when "the claims do not explicitly require the step").

A <u>system</u> using the claimed methods necessarily must, for example, receive payment data.  But that is not a <u>claim</u> limitation, except where expressly added.  *E.g.* claim 2.  Similarly, Defendants quote language from the Summary of the Invention that "buyers participate <u>in selected activities</u> … to determine the ultimate price the buyer is to pay for a <u>selected product or service</u>." D24 (quoting 3:38-41 (emphasis added)).  If, as Defendants contend, this language compels adding product selection to all claims, then wouldn't it also compel adding PDA selection to all claims?  It does neither.  *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1309 (Fed. Cir. 2007) (the specification "makes reference to 'roaming' telephones" but "Vonage fails to identify language that would require roaming in every case…and the claims do not require roaming").  The concept "selected by the buyer" is a claim limitation only in those claims where it is explicitly included.  *E.g.* Clams 16, 19, 24.

Finally, Figure 1 cited by Defendants is an embodiment where product selection is shown as a <u>separate</u> step, and <u>not</u> part of the step of accepting a price range (contrary to Defendants' construction of claim 1), nor the step of agreeing to a PDA (contrary to Defendants' construction of claim 18).

## IV.     "first" and "second" / ordering

(1)     Defendants' out-of-context quote from *Lifenet, Inc. v. Musculoskeletal Transplant Found.*, 2007 U.S. Dist. LEXIS 45172 (E.D. Va. June 21, 2007), gives the misleading impression that the court concluded that when the words "first" and "second" appear in a method claim, this implies an order.  D26.  The court found no such thing.  The parties *agreed* that the steps in that patent "occur in the recited order" (because they necessarily built on each other) and the court *never* addressed the meaning of "first" and "second."  *Id.* *19-*20.  Moreover, controlling law is found in Federal Circuit <u>holdings</u> that "use of the terms 'first' and 'second' is a common patent-law convention to distinguish between repeated instances of an element or limitation."  *Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1348 (Fed. Cir. 2005).

(2)     For claim 1, Defendants assert only that step [a] must occur before step [b], and step [b] before step [e].  D27.  The latter is not disputed, but the former is wrong.  Defendants' sole rationale is that "the product of element 1[b] is a product communicated in the prior step 1[a]."  D27.  But the phrase "the product" means nothing more than that both steps reference the <u>same</u> product or products.  PP19-20.  It says nothing about the order of the steps.  *Id.*  A system using the claim 1 method could accept a buyer's price range to buy a product (step [b]) and then present to the buyer a product (step [a]) that is available within that price range.  Alternatively, the system could first present a product and then accept a price range.  Because it is logically and "technologically possible" to do step[a] and [b] in either order, an order is not required.  *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed. Cir. 2003).

(3)     Claim 30 is not a method claim and has no steps that need ordering.

## V.     "auction"

(1)     Defendants argue for a narrow definition of "auction" on the basis that the Patent "treats a 'reverse auction' as a different business model than an 'auction.'"  D30.  But the fact that two things are "different" does not make them mutually exclusive.  A "reverse auction" is a type (*i.e.* a subset) of "auction," as the applicant expressly stated during prosecution.  Application claim 39 added the limitation "wherein the price is determined at least partially based upon participation

of the buyer in an auction." Dkt.# 192-4 (Exh.2), P94.  When adding the claim, the applicant

identified support in specification passages that mention "reverse auctions."  *Id*. at  P101.  More

significantly, the applicant also added dependent claim 40: "The method of Claim 39, wherein the

auction is a reverse auction."  *Id*. at P94 (emphasis added).  Because an antecedent claim must

encompass the entire scope of any dependent claim, the term "auction" in application claim 39

necessarily encompasses a "reverse auction."  And because the language of issued claim 13 is

identical to application claim 39, its language also necessarily encompasses a reverse auction.

(2)      Defendants do not dispute that the claim language and prosecution history make

clear that the auction is not a PDA.  D30.  Defendants' discussion of how "auction" applies to

their system, *id*., is both wrong and irrelevant to claim construction.

