# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| **PERFORMANCE PRICING, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 2:07cv432** |
| | § | |
| **GOOGLE INC., et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

This claim construction opinion construes the disputed terms in U.S. Patent No. 6,978,253 ("the '253 patent"). Plaintiff has filed an Opening Claim Construction Brief ("Opening") (Doc. No. 187) and a Reply Claim Construction Brief ("Reply") (Doc. No. 198). Defendants have filed a Joint Response Brief on Claim Construction ("Response") (Doc. No. 192), as well as a Joint Sur-Reply Brief on Claim Construction ("Surreply") (Doc. No. 207). The Court held a *Markman* hearing on June 18, 2009. (Doc. No. 209). On July 15, 2009, the Court issued a provisional claim construction order ("Provisional Order") (Doc. No. 218) setting forth the Court's initial constructions. At that time, the Court ordered the parties to submit further briefing on the issue of whether the steps recited in claims 1, 18, and 30 must be performed in the order recited. PROVISIONAL ORDER at 4–5. Pursuant to the Court's Order, the parties filed supplemental claim construction briefs. *See* PLAINTIFF'S SUPPLEMENTAL CLAIM CONSTRUCTION BRIEF ("Pl. Supp.") (Doc. No. 222); DEFENDANTS' JOINT SUPPLEMENTAL RESPONSE BRIEF ON CLAIM CONSTRUCTION ("D. Supp.") (Doc. No. 227). For the reasons stated herein, the Court adopts the constructions set forth below.

## BACKGROUND

On September 27, 2007, Plaintiff Performance Pricing, Inc. ("Performance Pricing") filed the instant action against Defendants Google, Inc. ("Google"); AOL LLC ("AOL"); Microsoft Corporation ("Microsoft"); and Yahoo! Inc. ("Yahoo") (collectively "Defendants"), alleging infringement of the '253 patent.[1] COMPLAINT (Doc. No. 1) at 1. Plaintiff asserts seven claims of the '253 patent. *See* NOTICE OF FILING OF P.R. 4-5(D) JOINT CLAIM CONSTRUCTION CHART, EXH. A ("Claim Chart") (Doc. No. 211). A representative claim is provided below with the disputed claim terms set forth in bold. Claim 1 of the '253 patent provides:

> 1. A method of doing business over a global communications network comprising the steps:
>> communicating to a buyer via the global communications network, a **description of a product**;
>> **accepting a first request from the buyer to buy the product** for a price to be determined within a **price range**;
>> **accepting a second request from the buyer to allow the price to be determined** based upon a **performance of the buyer** while participating in a **Price-Determining-Activity (PDA)**;
>> receiving data from the buyer over the global communications network, said data representing the **performance of the buyer** during the **PDA**; and
>> determining the price of the product based at least partially upon the data received, said **price being** within the **price range** and **scaled to the performance of the buyer**.

'253 patent at 9:30–46 (claim 1). The parties submitted a total of nine terms for construction. Each disputed term will be addressed herein.

---

[1]Defendants IAC Search Media, Inc. ("IAC") and A9.com ("A9") were added when Plaintiff filed its First Amended Complaint for Patent Infringement (Doc. No. 16). At the *Markman* hearing held on Thursday, June 18, 2009, Defendant Microsoft announced that it had reached a settlement with Plaintiff and closing documents would be filed soon. As a result of this and previous settlements, the only remaining Defendants are Google and AOL.

## LEGAL STANDARD

The claims of a patent define the patented invention. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389-90 (1996). Under *Markman v. Westview Instruments, Inc.*, district courts construe the scope and meaning of disputed patent claims as a matter of law. 517 U.S. at 373. Claims are construed from the standpoint of a person having ordinary skill in the art, *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003), and according to the Federal Circuit, the court must "indulge a heavy presumption that a claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (internal quotations omitted); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) ("the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention").

The first step of the claim construction analysis requires the court to look to the intrinsic evidence, beginning with the words of the claims themselves, followed by the specification and—if in evidence—the prosecution history. *Teleflex, Inc. v. Ficosa N. Am.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-84 (Fed. Cir. 1996); *see also Phillips*, 415 F.3d at 1315 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms"). A term's context in the asserted claim can be very instructive, and other claims may aid in determining the term's meaning because claim terms are typically used consistently throughout the patent. *Phillips*, 415 F.3d at 1314.

The claims of a patent "must [also] be read in view of the specification, of which they are a part" because the specification may help resolve ambiguity where the words in the claims lack clarity. *Id.* at 1315; *see also Teleflex*, 299 F.3d at 1325. Yet, the written description should not

trump the clear meaning of the claim terms. *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 966 (Fed. Cir. 2000) ("[a]lthough claims must be read in light of the specification of which they are part . . . it is improper to read limitations from the written description into a claim"); *Arbitron, Inc. v. Int'l Demographics Inc.*, No. 2:07-cv-434, 2009 WL 68875, *3 (E.D. Tex. Jan. 8, 2009) ("although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments").

Finally, an inventor may "choose [] to be his or her own lexicographer" by expressly defining terms in the specification. *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999). A court may examine the prosecution history to determine whether the patentee intended to deviate from a term's ordinary and customary meaning. *Teleflex*, 299 F.3d at 1326. The prosecution history may "limit [] the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Id.* (quoting *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)). If analysis of the intrinsic evidence resolves any ambiguity in disputed claim terms, then "it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1583 (citations omitted). Extrinsic evidence—such as expert testimony, dictionaries, and treatises—may be used only if ambiguities remain after analyzing all the intrinsic evidence. *Id.* at 1584.