## VI.      **"performance of the buyer"**

Defendants admit that a buyer's "physical acts" in performing the PDA and the resulting

"level of success" are two different concepts.  D12.  Defendants merely argue that the level of

success must be used to calculate price.  D12.  But that is irrelevant.  The question is whether

(i) the system receives the buyer's level of success, or instead (ii) the system receives data

representing the buyer's performance (*i.e.* actions) in the PDA, which the system then uses to

calculate level of success.  The claim language reflects the latter.

Moreover, the specification does not use the term "performance" by itself to describe the

level of success; instead, it uses phrases such as "performance rating or score" or "level of

performance."  2:23-25; 2:52-56.  If "performance" meant "level of success," then the

specification's use of "level of performance" would absurdly mean "level of level of success."

Finally, Defendants admit that under their construction "the buyer's level of success" must

be "calculated on the user's computer and communicated to the system."  D12 n.8.  That is

impractical or even impossible when the buyer's level of success depends on comparison to the

actions and deeds of other participants.  Examples are "a bridge game where he would be dealer

and North, and would be playing with three other individuals who have selected bridge as their

PDA" (5:53-56), or cribbage, Monopoly, Trivial Pursuit, or other similar games (8:6-10), or in a

"simulated horse race" where a buyer competes against other "actual players" "simultaneously" with a countdown and synchronized start. 8:24-37. It is particularly improper to impose as a required claim limitation that level of success is calculated on the buyer's computer when the specification _never once_ describes such a process, not even as an alternative embodiment.

**VII.     The remaining constructions.**

"master controller":  Defendants' argument was already addressed and rebutted.  PP28-29.

"price range":  Defendants quote specification passages that use the phrase "specified price range" (D28), but ignore the many passages (including in the Summary of Invention), that use "price range" without the "specified" modifier.  2:65; 3:6-7; 3:63; 4:52.  What is decisive, however, is that the _claim language_ does _not_ include the modifier, and the Court may not "add a narrowing modifier before an otherwise general term that stands unmodified in a claim." _Renishaw PLC v. Marposs Societa' per Azioni_, 158 F.3d 1243, 1249-50 (Fed. Cir. 1998); _Innova/Pure Water, Inc. v. Safari Water Filtration Sys._, 381 F.3d 1111, 1118 (Fed. Cir. 2004) ("In the absence of modifiers…terms are typically construed as having their full meaning"), _expressly reaffirmed in Phillips v. AWH Corp._, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

"description of a product"/"data representing a plurality of products":  The claims use the phrases "a product" and "plurality of products," and not "a _particular_ product" or "plurality of _particular_ products."  Accordingly, the modifier "particular" should not added.  _Id._

**VIII.   Conclusion.**

Plaintiff's proposals should be adopted and Defendants' proposals rejected.

Dated June 8, 2009                                      Respectfully submitted,

                                                        By:   __/s/ Christin Cho_____

                                                             Christin Cho
                                                             CA State Bar No. 238173
                                                             Email: christin@dovellaw.com
                                                             Gregory S. Dovel
                                                             CA State Bar No. 135387

Email:  greg@dovellaw.com
Sean Luner
CA State Bar No. 165443
Email:  sean@dovellaw.com
Dovel & Luner, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
Telephone:  310-656-7066
Facsimile:  310-657-7069

S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
Capshaw DeRieux, L.L.P.
Energy Centre
1127 Judson Road, Ste 220
P. O. Box 3999 (75606-3999)
Longview, Texas 75601-5157
Telephone: (903) 236-9800
Facsimile: (903) 236-8787
Email:  capshaw@capshawlaw.com
Email:  ederieux@capshawlaw.com

Robert M. Parker
State Bar No. 15498000
Email: rmparker@cox-internet.com
Robert Christopher Bunt
State Bar No. 00787165
Email: cbunt@cox-internet.com
Parker & Bunt, P.C.
100 East Ferguson, Ste. 1114
Tyler, TX 75702
Telephone:  903/531-3535
Facsimile: 903/533-9687

ATTORNEYS FOR PLAINTIFF
PERFORMANCE PRICING, INC.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document was served, via E-mil, on counsel for Defendants this 8th day of June, 2009.

/s/ Christin Cho
Christin Cho