## DISCUSSION

The parties present the following nine claim terms and phrases for construction: 1) "Price-Determining-Activity;" 2) "price being . . . scaled to the performance of the buyer;" 3) "accepting;" 4) "first" and "second"/ordering of steps, 5) "auction," 6) "performance of the buyer;" 7) "master

controller;" 8) "description of the product"/"data representing a plurality of products" and 9) "price range."[2]

## I.     "price determining activity"[3]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| 1) any activity or combination of activities, other than offering or accepting a price, that is used to determine the price paid for the product or service; or<br>2) any form of competition or entertainment activity or combination of such activities, other than offering or accepting a price, that is used to determine the price paid for the product or service | inherently entertaining activity, such as a game, puzzle or quiz, that is used to set the product's price, but otherwise is collateral to its sale |

Plaintiff argues that a price-determining activity ("PDA") may be either any activity or any entertaining and/or competitive activity. OPENING at 1–2. Plaintiff argues that the activities listed in the specification conclude with "or any other activity," and therefore a PDA is not limited to inherently entertaining activities. *Id.* at 2. Plaintiff adds that the specification explicitly notes that a PDA includes "various forms of competition and/or entertainment." *Id.* at 3. Plaintiff also argues that the PDA must be collateral to the main activity, which is offering or accepting a price. *Id.* at 6.

Defendants argue that because the term "PDA" was coined by the patentee the PDA must be collateral to the sale, as the specification discloses. RESPONSE at 5–7. Defendants contend that by excluding only the offer or acceptance of a price from the definition of a PDA, selecting a product would improperly be included within the scope of the term. *Id.* at 7–8. Finally, Defendants

---

[2]The parties have also agreed to a number of constructions. PARTIES' COMPLIANCE WITH PATENT RULE 4-3 (Doc. No. 166).

[3]The term "price-determining-activity" is located in claims 1 and 18.

argue that the PDA must be "inherently entertaining" because the specification repeatedly discloses this requirement.[4]  RESPONSE at 8–10.

Looking first to the claims of the '253 patent, claim 1 discloses:

> 1. A method of doing business over a global communications network comprising the steps:
>> communicating to a buyer via the global communications network, a description of a product;
>> accepting a first request from the buyer to buy the product for a price to be determined within a price range;
>> accepting a second request from the buyer to allow the price to be determined based upon a performance of the buyer while participating in a **Price-Determining-Activity (PDA)**;
>> receiving data from the buyer over the global communications network, said data representing the performance of the buyer during the **PDA**; and
>> determining the price of the product based at least partially upon the data received, said price being within the price range and scaled to the performance of the buyer.

'253 patent at 9:31–49 (claim 1).  While claim 1 does not indicate what type of price-determining activity is contemplated, other dependent claims indicate that the PDA can be a video game.  *Id.* at 9:59–60 (claim 5), 10:32–33 (claim 17), 11:22–12 (claim 29).

In the Background section of the specification, the patentee explains that prior art business models did not allow "a potential buyer to engage in a competitive/entertaining collateral price-determining activity (PDA) which ultimately determines the price of the product or service to be secured, depending on the buyer's performance during the collateral activity."  '253 patent

---

[4]Defendants also argue that Plaintiff's proposed construction would render the patent invalid as lacking a sufficient written description.  RESPONSE at 11–12.  Claim language should generally be construed to preserve validity, if possible.  *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1367 (Fed. Cir. 2002).  However, where the only claim construction that is consistent with the claim's language and written description renders the claim invalid, this axiom does not apply and the claim is invalid.  *Id.* (quoting *Rhine v. Casio*, Inc., 183 F.3d 1342, 1345 (Fed. Cir. 1999)).

at 1:57–62.  Throughout the specification, the PDA is referred to as a "collateral" or "intermediary" activity.  *See, e.g.*, '253 patent at 1:59,1:62, 2:19, 2:25, 4:1, 4:3,

In the Summary of the Invention section, the patentee further explains that

> Various forms of electronic competition and/or entertainment are used as intermediary activities between said buyers and sellers to ultimately determine a contract price. . . .  The ultimate price (within the range) is determined based upon the buyer's performance rating, or score, which the buyer receives from participating in a collateral activity. . . .  The activity may be a video game (including audio/visual games), electronic board game, crossword puzzle or other word game, sports bet, card game, or any other activity or combination of activities.

'253 patent at 2:17–35; *see also id.* at 4:3–5; 5:22–24.  Specific examples of PDAs disclosed in the specification include a bridge game where the buyer would be dealer and North and would be playing with three other individuals; a Mark McGwire trivia quiz of ten questions; an offer to predict which major league baseball player will be the first to reach fifty homeruns this season; a game of keno; a classic PacMan video arcade game; a simulated stock market; sports wagering; Trivial Pursuit; Monopoly; and simulated horse racing, among others.  '253 patent at 5:53–60, 7:53–54, 7:66–67, 8:6–10, 8:16–26.  It is further noted that a "wide variety" of PDAs may be used. *Id.* at 7:14–16.  These disclosures indicate that a broad range of activities are contemplated by the patentee's use of the term "PDA."

The prosecution history further supports this conclusion.  After a Final Rejection from the United States Patent and Trademark Office, the applicant appealed the examiner's decision to the Board of Patent Appeals and Interferences ("BPAI").  *See* RESPONSE, SISTOS DEC., EXH. 2 at 65, 115.  The BPAI held that certain claims were patentable.  The BPAI also indicated that it took a broad view of the activities comprising a PDA.  *Id.* at 155.

7

> We find nothing in claim 1 that limits the claim to only "competitive or entertainment-based" activity. Rather, the claim merely recites "a Price-Determining-Activity (PDA)". Nothing in the claim requires that the PDA be read as competitive or entertainment-based. Further, Appellant's specification recites at page 3, lines 18–29, that the collateral activity may be "any other activity or combination of activities.[5]

*Id.* The intrinsic record makes unambiguously clear that a PDA is not limited to an "inherently entertaining activity," as Defendants propose.

The parties agree that the "collateral" or "intermediary" nature of the PDA should be included in the construction. RESPONSE at 5–6; REPLY at 3–4. However, the parties dispute whether the term "collateral" sufficiently defines the term. REPLY at 4–5. At the hearing, Plaintiff indicated that it would agree to defining "collateral" as "not otherwise part of a conventional or traditional sales transaction." Defendants indicated that they agreed if the terms "conventional" and "traditional" were not in the definition.

In support of including the term "traditional" or "conventional," Plaintiff points to the specification of the '253 patent which indicates that the invention differs from "traditional transaction methods" in a number of ways. '253 patent at 1:19–25. While the patentee does refer to the state of the art in this manner, the Court sees no reason to include the term in the construction. The specification indicates that the PDA is collateral to the purchase transaction between a buyer and seller. *See* '253 patent at 1:17–48. This purchase transaction comprises "[s]ellers offer[ing] a product or service within a specified price range, and buyers enter[ing] into a contract to buy the

---

[5]This interpretation sets forth the broadest reasonable interpretation of the term. *See In re Trans Texas Holdings Corp.*, 498 F.3d 1290, 1295 (Fed. Cir. 2007). While the courts are bound by different standards for claim construction, this interpretation is a part of the prosecution history and should be considered by the Court as part of the intrinsic record. *See Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996).

product or service within that price range.  *Id.* at 2:20–23.  The specification also notes that the buyer may provide payment information in a number of ways, including "via phone, regular mail, e-mail, or any other means" and this disclosure "preferably occurs prior to allowing the buyer to participate in the PDA."  *Id.* at 5:4–35.  In conjunction, these excerpts indicate that the PDA is collateral to a sales transaction and one part of a sales transaction involves disclosing payment information, which need not occur in a "traditional" manner—it may occur via e-mail or "any other means."  *Id.*  Therefore, the Court finds that the proper construction of the term "price determining activity" is "any form of competition or entertainment activity or combination of such activities that is used to determine the price paid for the product or service and is not otherwise part of a sales transaction."

## II.  "price being . . . scaled to the performance of the buyer"[6]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| price being adjusted to a standard (defined by a ratio, table, or other algorithm) according to the performance of the buyer, such that achieving a better performance level results in a lower price than would otherwise apply | price being assigned from a predetermined set of graduated prices and corresponding performance levels, in which a lower price always corresponds to a better performance in the PDA and a higher price always corresponds to a worse performance in the PDA |

Plaintiff argues that the standard for scaling a price can be a formula, ratio, table or algorithm.  OPENING at 7–9.  Plaintiff adds that this standard is not limited to a predetermined table of prices.  *Id.* at 8–10.  Plaintiff also argues that a lower price does not "always" correspond to a better performance at the PDA.  *Id.* at 12–13.  Defendants contend that the specification discloses

---

[6]The term "price being . . . scaled to the performance of the buyer" is in claim 1.

that the scaling occurs according to a scaled set of prices. RESPONSE at 13–14. Defendants also argue that a lower price always corresponds to a better performance at the PDA. *Id.*

As set forth above, claim 1 of the '253 patent discloses that the price of the product or service is determined "based at least partially upon the data received, said price being within the price range and scaled to the performance of the buyer." '253 patent at 9:31–49 (claim 1). As Plaintiff points out, the claim language indicates that the price is not exclusively determinated based on the buyer's performance. *Id.* at 9:44–46. The specification discloses:

> The ultimate price [of the product or service] (within the range) is determined based upon the buyer's performance rating, or score, which the buyer receives from participating in a collateral activity. Thus, if a buyer performs poorly at the activity, the price will be higher, whereas if the buyer does well, the price will be lower.

'253 patent at 2:23–28. The specification also discloses that the scaling may occur according to a price-determining or mapping algorithm, a table of values, or a score comparison among players. '253 patent at 7:42–49, 57–62, 8:10–13. With respect to scaling, the specification also discloses that "a price determining algorithm associated with a PDA may involve considerations of the number of players or buyers involved, and the skill level of those players." *Id.* at 8:10–13. In order to take into account such variables as the number of players or the skill level of the players, the scaling cannot be limited to only predetermined set of graduated prices and corresponding performance levels, as Defendants argue. Moreover, as previously noted, the specification explicitly discloses scaling methods that are not so limited.

Plaintiff argues that a better price does not always correspond to a higher score. OPENING at 12–13. The specification consistently indicates that if a buyer performs poorly at the activity, the price will be higher, whereas if the buyer does well, the price will be lower. *See* '253 patent

at 2:26–28, 52–56, 3:64–67, 4:1; *see also id.* at 5:39–67; 7:40–52; 8:14–23, 46–58. While the specification does note that considerations other than score may be taken into account, it limits these considerations to the number of players involved and the skill level of the players. *Id.* at 8:10–13. The specification neither lists other considerations, nor indicates that this list is non-exhaustive. The listed considerations do not indicate that a better price does not always correspond to a higher score.

Moreover, the prosecution further supports this conclusion. The "scaling" limitation was disclosed a the point of novelty during prosecution. RESPONSE, SISTOS DEC., EXH. 2 at 48. Later, the applicant indicated that "[t]ypically, the better the buyer performs during the PDA, the lower the price will be of the product being purchased" and "price is scaled . . . such that the better the buyer performs during the PDA, the lower the price will typically be of the product being purchased." *Id.* at 118, 129. The applicant also emphasized that "[t]he PDA is directly connected to the price of the product" and claim 1 "recited [a] direct link between a Price-Determining-Activity (PDA) and the price of the product." *Id.* at 125, 129 (emphasis omitted). The decision of the BPAI also reflects these contentions: "if a buyer performs poorly at the activity, the price will be higher, whereas if the buyer does well, the price will be lower." *Id.* at 149. Therefore, the intrinsic record indicates that a buyer's score or performance level is directly connected to the price of the product and a better performance results in a lower price.

Plaintiff argues that this is not always the case and sets forth a number of hypothetical formulas where a better performance would not necessarily result in a lower price. OPENING at 12–14; REPLY at 9–11. However, such speculation does not change the disclosures set forth by the patentee in the intrinsic record. The patentee specifically emphasizes the "direct connection" and "direct link" between a better performance and a lower price. *Id.* at 118, 125, 129.

The statements are unambiguous, and Plaintiff points to nothing in the intrinsic record that indicates that a better performance could ever result in a higher price. Therefore, the Court finds that the proper construction of the term "price being . . . scaled to the performance of the buyer" is "price being adjusted by a ratio, table, or algorithm, wherein a lower price always corresponds to a better performance or better performance level in the PDA and a higher price always corresponds to a worse performance or worse performance level in the PDA."

### III.   "accepting a first request from the buyer to buy the product"[7]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| receiving with consent or approval a request from the buyer to buy the product or service | accepting from the buyer a selection of the product to buy |

**"accepting a second request from the buyer to allow the price to be determined"[8]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| receiving with consent or approval a second request from the buyer to allow the price to be determined | accepting a request from the buyer that the price of the selected product be determined |

**"accepting acknowledgment from the buyer representing an intent of the buyer to buy the first product"[9]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| receiving with consent or approval an acknowledgment from the buyer representing an intent of the buyer to buy the first product or service | accepting from the buyer a selection of the first product to buy |

---

[7]The term "accepting a first request from the buyer to buy the product" is in claim 1.

[8]The term "accepting a second request from the buyer to allow the price to be determined" is in claim 1.

[9]The term "accepting acknowledgment from the buyer representing an intent of the buyer to buy the first product" is in claim 18.

The parties dispute whether the term "accepting" requires consent or approval. OPENING at 14–18; RESPONSE at 25; REPLY at 14–15. Plaintiff argues that the claimed invention creates a binding contractual obligation on the buyer. OPENING at 15. Defendants assert that the specification explicitly notes that non-binding contracts are encompassed within the scope of the invention. RESPONSE at 25.

Claim 1 refers to accepting requests and acknowledgment from the buyer throughout the transaction. '253 patent at 9:31–49 (claim 1). As Defendants point out, the specification notes that a binding contractual agreement is not required:

> Actual start of the PDA may require additional input from the buyer, indicating he or she is ready to begin, and/or that he or she agrees to and understands that by beginning the PDA, he or she has entered into a binding contract. . . . When the PDA is complete as to the buyer (step 150) the actual price of the product or service at issue is determined (step 160), and if the contract is binding, the transaction may then be completed. If the contract is not binding, because e.g., the buyer was given the opportunity of engaging the PDA on a "no commitment basis", [sic] then at this point the buyer is asked if he or she wants to close the transaction at the determined price.

*Id.* at 5:15–36. Thus, if the agreement is binding, the start of the PDA may require that the buyer acknowledge that it is binding. However, if the agreement is not binding, then the buyer may decide not to close the transaction after the buyer completes the PDA. Thus, to construe "accepting" in terms of contract formation would be improper.

There is nothing in the claim language, the specification, nor the prosecution history to indicate that the patentee intended the term "accepting" to be construed as anything outside of its customary and ordinary meaning. Defendants' proposed construction will not further assist the jury in understanding the claim language, as it merely repeats, reorganizes, and modifies the claim language. Acknowledging the similarities, Defendants indicated at the hearing that they believe a

13

construction is not necessary, as the jurors would correctly understand the term as used within the claim. The Court agrees and finds that the "accepting" terms are neither unfamiliar, confusing, nor affected by the specifications or prosecution history of the asserted patents. The term "accepting" will not be unfamiliar to the jury since the term is a familiar and commonplace word used in everyday language by lay jurors. The term is not confusing because the lay meaning of this term is the same meaning as that which a person having ordinary skill in the art would attribute to the term. Furthermore, there is no evidence that the specifications or the prosecution history intended that a different meaning attach to this term. Therefore, the Court finds that these terms require no construction.

## IV. "first" and "second"[10]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| the terms "first" and "second" are used to distinguish one instance of the same thing from another. For example, the phrase "second request" means a request other than the "first request." The terms "first" and "second" do not refer to time sequence. | the "first" request must precede and is separate from the "second" request |

**ordering of steps**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| The steps of claim 1 may be performed before, at the same time as, or after any other step, except that steps [b], [c], and [d] must occur before step [e]. The steps of claim 18 must be performed in order. | The steps of the asserted claims must be performed in order. |

---

[10]The terms "first" and "second" are in claims 1, 11, 12, and 18.

The parties indicate that there is no dispute whether the recited steps of claim 18 must be performed in order because Defendants perform the recited steps in that order.[11] PL. SUPP. at 1. The main dispute centers on whether claims 1 and 30 have an order in which the recited steps must be performed. With respect to claim 1, the parties agree that steps [b], [c], and [d] must be performed before step [e]. OPENING at 20–21; RESPONSE at 27. Defendants argue that as a matter of logic, the steps must be performed in the recited order. RESPONSE at 26–27; REPLY at 5; D. SUPP at 1–4. Defendants also argue that claim 1 explicitly recites a "first" request that precedes a "second" request, and therefore, the first must necessarily precede the second. RESPONSE at 26.

Looking first to claim 1, this claim discloses:

> 1. A method of doing business over a global communications network comprising the steps:
>> communicating to a buyer via the global communications network, a description of a product;
>> accepting a **first request** from the buyer to buy the product for a price to be determined within a price range;
>> accepting a **second request** from the buyer to allow the price to be determined based upon a performance of the buyer while participating in a Price-Determining-Activity (PDA);
>> receiving data from the buyer over the global communications network, said data representing the performance of the buyer during the PDA; and
>> determining the price of the product based at least partially upon the data received, said price being within the price range and scaled to the performance of the buyer.

'253 patent at 9:31–49 (claim 1). Nothing in this claim precludes step [a] from occurring at any

---

[11]While Plaintiff has provided a modified proposal regarding claim 18, PL. SUPP. at 2, the Court finds no reason to depart from the parties' original agreement as to claim 18 for the purposes of this litigation. Plaintiff has indicated that it agreed because the dispute did not matter for the purposes of infringement. PL. SUPP. at 1. Thus, the Court will address claim 18 only as necessary to properly resolve the parties' dispute as to claims 1 and 30.

points during the claimed method, nor steps [b], [c], or [d] from occurring at any time before step [e]. There are no explicit, nor inherent disclosures in the claim that require a particular order.

Moreover, logic does not require Defendants' proposed sequential limitation. Without support or citation, Defendants assert that "[i]n order for the system to 'accept[] a first request from the buyer to buy the product for a price to be determined within a price range,' the product must first be communicated to the buyer in step 1[a]." RESPONSE at 27; *see also* D. SUPP. at 2. In the Background section of the '253 patent, the patentee discloses that "Priceline.com uses a model which allows the buyer to present a bid or offer price they wish to pay for a product or service, and a seller then accepts the buyer's offer to enter into a binding contract, typically as the result of a reverse auction process." '253 patent at 1:31–35. In this example—a reverse auction—the seller first accepts a request from the buyer to buy a type of product or service, and then after the seller accepts the buyer's offer, a description of the particular product or service is communicated to the buyer. Such reverse auctions are noted within the specification as optional business models that can be incorporated into the claimed invention.

> The present invention thus may be used independently of other business models, or in combination therewith, to form binding contracts. For example, using the auction or reverse auction models, the buyer may be entitled to a further discount of the auction or reverse auction price, which discount may be greater if the buyer performs well at the PDA, and not so great if the buyer performs poorly.

'253 patent at 4:36–43. In such a situation, step [a] would not necessarily occur first, as Defendants propose.

While Defendants are correct that the preferred embodiments disclose methods that are performed in an order that corresponds to that expressed in the claims, D. SUPP at 2–3, the

specification fails to indicate that this order is required. In fact, referring to one disclosed embodiment, the specification expressly indicates that the step where the buyer provides payment information "may occur at any stage in the process." '253 patent at 5:13–15. The specification adds that "[w]hile certain embodiments are illustrated in the drawings and are described herein, including preferred embodiments, it will be apparent to those skilled in the art that the specific embodiments described herein may be modified without departing from the inventive concepts described. . . . Accordingly, the invention is not to be restricted except by the claims which follow." *Id.* at 9:11–28.

Defendants—citing to *E-Pass Techs. v. 3Com Corp.*— argue that if a few of the steps must be performed in a certain order, as Plaintiff concedes, then all of the steps must be performed in order. D. Supp. at 3–4 (citing *E-Pass*, 473 F.3d 1213, 1222 (Fed. Cir. 2007)). However in *E-Pass*, the parties' dispute was whether summary judgment of non-infringement was properly granted—not whether the steps of the claim must be performed in order. The passing statement made by the Federal Circuit—and cited by Defendants—cites to *Mantech Environmental Corp. v. Hudson Environmental Services, Inc.* 152 F.3d 1368, 1375–76 (Fed. Cir. 1998). There, the Federal Circuit held that due to the sequential nature of the limitations of the claim, the method logically required that the steps be performed in order. *Id.* at 1376–1377. Here, as discussed above, the claim language fails to set forth such a required logical or sequential order.

Moreover, the use of the terms "first" and "second" do not impose a temporal limitation, but instead are used as a common patent-law convention to distinguish between repeated instances of an element or limitation. *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003). Defendants cite to *LifeNet, Inc. v. Musculoskeletal Transplant Foundation*, No. 3:06cv6876, 2007 WL 1815629, *8 (E.D. Va. June 21, 2007) in support of the argument that

the recitation of "first" and "second" requests necessarily requires a sequential order. RESPONSE at 26. In *LifeNet*, the claim language indicated that such a sequential limitation was intended by the patentee. For example, dependent claim 20 of the asserted patent disclosed the step of "sonicating said second cleaned bone graft with sterile water prior to sonicating with said third solvent." *LifeNet*, 2007 WL 1815629 at *8. This limitation explicitly indicates that the second bond graft must be sonicated *prior to* the third. *Id.* Similarly, dependent claim 19 disclosed that a second bone graft is sonicated to produce a third bone graft. Because the second bone graft must be sonicated prior to the third and the third bone graft is produced from sonicating the second bone graft, the order of steps is necessarily implied. Here, claim 1 includes no such language, nor implication.

Turning to claim 30, this claim discloses a "system for conducting e-commerce over a global communications network" which is comprised of a computer server with particular functionality. '253 patent at 11:13–23, 12:1–7 (claim 30). Defendants argue that because Plaintiff agrees that the steps of claim 18 must be performed in order, it follows that the steps of claim 30 must be performed in order as well because claim 30 discloses a computer system that performs the steps disclosed in claim 18. RESPONSE at 27. Plaintiff has indicated—and Defendants do not dispute—that the accused products perform the steps of claim 18 in the order recited, and this is why Plaintiff does not dispute that the steps of claim 18 must be performed in order. PL. SUPP. at 1. This agreement, alone, is not a justifiable basis for holding that claim 30 has a sequential limitation.

Moreover, claim 30 discloses a system that performs certain functions. Unlike the cases cited by Defendants, the functions disclosed in claim 30 need not be performed in order. In *Oak Tech., Inc. v. Int'l Trade Com'n*—like *LifeNet*, discussed above—the claim language indicated that such a sequential limitation was intended by the patentee. 248 F.3d 1316, 1325 (Fed. Cir. 2001).

In *Versata Software, Inc. v. SAP Am., Inc.*, the system claims disclosed steps that were "essentially similar" to those disclosed by a method claim that had a required order. No. 2:07-cv-153, 2009 WL 1408520, *13 (E.D. Tex. May 19, 2009). In *Visto Corp. v. Good Tech., Inc.*, the claims at issue were method claims—not system claims. No. 2:06-cv-039, 2008 WL 163576, *6 (E.D. Tex. Jan. 16, 2008). Here, claim 30 discloses a system for conducting e-commerce, and the recited steps have no explicit, implicit, or logical required order for all the reasons set forth regarding claim 1. Therefore, the Court finds that the steps of claim 1 may be performed before, at the same time as, or after any other step, except that steps [b], [c], and [d] must occur before step [e]. Pursuant to the parties' agreement, the Court also finds that he steps of claim 18 must be performed in order, however, claim 30 does not have a sequential limitation. Further, the terms "first" and "second" also do not impose a sequential limitation.

## V.    "auction"[12]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| process for selling a product or service by taking bids and selling to the winning bidder; an auction is not a PDA | a public sale of property to the highest bidder (as by successive increased bids) |

At the hearing, the parties indicated that they had come to an agreement regarding the proper construction of the term "auction." The Court finds that the parties' joint proposed construction for auction is proper, and therefore, the construction the Court will adopt for the term "auction" is "process for selling a product or service that includes taking bids and selling to the winning bidder; an auction is not a PDA."

---

[12]The term "auction" is in claim 13.

## VI.    "performance of the buyer"[13]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| the buyer's actions or deeds in the Price-Determining Activity | the buyer's level of success (at the Price-Determining-Activity) |

Plaintiff argues that the buyer's performance at the PDA is separate and distinct from the buyer's "level of success," as proposed by Defendants. OPENING at 27. Defendants argue that the buyer's performance at the PDA is an assessment of how well the buyer performed. RESPONSE at 12.

Claim 1 of the '253 patent discloses that the price for a product or service is determined based on the performance of the buyer while participating in a PDA. '253 patent at 9:30–46 (claim 1); *see also id.* at 10:34–47 (claim 18), 11:13–23, 12:1–7 (claim 30). The specification adds that in the auction or reverse auction model, "the buyer may be entitled to a further discount of the auction or reverse auction price, which discount may be greater if the buyer performs well at the PDA, and not so great if the buyer performs poorly." '253 patent at 4:39–43. A preferred embodiment discloses a PDA that is a trivia quiz of ten questions. *Id.* at 5:49–67, 6:1–18. If the buyer gets nine questions correct on the quiz, this performance locks in the price according to the predetermined algorithm as presented to him at the start of the game. *Id.* Thus, in this embodiment, the "performance of the buyer" which determines the price is the buyer's performance of answering nine questions correctly.

As previously noted, the specification consistently indicates that if a buyer performs poorly at the activity, the price will be higher, whereas if the buyer does well, the price will be

---

[13]The term "performance of the buyer" is in claims 1 and 18.

lower.  *See* '253 patent at 2:26–28, 2:52–56, 3:64–67, 4:1; *see also* 5:39–67; 7:40–52; 8:14–23, 8:46–58.  The prosecution history includes similar statements.  *See* Response, Sistos Dec., Exh. 2 at 118 ("[t]ypically, the better the buyer performs during the PDA, the lower the price will be of the product being purchased"); *see also id.* at 149.  The intrinsic record indicates that a buyer's score or performance level is directly connected to the price of the product and a better performance results in a lower price.  Thus, the intrinsic record unambiguously indicates that it is not the buyer's actions or deeds that determine the price, but the buyer's achievements, accomplishments, or level of success that determine the price to be paid.  Therefore, the Court finds that the proper construction for "performance of the buyer" is "the buyer's level of success at the Price Determining Activity ("PDA")."

## VII.    "master controller"[14]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a device or subsystem that has overall control of other devices or systems | centralized server |

Plaintiff argues that a "master controller" is not limited to only a centralized server. Opening at 28.  Defendants contend that a "master controller" must be centralized.  Response at 30.

Claim 12 depends from claim 1 and discloses:

> 12. The method of claim 1, wherein the steps of accepting the first request from the buyer, accepting the second request from the buyer, and receiving the performance data from the buyer, are performed by a **master controller**.

'253 patent at 10:17–20.  In other words, the master controller accepts the first and second requests and receives the performance data from the buyer.

---

[14]The term "master controller" is in claim 12.

The specification adds that the buyer selects a desired product or service "via a website managed by the seller or the seller's agent (e.g., a master controller)." '253 patent at 4:30–31. The master controller may be a computer server which provides content to and manages a website and handles operations for efficient processing and marketability. *Id.* at 6:19–26. The specification refers to the master controller as a "centralized server," "controller," "master operation controller," "operation controller," and "content server." *Id.* at 4:17, 6:20–22, 33, 64–67, 7:1. The parties' main dispute centers on whether the "master controller" must be centralized or may be distributed. The aforementioned sections of the specification indicate that a "master controller" may be a centralized server, as Defendants propose. However, the language of the claims and the specification do no limit the master controller to only a centralized server. Therefore, the Court rejects Defendants' proposed construction.

Plaintiff proposes a broad construction that indicates that the "master controller" has "overall control of other devices or systems." There are significant problems with this construction. Not only is this construction overly broad, but it has no support in the specification. Plaintiff contends that the construction is proper because it has support from a myriad of different dictionaries. OPENING at 28 (citing *Oxford Dictionary of Computing*, *Microsoft Computer Dictionary*, *WordNet 3.0*, and *Am. Heritage Dictionary of the English Language*). While dictionaries are "often useful to assist in understanding the commonly understood meaning of words . . . in claim interpretation," *Phillips*, 415 F.3d at 1322, the "ordinary meaning" of a claim term "is its meaning to the ordinary artisan after reading the entire patent" *id.* at 1321. Thus, reliance placed on intrinsic evidence—the claims, specification, and prosecution history—should be greater than that placed on extrinsic sources—dictionaries, treatises, and encyclopedias, among other sources. *Id.* at 1320. Furthermore,

extrinsic sources may be considered, but may not be "used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id.* at 1324.

Despite the Federal Circuit's statement that dictionaries may be useful in determining the ordinary meaning of a term, the Court explicitly noted three main problems with this approach. First, dictionaries focus on the abstract meaning of words rather than the meaning of claim terms within the context of the patent. *Phillips*, 415 F.3d at 1321. Second, dictionaries collect all uses of particular words, and the use of such dictionaries may extend patent protection beyond what should properly be afforded by the inventor's patent. *Id.* at 1321–22. Finally, the scope of a claim term should not be determined based on "the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification to solely rely on one dictionary rather than another."[15] *Id.* at 1322.

Plaintiff explicitly invites this Court to adopt an overly broad construction of the term "master controller" that has no support in the claims, specification, or prosecution history and that is based on a myriad of different dictionary definition. Yet, the specification sets forth specific functionality, as well as particular embodiments of a "master controller." Therefore, based on the intrinsic evidence, the Court finds that the proper construction of the term "master controller" is "a computer server, centralized server, operation controller, or content server for managing transactions."

---

[15]While the parties were able to agree to a construction of the term "auction," the Court notes that Plaintiff also attached a copy of a Wikipedia page in support of its proposed construction for this term. OPENING, EXH. 15. This exhibit suffers from not only the deficiencies that are discussed above, but other problems as well. The content on this website is provided by volunteers from around the world—anyone with internet access can provide or modify content. *See Iovate Health Sciences, Inc. v. Bio-Engineered Supplements & Nutrition, Inc.*, No. 9:07-cv-46, 2008 WL 859162, *8 n.4 (E.D. Tex. Mar. 28, 2008) (Clark, J.). Thus, not only is the information unreliable, *Techradium, Inc. v. Blackboard Connect Inc.*, No. 2:08-cv-214 (Ward, J.), 2009 WL 1152985, *4 n.5 (E.D. Tex. April 29, 2009), but it can potentially change on a day-to-day basis.

## VIII. "description of a product"[16]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| information sufficient to identify a product or service | information sufficient to identify a particular product |

### "data representing a plurality of products"[17]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| data sufficient to identity two or more products or services | data sufficient to identify two or more particular products |

Plaintiff argues that the only difference between the parties' proposed constructions—the insertion of a single word by Defendants—is not supported by the claim language. OPENING at 30. Defendants argue that as a matter of logic, the claims require that a particular product be selected. RESPONSE at 22–23. Defendants also point to portions of the specification which refer to "the product," in support of their argument that a particular product must be identified or selected. *Id.* at 23–24.

Claim 1 of the '253 patent discloses:

> 1. A method of doing business over a global communications network comprising the steps:
> communicating to a buyer via the global communications network, a **description of a product**;
> accepting a first request from the buyer to buy the product for a price to be determined within a price range;
> accepting a second request from the buyer to allow the price to be determined based upon a performance of the buyer while participating in a Price-Determining-Activity (PDA);

---

[16]The term "description of a product" is in claim 1.

[17]The term "data representing a plurality of products" is in claim 18.

receiving data from the buyer over the global communications network, said data representing the performance of the buyer during the PDA; and

determining the price of the product based at least partially upon the data received, said price being within the price range and scaled to the performance of the buyer.

'253 patent at 9:31–49 (claim 1). Claim 18 discloses:

18. A method of determining a price of a product using a global communications network, comprising the steps:

communicating to a buyer via the global communications network, **data representing a plurality of products** available, said plurality of products including a first product;

accepting acknowledgment from the buyer representing an intent of the buyer to buy the first product at a price to be determined upon a performance of the buyer while participating in a Price-Determining-Activity (PDA), said acknowledgment being communicated over the global communications network;

determining the performance of the buyer; and

assigning a price to the product, said price being scaled to the performance of the buyer.

'253 patent at 10:34–47 (claim 18). Neither of these claims indicate that a "particular" product is identified. Moreover, claim 1 recites "a description of a product." It is a fundamental principle of patent law that the term "a" in a patent claim means "one or more." *See Baldwin Graphics Sys., Inc. v. Siebert,* 512 F.3d 1338, 1343 (Fed. Cir. 2008); *Free Motion Fitness, Inc. v. Cybex Intern., Inc.*, 423 F.3d 1343, 1350–51 (Fed. Cir. 2005); *Scanner Tech. Corp. v. ICOS Vision Sys. Corp., N.V.*, 365 F.3d 1299, 1305–1306 (Fed. Cir. 2004); *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.*, 246 F.3d 1336, 1347 (Fed. Cir. 2001). Absent the indication of a clear intent to limit the article, this language can be read as "one or more descriptions of one or more products." Thus, to construe this term to require a "particular" product could be misleading to the

jury.  Further, the specification fails to indicate that a "particular" product must be identified.  The specification refers to identifying "a product" or "the product," but there is no support for Defendants' proposal.  Therefore, the Court finds that the proper construction of the term "description of a product" is "information sufficient to identify a product or service."  The Court finds that the proper construction of the term "data representing a plurality of products" is "data sufficient to identify two or more products or services."

## IX.    "price range"[18]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| upper and lower bounds within which the price may vary | specified upper and lower bounds within which the price may vary |

Plaintiff argues that, like the previous term, Defendants' construction improperly requires a "specific" upper and lower bound for the price range.  OPENING at 30.  Defendants argue that the range must be specified because the Abstract and Summary of the Invention sections of the '253 patent use this term.  RESPONSE at 27–28.

Claim 1 of the '253 patent discloses:

> 1. A method of doing business over a global communications network comprising the steps:
>> communicating to a buyer via the global communications network, a description of a product;
>> accepting a first request from the buyer to buy the product for a price to be determined within a **price range**;
>> accepting a second request from the buyer to allow the price to be determined based upon a performance of the buyer while participating in a Price-Determining-Activity (PDA);
>> receiving data from the buyer over the global communications network, said data representing the performance of the buyer during the PDA; and

---

[18]The term "price range" is in claims 1 and 11.

> determining the price of the product based at least partially upon the data received, said price being within the **price range** and scaled to the performance of the buyer.

'253 patent at 9:31–49 (claim 1). The specification refers to "a specified price range," "that price range," "a certain price range," "a price range," and "the price range." *See, e.g., id.* at 2:21, 2:22–23, 2:47–48, 2:65, 3:6–7. While the specification does refer to a "specified price range," the specification refers to a price range without this modifier on a number of occasions. *See, e.g., id.* at 2:65, 3:6–7, 4:52, 3:63. In whole, the intrinsic record fails to indicate that a "specified" price range is required. Therefore, the Court finds that the proper construction for "price range" is "upper and lower bounds within which the price may vary."

### CONCLUSION

For all the foregoing reasons, the Court construes the disputed claim language in this case in the manner set forth above. For the ease of reference, the Court's claim interpretations are set forth in a table attached to this opinion as Appendix A.

**So ORDERED and SIGNED this 13th day of August, 2009.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **PERFORMANCE PRICING, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION No.2:07-cv-432** |
| | § | |
| **GOOGLE, INC., et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**<u>APPENDIX A</u>**

| Claim Language | Asserted Claims | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|---|
| product | | AGREED | AGREED | product or service |
| a second price | | AGREED | AGREED | price for the product to be paid by the second buyer |
| the price/said price | | AGREED | AGREED | the price of the product |
| the/a | | AGREED | AGREED | The following phrases use the articles "a" and "the" to indicate a repeated instance of the same thing:<br>1) "a price range" and "the price range" refer to the same price range<br>2) "a product" and "the product" refer to the same product<br>3) "a buyer" and "the buyer" refer to the same buyer<br>4) "at least one participant" and "the at least one participant" refer to the same participant or participants<br>5) "a first product" and "the first product" refer to the same product |
| bid | | AGREED | AGREED | offer of a price in an auction |

| Claim Language | Asserted Claims | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|---|
| price determining activity ("PDA") | 1, 18, 30 | any activity or combination of activities, other than offering or accepting a price, that is used to determine the price paid for the product or service, or any form of competition or entertainment activity or combination of such activities, other than offering or accepting a price, that is used to determine the price paid for the product or service | inherently entertaining activity, such as a game, puzzle or quiz, that is used to set the product's price, but otherwise is collateral to its sale | any form of competition or entertainment activity or combination of such activities that is used to determine the price paid for the product or service and is not otherwise part of a sales transaction |
| price being . . . scaled to the performance of the buyer | 1, 18, 30 | price being adjusted to a standard (defined by a ratio, table, or other algorithm) according to the performance of the buyer, such that achieving a better performance level results in a lower price than would otherwise apply | price being assigned from a predetermined set of graduated prices and corresponding performance levels, in which a lower price always corresponds to a better performance in the PDA and a higher price always corresponds to a worse performance in the PDA | price being adjusted by a ratio, table, or algorithm, wherein a lower price always corresponds to a better performance or better performance level in the PDA and a higher price always corresponds to a worse performance or worse performance level in the PDA |
| accepting a first request from the buyer to buy the product | 1 | receiving with consent or approval a request from the buyer to buy the product or service | accepting from the buyer a selection of the product to buy | no construction necessary |
| accepting a second request from the buyer to allow the price to be determined | 1 | receiving with consent or approval a second request from the buyer to allow the price to be determined | accepting a request from the buyer that the price of the selected product be determined | no construction necessary |

| Claim Language | Asserted Claims | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|---|
| accept[ing] acknowledgment from the buyer representing an intent of the buyer to buy the first product | 18, 30 | receiving with consent or approval an acknowledgment from the buyer representing an intent of the buyer to buy the first product or service | accepting from the buyer a selection of the first product to buy | no construction necessary |
| first/second | 1, 11, 12, 18, 30 | the terms "first" and "second" are used to distinguish one instance of the same thing from another. For example, the phrase "second request" means a request other than the first request. The terms "first" and "second" do no refer to time sequence. | The "first" request must precede and is separate from the "second" request. | The terms "first" and "second" do not impose a sequential limitation. |
| ordering of steps | 1, 18, 30 | The steps of claim 1 may be performed before, at the same time as, or after any other step, except that steps [b], [c], and [d] must occur before step [e]. The steps of claim 18 must be performed in order. | The steps of the asserted claims must be performed in order. | The steps of claim 1 may be performed before, at the same time as, or after any other step, except that steps [b], [c], and [d] must occur before step [e]. The steps of claim 18 must be performed in order. Claim 30 does not have a sequential limitation. |
| auction | 13, 22 | process for selling a product or service by taking bids and selling to the winning bidder; an auction is not a PDA | a public sale of property to the highest bidder (as by successive increased bids) | process for selling a product or service that includes taking bids and selling to the winning bidder; an auction is not a PDA |
| performance of the buyer | 1, 18, 30 | the buyer's actions or deeds in the Price-Determining-Activity | the buyer's level of success at the Price-Determining-Activity | the buyer's level of success at the Price Determining Activity |

| Claim Language | Asserted Claims | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|---|
| master controller | 12 | a device or subsystem that has overall control of other devices or systems | centralized server | computer server, centralized server, operation controller, or content server for managing transactions |
| description of a product | 1 | information sufficient to identify a product or service | information sufficient to identify a particular product | information sufficient to identify a product or service |
| data representing a plurality of products | 18, 30 | data sufficient to identify two or more products or services | data sufficient to identify two or more particular products | data sufficient to identify two or more products or services |
| price range | 1, 11 | upper and lower bounds within which the price may vary | specified upper and lower bounds within which the price may vary | upper and lower bounds within which the price may vary |