# EXHIBIT A

### Issued by the
# UNITED STATES DISTRICT COURT

<u>Central District of</u>      <u>California</u>

Performance Pricing, Inc.

V.

Google Inc.; AOL LLC; Microsoft Corp.;
Yahoo! Inc.; IAC Search & Media, Inc.;
and A9.com, Inc.

**SUBPOENA IN A CIVIL CASE**

Case Number: [1] 2:07-cv-432 (LED)
(Eastern District of Texas)

TO: Neal M. Cohen
2040 Main St., 9th Floor
Irvine, CA 92614

] YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |

[ ] YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

[X] YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See ATTACHMENT A

| PLACE | DATE AND TIME |
|---|---|
| Quinn Emanuel Urquhart Oliver & Hedges, LLP | November 6, 2008 |
| 865 Figueroa Street, 10th Floor | 10:30 a.m. |
| Los Angeles, CA 90017 | |

[ ] YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Emily C. O'B* Attoney for Google Inc., AOL LLC, and IAC Search & Media | 10/22/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Emily C. O'Brien
50 California St., 22nd Floor, San Francisco, CA 94111, Tel. (415) 875-6323

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.



EXHIBIT __A__

PAGE __6__

## PROOF OF SERVICE

| | DATE | | PLACE |
|---|---|---|---|

SERVED

SERVED ON (PRINT NAME)                          MANNER OF SERVICE


SERVED BY (PRINT NAME)                           TITLE


## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE                                      SIGNATURE OF SERVER


                                                              ADDRESS OF SERVER


Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.

The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).


EXHIBIT __A__
PAGE __2__

# ATTACHMENT A

## I.  DEFINITIONS

1.  The terms "DOCUMENT" and "DOCUMENTS" include "electronically stored information," "things" and include everything contemplated by Rules 26 and 34 of the Federal Rules of Civil Procedure. They include any handwritten, typewritten, printed, or photocopied material, including but not limited to, all correspondence, memoranda, notes of meetings or conversations (personal or telephonic), reports, summaries, agreements, legal documents, and writings of every description, from which information can be obtained, whether maintained in hard copy or electronic form.

2.  "YOU" or "YOUR" means Neal M. Cohen.

3.  "PERFORMANCE PRICING" means Performance Pricing, Inc., and its officers, directors, current and former employees, counsel, agents, consultants, representatives, and any other persons acting on behalf of any of the foregoing, and Performance Pricing, Inc.'s affiliates, parents, divisions, joint ventures, licensees, franchisees, assigns, predecessors and successors in interest, and any other legal entities, whether foreign or domestic, that are owned or controlled by Performance Pricing, Inc., and all predecessors and successors in interest to such entities.

4.  "DOVEL & LUNER" means the law firm of Dovel & Luner, LLP, and its partners, associates, current and former employees, agents, consultants, representatives, and any other persons acting on behalf of any of the foregoing.

5.  "PricePlay" means PricePlay.com, and its officers, directors, current and former employees, counsel, agents, consultants, representatives, and any other persons acting on behalf of any of the foregoing, and PricePlay.com's affiliates, parents, divisions, joint ventures, licensees, franchisees, assigns, predecessors and successors in interest, and any other legal entities, whether foreign or domestic, that are owned or controlled by PricePlay.com and all predecessors and successors in interest to such entities, including without limitation Homegopher, Inc. and Adam Sappo, Inc.

1

ATTACHMENT A

EXHIBIT A

PAGE 8

6.      The term "LAWSUIT" shall refer to PERFORMANCE PRICING's lawsuit against Google Inc., AOL LLC, Microsoft Corp., Yahoo! Inc., IAC Search & Media, Inc., and A9.com, Inc., the amended complaint filed on October 16, 2007, in the U.S. District Court, Eastern District of Texas, Case No. 2-07CV-432.

7.      "COMMUNICATION," "COMMUNICATE," "COMMUNICATED" or "COMMUNICATIONS" shall mean, without limitation, any transmission, conveyance or exchange of a word, statement, fact, thing, idea, DOCUMENT, instruction, information, demand or question by any medium, whether by written, oral or other means, including but not limited to electronic communications and electronic mail ("e-mail").

8.      "THING" as used herein means any physical object other than a "DOCUMENT."

9.      "PERSON" refers to any individual, corporation, proprietorship, association, joint venture, company, partnership or other business or legal entity, including governmental bodies and agencies.

10.     "IDENTIFY,"

        (a)      when used with reference to an individual, means to state his/her full name, his/her job title and employer at the time referred to, his/her last known job title and employer, and his/her last known residence and business addresses and telephone numbers;

        (b)      when used with reference to a document or thing, means to state the date the DOCUMENT or THING was created; the name of the individual who created the DOCUMENT or THING; the type of DOCUMENT or THING (*e.g.*, letter, memorandum, computer chip, etc.); the name of the employer or the individual who directed that the DOCUMENT or THING be created; the name of the individual from whom the DOCUMENT or THING was obtained; and the name of the individual who sent and the individual who received the DOCUMENT or THING; the name of the entity and/or individual having possession of the DOCUMENT or THING; and all other specifics necessary to identify the DOCUMENT or THING with sufficient particularity to meet the requirements for inclusion in a motion to compel discovery pursuant to Federal Rules of Civil Procedure 26 and 37. If any DOCUMENT or

ATTACHMENT A

EXHIBIT ___A___

PAGE _____7_____

THING was, but is no longer in your possession or subject to your control, state what disposition was made of it and the reasons for such disposition; and

        (c)     when used in reference to an event or COMMUNICATION, means to state the date it occurred, the names and positions of the individuals participating and/or present, the location where it occurred, and a description of the event or the subject matter of the COMMUNICATION.

     11.    "REFLECT," "REFLECTING," "RELATE TO," "REFER TO," "RELATING TO," and "REFERRING TO" shall mean relating to, referring to, concerning, mentioning, reflecting, pertaining to, evidencing, involving, describing, discussing, commenting on, embodying, responding to, supporting, contradicting, or constituting (in whole or in part), as the context makes appropriate.

     12.    "THE '253 PATENT" means U.S. Patent No. 6,978,253, entitled "Systems and Methods for Transacting Business Over a Global Communications Network Such as the Internet," all underlying patent applications, all continuations, continuations-in-part, divisionals, reissues, and any other patent applications in the '253 patent family.

     13.    "USPTO" refers to the United States Patent and Trademark Office.

     14.    "PRIOR ART" encompasses, without limitation, the subject matter described in every subdivision of 35 U.S.C. section 102 and 35 U.S.C. section 103.

     15.    "FILE HISTORY" refers to the USPTO records of all COMMUNICATIONS and all DOCUMENTS and things sent between the USPTO and the patent applicant or the applicant's attorneys or agent, in connection with the prosecution of THE '253 PATENT, including without limitation any and all reissue or reexamination proceedings regarding THE '253 PATENT.

     16.    "Include" and "including" shall mean including without limitation.

     17.    The masculine shall include the feminine, and the feminine shall include the masculine.

EXHIBIT   A

PAGE   10

18.     The singular form of words shall include the plural, and the plural shall include the singular.

## II.     INSTRUCTIONS

1.      In responding to this subpoena, you are requested to furnish all documents or things in your possession, custody, or control, regardless of whether such documents or things are possessed directly by you or your employees, attorneys, or any other person or persons acting on your behalf.

2.      In producing documents for inspection, you are requested to produce the original of each document together with all non-identical copies and drafts of that document. A copy of a document bearing a comment, notation, or marking of any kind, which is not a part of the original, shall be considered a separate document. Any draft, preliminary or superseded version of any document also is to be considered a separate document.

3.      All documents that are maintained in electronic form should be produced in electronic form even if a paper copy of the same document was produced.

4.      Documents attached to each other should not be separated.

5.      If any requested document or thing cannot be produced in full, please produce it to the extent possible, indicating what is being withheld and the reason it is being withheld.

6.      If any requested document is withheld on the grounds of privilege, please provide the information required by Federal Rule of Civil Procedure 26(b)(5)(A).

7.      Please produce documents and things responsive to these requests as they are kept in the usual course of business or, alternatively, organized and labeled to correspond to each request to which the documents or things are responsive.

## III.     SPECIFIC REQUESTS FOR PRODUCTION

1.      All DOCUMENTS RELATING TO THE '253 PATENT.

EXHIBIT ___A___
PAGE ___ll___

2.      All DOCUMENTS RELATING TO any and all applications for reissue of THE '253 PATENT.

3.      All DOCUMENTS RELATING TO any and all requests for reexamination of THE '253 PATENT.

4.      All patent applications (including drafts), and FILE HISTORIES RELATED TO THE '253 PATENT.

5.      All DOCUMENTS RELATING TO the conception of any alleged invention described, disclosed or claimed in THE '253 PATENT.

6.      All DOCUMENTS RELATING TO the reduction to practice of any alleged invention described, disclosed or claimed in THE '253 PATENT.

7.      All DOCUMENTS RELATING TO diligence between the dates of conception and reduction to practice of any alleged invention described, disclosed, or claimed in THE '253 PATENT.

8.      All DOCUMENTS RELATING TO the first written description, first disclosure, and best mode of practice of any alleged invention described, disclosed, or claimed in THE '253 PATENT.

9.      All COMMUNICATION, including correspondence and memoranda, with foreign patent agents or third parties, RELATED TO the prosecution of THE '253 PATENT.

10.     All DOCUMENTS RELATING TO the design or development of any alleged invention described, disclosed, or claimed in THE '253 PATENT, including any invention disclosure forms and prototypes.

11.     All DOCUMENTS and things before June 29, 1999 RELATING TO the manufacture, use, offer for sale or sale of products within the scope or the perceived scope of THE '253 PATENT.

12.     All DOCUMENTS RELATING TO any U.S. or foreign patents or patent applications filed prior to June 29, 1999 RELATING TO any system(s) for affecting the price of

ATTACHMENT A

EXHIBIT _A_

PAGE _12_

a product or service through an activity performed by the buyer for determining price or any alleged invention disclosed, described or claimed in THE '253 PATENT.

13. All DOCUMENTS RELATING TO any publications, sale, offer for sale, or public use prior to June 29, 1999 of any system(s) for affecting the price of a product or service through an activity performed by the buyer for determining price or any alleged invention disclosed, described, or claimed in THE '253 PATENT.

14. All textbooks, articles, or other sources consulted, gathered, or reviewed in drafting or prosecuting the patent application for THE '253 PATENT.

15. All DOCUMENTS RELATING TO the prosecution of any U.S. or foreign patents or patent applications, whether issued, pending or abandoned, that claim priority to THE '253 PATENT or from which THE '253 PATENT claims priority, including but not limited to PRIOR ART cited in the prosecution of these patents or patent applications and all DOCUMENTS RELATING TO any opposition proceeding in connection with these patent applications.

16. All DOCUMENTS challenging, questioning, analyzing, or otherwise RELATING TO the patentability, validity, enforceability, or infringement of any alleged invention described, disclosed, or claimed in THE '253 PATENT.

17. All DOCUMENTS created or discovered in connection with any PRIOR ART search and/or RELATING TO any pre-litigation investigation.

18. All DOCUMENTS RELATING TO any alleged infringement of THE '253 PATENT, including, but not limited to, any DOCUMENTS concerning or relating to pre-litigation investigations RELATED TO the alleged infringement.

19. All DOCUMENTS supporting any objective indicia of non-obviousness of any alleged invention described, disclosed or claimed in THE '253 PATENT, including, but not limited to, contentions of commercial success of the invention and/or products embodying the invention, long-felt but unsolved needs met by those products and/or the invention, failure of

ATTACHMENT A

EXHIBIT __A__

PAGE __13__

others to meet these needs, industry recognition of the invention and/or products embodying the invention, and deliberate copying of the invention or laudatory statements by accused infringers.

20. All DOCUMENTS RELATING TO or constituting license agreements, draft license agreements, licensing correspondence, licensing negotiations, or demand letters for any alleged invention described, disclosed or claimed in THE '253 PATENT.

21. All DOCUMENTS from any proceeding RELATING TO THE '253 PATENT, including—without limitation—dispute resolutions, contested proceedings, interferences, reexaminations, reissues and charges of infringement.

22. All DOCUMENTS RELATING TO any analyses or efforts to design THE '253 PATENT or products or systems embodying the subject matter disclosed or claimed in THE '253 PATENT around other products, systems or patents.

23. All DOCUMENTS recording or RELATED TO the ownership, assignment or conveyance of any interest in THE '253 PATENT.

24. All DOCUMENTS RELATING TO PERFORMANCE PRICING's patent infringement claims asserted in the LAWSUIT.

25. All DOCUMENTS RELATING TO PERFORMANCE PRICING, PricePlay, or Wayne Lin, or Acacia Group Technologies.

26. All DOCUMENTS RELATING TO any work performed by YOU on behalf of PERFORMANCE PRICING, PricePlay, Wayne Lin, or Acacia Group Technologies.

27. All DOCUMENTS RELATING TO any work performed by YOU for DOVEL & LUNER RELATING TO PERFORMANCE PRICING, PricePlay, Wayne Lin, Acacia Group Technologies, THE '253 PATENT, or any system(s) for affecting the price of a product or service through an activity performed by the buyer for determining price.

28. All DOCUMENTS RELATING TO any contracts or agreements between YOU and PERFORMANCE PRICING, PricePlay, Wayne Lin, or Acacia Group Technologies.

29. ALL DOCUMENTS RELATING TO any contracts or agreements between YOU and DOVEL & LUNER RELATING TO PERFORMANCE PRICING, PricePlay, Wayne Lin,

ATTACHMENT A

EXHIBIT __A__

PAGE __14__

Acacia Group Technologies, THE '253 PATENT, or any system(s) for affecting the price of a product or service through an activity performed by the buyer for determining price.

30.     All DOCUMENTS received by YOU from PERFORMANCE PRICING, PricePlay, Wayne Lin or Acacia Group Technologies.

31.     All DOCUMENTS received by YOU from DOVEL & LUNER RELATING TO PERFORMANCE PRICING, PricePlay, Wayne Lin, Acacia Group Technologies, THE '253 PATENT, or any system(s) for affecting the price of a product or service through an activity performed by the buyer for determining price.

32.     All DOCUMENTS sent by YOU to PERFORMANCE PRICING, PricePlay, Wayne Lin, or Acacia Group Technologies.

33.     All DOCUMENTS sent by YOU to DOVEL & LUNER RELATING TO PERFORMANCE PRICING, PricePlay, Wayne Lin, Acacia Group Technologies, THE '253 PATENT, or any system(s) for affecting the price of a product or service through an activity performed by the buyer for determining price.

34.     All DOCUMENTS generated in connection with any work performed by YOU, YOUR employees, partners, agents or assigns, on behalf of PERFORMANCE PRICING, PricePlay, Wayne Lin, or Acacia Group Technologies.

35.     All DOCUMENTS generated in connection with any work performed by YOU, YOUR employees, partners, agents or assigns, on behalf of DOVEL & LUNER RELATING TO PERFORMANCE PRICING, PricePlay, Wayne Lin, Acacia Group Technologies, THE '253 PATENT, or any system(s) for affecting the price of a product or service through an activity performed by the buyer for determining price.

36.     All billing records, including invoices, generated in connection with any work performed by YOU, YOUR employees, partners, agents, or assigns, on behalf of PERFORMANCE PRICING, PricePlay, Wayne Lin, or Acacia Group Technologies.

37.     All billing records, including invoices, generated in connection with any work performed by YOU, YOUR employees, partners, agents, or assigns, on behalf of DOVEL &

EXHIBIT __A__

PAGE __15__

LUNER RELATING TO PERFORMANCE PRICING, PricePlay, Wayne Lin, Acacia Group Technologies, THE '253 PATENT, or any system(s) for affecting the price of a product or service through an activity performed by the buyer for determining price.

38. All COMMUNICATIONS RELATING TO PERFORMANCE PRICING, PricePlay, Wayne Lin, or Acacia Group Technologies.

39. All DOCUMENTS RELATING TO any products or systems of PERFORMANCE PRICING, PricePlay or Wayne Lin that RELATE TO THE '253 PATENT, including without limitation any marketing materials, brochures, proposals, presentations, or technical materials.

40. All DOCUMENTS RELATING TO any PERFORMANCE PRICING, PricePlay or Wayne Lin system(s) for affecting the price of a product or service through an activity performed by the buyer for determining price, including without limitation any marketing materials, brochures, proposals, presentations, or technical materials.

41. All DOCUMENTS RELATING TO any components of PERFORMANCE PRICING's, PricePlay's or Wayne Lin's system(s) for affecting the price of a product or service through an activity performed by the buyer for determining price.

42. All COMMUNICATIONS with attorneys or agents of any of the following: PERFORMANCE PRICING, PricePlay, Wayne Lin or Acacia Group Technologies relating to THE '253 PATENT.

43. All COMMUNICATIONS with DOVEL & LUNER RELATING TO PERFORMANCE PRICING, PricePlay, Wayne Lin, Acacia Group Technologies, THE '253 PATENT, or any system(s) for affecting the price of a product or service through an activity performed by the buyer for determining price.

44. All notes or minutes from any meetings or telephone conferences with PERFORMANCE PRICING, PricePlay, Wayne Lin or Acacia Group Technologies or in which PERFORMANCE PRICING, PricePlay, Wayne Lin or Acacia Group Technologies were discussed.

EXHIBIT A
PAGE 16

45. All notes or minutes from any meetings or telephone conferences with DOVEL & LUNER RELATING TO PERFORMANCE PRICING, PricePlay, Wayne Lin, Acacia Group Technologies, THE '253 PATENT, or any system(s) for affecting the price of a product or service through an activity performed by the buyer for determining price.

46. All DOCUMENTS RELATING TO YOUR retention of any intellectual property RELATING TO any of the work performed for or in connection with PERFORMANCE PRICING, PricePlay, Wayne Line or Acacia Group Technologies.

47. All DOCUMENTS RELATING TO YOUR retention of any intellectual property RELATING TO PERFORMANCE PRICING, PricePlay, Wayne Lin, Acacia Group Technologies, THE '253 PATENT, or any system(s) for affecting the price of a product or service through an activity performed by the buyer for determining price.

48. All DOCUMENTS that RELATE TO any other lawyers in addition to YOU that participated in the prosecution of THE '253 PATENT.

49. All COMMUNICATIONS with any lawyers in addition to YOU that participated in the prosecution of THE '253 PATENT.

50. All DOCUMENTS sent by YOU to any other lawyers that participated in the prosecution of THE '253 PATENT.

51. All DOCUMENTS received by YOU from any other lawyers that participated in the prosecution of THE '253 PATENT.

52. All DOCUMENTS REFERRING or RELATING to THE LAWSUIT.

EXHIBIT _A_

PAGE _12_

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| PERFORMANCE PRICING, INC., a Texas corporation; | |
| Plaintiff, | CASE NO.  2:07-cv-432 (LED) |
| vs. | **Jury Trial Demanded** |
| GOOGLE INC., a Delaware corporation; AOL LLC, a Delaware limited liability company; MICROSOFT CORPORATION, a Washington corporation; YAHOO! INC., a Delaware corporation; IAC SEARCH & MEDIA, INC., a Delaware corporation; A9.COM, INC., a Delaware corporation; | |
| Defendants. | |

## AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Performance Pricing, Inc. ("Performance Pricing") sues Google Inc., AOL LLC,

Microsoft Corporation, Yahoo! Inc., IAC Search & Media, Inc., and A9.com, Inc., (collectively

"Defendants") and, on information and belief, alleges as follows:

### Introduction

1.     Plaintiff Performance Pricing is the exclusive licensee with all substantial

rights in the invention described and claimed in United States Patent No. 6,978,253 entitled

"Systems and Methods for Transacting Business Over a Global Communications Network such

as the Internet" (the "'253 patent").  Defendants have used, and continue to use, Plaintiff

Performance Pricing's patented technology in methods and systems that they make, use, sell, and

offer to sell, without Plaintiff's permission.  Plaintiff seeks damages for patent infringement and

1

EXHIBIT A
PAGE 19

an injunction preventing Defendants from making, using, selling, or offering to sell the
technology claimed by the Patent without Plaintiff's permission.

### Jurisdiction and Venue

2.    This is an action for patent infringement arising under the patent laws of
the United States, 35 U.S.C. §§ 271 and 281, *et seq.* The Court has original jurisdiction over this
patent infringement action under 28 U.S.C. § 1338(a).

3.    Within this judicial district each of the Defendants has committed acts and
continues to commit acts that give rise to this action, including using, selling, and offering to sell
products, methods, and systems that infringe the claims of the '253 patent. Moreover, each of
the Defendants regularly does substantial business in this judicial district. Venue is proper in this
district pursuant to 28 U.S.C. § 1391(b) and § 1400.

### Plaintiff Performance Pricing

4.    Performance Pricing, Inc. is a Texas corporation having a principal place
of business in Austin, Texas.

### Defendants

5.    Upon information and belief, Google Inc. is a Delaware corporation
having its principal place of business in Mountain View, California ("Google"). Google is
registered to do business as a foreign for-profit corporation in the state of Texas. Google's
foreign corporation registration lists Corporation Service Company DBA CSC as its registered
agent for service of process.

2.

EXHIBIT A
PAGE 20

6.      Upon information and belief, AOL, LLC is a Delaware limited liability company having its principal place of business in Dulles, Virginia ("AOL"). AOL is registered to do business as a foreign limited liability company in the state of Texas. AOL's foreign corporation registration lists Corporation Service Company DBA CSC as its registered agent for service of process.

7.      Upon information and belief, Microsoft Corporation is a Washington corporation having its principal place of business in Redmond, Washington ("Microsoft"). Microsoft is registered to do business as a foreign for-profit corporation in the state of Texas. Microsoft's foreign corporation registration lists Corporation Service Company as its registered agent for service of process.

8.      Upon information and belief, Yahoo! Inc. is a Delaware corporation having its principal place of business in Sunnyvale, California ("Yahoo"). Yahoo is registered to do business as a foreign for-profit corporation in the state of Texas. Yahoo's foreign corporation registration lists CT Corporation System as its registered agent for service of process.

9.      Upon information and belief, IAC Search & Media, Inc., is a Delaware corporation having its principal place of business in Oakland, California ("IAC"). IAC is registered to do business as a foreign for-profit corporation in the state of Texas. IAC's foreign corporation registration lists National Registered Agents, Inc. as its registered agent for service of process.

10.     Upon information and belief, A9.com, Inc., is a Delaware corporation having its principal place of business in Palo Alto, California ("A9.com").

3

EXHIBIT __A__
PAGE __21__

## First Claim for Patent Infringement
### (infringement of the '253 patent)

11.    Plaintiff incorporates by reference each of the allegations in paragraphs 1 through 10 above and further alleges as follows:

12.    The United States Patent and Trademark Office issued the '253 patent on December 20, 2005. Attached as Exhibit A is what is believed to be a copy of the text of the '253 patent. Plaintiff Performance Pricing is the exclusive licensee with substantially all rights to the '253 patent, including the rights to pursue and collect damages for any infringement of the patent and to obtain injunctive relief to stop infringement.

13.    Without a license or permission from Plaintiff, Defendants Google, AOL, Microsoft, Yahoo, IAC, and A9.com have infringed the '253 patent and, unless enjoined, will continue to do so, by making, using, providing, selling, and offering for sale products, methods, and systems that infringe the claims of the '253 patent including, without limitation, the products, methods, and systems of Google's AdWords, AOL's Search Marketplace, Microsoft's adCenter, Yahoo's Search Marketing, IAC's Ask Sponsored Listings, and A9.com's Clickriver Ads.

14.    Plaintiff has been damaged by Defendants' infringement of the '253 patent and will suffer additional irreparable damage and impairment of the value of its patent rights unless Defendants are enjoined from continuing to infringe the '253 patent.

15.    Plaintiff is entitled to recover damages from the Defendants to compensate it for the infringement.

16.    Plaintiff demands trial by jury of all issues relating to this claim.

4

EXHIBIT __A__

PAGE __22__

WHEREFORE, Plaintiff prays for judgment as follows:

    A.    A decree preliminarily and permanently enjoining Defendants, their officers, directors, employees, agents, and all persons in active concert with them, from infringing, and contributing to or inducing others to infringe, the '253 Patent;

    B.    Compensatory damages for Defendants' infringement of the '253 Patent;

    C.    Costs of suit and attorneys' fees on the basis that this patent infringement case is exceptional;

    D.    Pre-judgment interest; and

    E.    For such other relief as justice requires.

Dated: October 16, 2007              Respectfully submitted,

By:   /s/ N. Claire Abernathy
        S. Calvin Capshaw.
        State Bar No. 03783900
        Email: ccapshaw@mailbmc.com
        Elizabeth L. DeRieux
        State Bar No. 05770585
        Email: ederieux@mailbmc.com
        N. Claire Abernathy
        State Bar No. 24053063
        Email: cabernathy@mailbmc.com
        Brown McCarroll, L.L.P.
        1127 Judson Road, Suite 220
        Longview, TX 75601
        Telephone:  (903) 236-9800
        Facsimile:  (903) 236-8787

5

Robert M. Parker
State Bar No. 15498000
Email: rmparker@pbatyler.com
Robert Christopher Bunt
State Bar No. 00787165
Email: rcbunt@pbatyler.com
Charles Ainsworth
State Bar No. 00783521
Email: charley@pbatyler.com
Parker, Bunt & Ainsworth, P.C.
100 East Ferguson, Ste. 1114
Tyler, TX 75702
Telephone: (903) 531-3535
Facsimile: (903) 533-9687

Gregory S. Dovel
CA State Bar No. 135387
E-mail: greg@dovellaw.com
Sean Luner
CA State Bar No. 165443
E-mail: sean@dovellaw.com
Christin K. Cho
CA State Bar No. 238173
E-mail: christin@dovellaw.com
Dovel & Luner, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
Telephone: (310) 656-7066
Facsimile: (310) 657-7069

ATTORNEYS FOR PLAINTIFF
PERFORMANCE PRICING, INC.

## CERTIFICATE OF SERVICE

I hereby certify that the following counsel of record who are deemed to have consented to electronic service are being served this 16th day of October, 2007, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3). Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.

/s/ N. Claire Abernathy

6

EXHIBIT A
PAGE 2Y

# EXHIBIT B

EXHIBIT _A_
PAGE __25__

US006978253B2

## (12) United States Patent
### Lin

(10) Patent No.: **US 6,978,253 B2**
(45) Date of Patent: **Dec. 20, 2005**

(54) **SYSTEMS AND METHODS FOR TRANSACTING BUSINESS OVER A GLOBAL COMMUNICATIONS NETWORK SUCH AS THE INTERNET**

(76) Inventor: **Wayne W. Lin**, 20 Winterfield Rd., Irvine, CA (US) 92602

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1082 days.

(21) Appl. No.: **09/342,866**

(22) Filed: **Jun. 29, 1999**

(65) **Prior Publication Data**

US 2001/0000044 A1  Mar. 15, 2001

(51) Int. Cl.[7] ............................................ G06F 17/60
(52) U.S. Cl. ...................... 705/26; 705/14; 705/400
(58) Field of Search ........................ 705/26, 37, 27, 705/14, 400; 463/1, 7, 9, 16, 23, 25; 273/429–432

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,040,629 A | 8/1977 | Kelly | 273/135 |
| 4,799,156 A | * 1/1989 | Shavit et al. | 705/26 |
| 4,850,007 A | * 7/1989 | Marino et al. | 379/114.01 |
| 4,869,500 A | * 9/1989 | Williams | 463/2 |
| 5,085,435 A | 2/1992 | Rossides | 273/138 |
| 5,269,521 A | 12/1993 | Rossides | 273/138 |
| 5,620,182 A | 4/1997 | Rossides | 273/138.2 |
| 5,215,314 A | 2/1998 | Payne et al. | 380/24 |
| 5,794,207 A | 8/1998 | Walker et al. | 705/23 |
| 5,816,918 A | * 10/1998 | Kelly et al. | 463/16 |
| 5,855,008 A | 12/1998 | Goldhaber et al. | 705/14 |
| 5,916,024 A | * 6/1999 | Von Kohorn | 463/40 |
| 6,061,660 A | * 5/2000 | Eggleton et al. | 705/14 |
| 6,216,111 B1 | * 4/2001 | Walker et al. | 705/14 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | 0005668 | * | 2/2000 |
| WO | 0024484 | * | 5/2000 |

### OTHER PUBLICATIONS

Rockoff, Todd E.; Groves, Michael; "Design of an Internet-based system for remote Dutch auctions;" Internet Research: Electronic Networking Applications and Policy; vol. 5; n4; pp. 10-16; 1995.*

Beeler, A., "Online coupon site links with fun and games", Advertising Age, vol. 70, No. 44, p. 48, Oct. 25, 1999.

Unknown, "SportsMAD prepares for a February launch", New Media Age, p. 3, Dec. 9, 1999.

Unknown, "AllstarMall To Develop Extensive Toy Internet Site", PR Newswire, Dec. 3, 1998.

Krantz, M., "Point, Click-And Here's The Pitch: Yoyodyne uses prizes to get you to read those online ads", Business Week, Feb. 9, 1998, p. ENT8.

Hein, K., "SportscatLoom Pays eBucks for Visits", iMarketing News, vol. 2, No. 1, p. 12, Jan. 10, 2000.

* cited by examiner

Primary Examiner—Jeffrey A. Smith

(57) **ABSTRACT**

A business model/process is described for conducting business transactions over the Internet, allowing buyers to reduce the price of the selected product/service based on the buyer's performance during a collateral activity. Sellers offer the product/service within a specified price range, and buyers accept the offer, in exchange for the opportunity to close the transaction at the lowest price offered by achieving a high score during the collateral activity. The ultimate price is within the agreed upon range, but is determined based upon the buyer's performance during the collateral activity. The activity may be a video game, electronic board game, sports bet, card game, or any other activity, and may be performed against the seller, a pre-programmed software opponent, a computer opponent, another buyer competing for the same or a different product, a player participating as a player only and not as a buyer, or anyone or anything else.

**33 Claims, 2 Drawing Sheets**



Exhibit A

EXHIBIT A
PAGE 26



Fig. 1

Fig. 3

EXHIBIT ___A___
PAGE ___23___



*Fig. 2*

EXHIBIT 4

PAGE 28

1

## SYSTEMS AND METHODS FOR TRANSACTING BUSINESS OVER A GLOBAL COMMUNICATIONS NETWORK SUCH AS THE INTERNET

### FIELD OF THE INVENTION

The present invention relates generally to systems and methods of doing business over a global business network such as the Internet, and more particularly to systems and methods wherein various forms of competition and/or entertainment are used to determine transaction prices between buyers and sellers.

### BACKGROUND

Many businesses have recently begun expanding into e-commerce in an effort to attract some of the seemingly endless source of potential buyers. In fact, many new businesses actually offer their products and services solely via e-commerce. Some e-commerce businesses provide traditional transaction methods, wherein the seller offers a specified product at a specified price, and the buyer "buys" the product by performing a required set of tasks acknowledging the formation of a binding buy-sell contract. This occurs at Amazon.com, e.g., which began as an on-line book seller, but has recently expanded into other fields such as music and videos.

Various other business models have also emerged, apparently in an effort to attract a greater portion of the on-line market. For example, Priceline.com uses a model which allows the buyer to present a bid or offer price they wish to pay for a product or service, and a seller then accepts the buyer's offer to enter into a binding contract, typically as the result of a reverse auction process. See, e.g., U.S. Pat. No. 5,794,207, the contents of which are hereby incorporated herein by reference. VerticalNet.com uses a model which allows businesses to find information regarding manufacturers of specific products, after which time the business (buyer) then contacts the manufacturer directly to purchase the products. Onsale.com and eBay.com use auction models allowing sellers to submit their products to an electronic auction, which buyers then bid on electronically. Onsale.com has also announced an "at-cost" program, claiming to sell various computer and other electronic products at wholesale cost. Other e-commerce companies simply use their websites as an advertising activity to promote their products.

These various e-commerce business models all have certain advantages and disadvantages, but as a fundamental principle of a free market economy such as in the United States, their common goal likely is to attract as many customers as possible, to ultimately lead to more transactions and hence more profit for the companies employing the models. As such, they all seem to focus in one way or another on factors typically considered important by potential buyers - namely price and convenience. None of them, however, allow a potential buyer to engage in a competitive/entertaining collateral price-determining activity (PDA) which ultimately determines the price of the product or service to be secured, depending on the buyer's performance during the collateral activity.

Off-line sweepstakes systems are also known, which allow a game player to win cash or other prizes or credits depending on the player's performance of a specified set of tasks. A simple example involves a player scratching off one of a number of covered areas on a card, to reveal a prize.

2

However, such systems typically do not bind the player to a contract, but merely provide an offer to the player/buyer to enter into a contract on the specified terms.

Systems and methods are thus desirable to allow a potential buyer to engage in competitive/entertaining activities wherein the activities ultimately determine the price of the product or service to be bought, depending on the buyer's performance while participating in the PDA. Such systems and methods using a global communications network such as the Internet would provide buyers and sellers an alternative method of conducting e-commerce.

### SUMMARY OF THE INVENTION

The present invention comprises a business model used to determine the price of goods and/or services to be provided from a seller or sellers to a buyer or buyers. Various forms of electronic competition and/or entertainment are used as intermediary activities between said buyers and sellers to ultimately determine a contract price. Sellers offer a product or service within a specified price range, and buyers enter into a contract to buy the product or service within that price range. The ultimate price (within the range) is determined based upon the buyer's performance rating, or score, which the buyer receives from participating in a collateral activity. Thus, if a buyer performs poorly at the activity, the price will be higher, whereas if the buyer does well, the price will be lower. The activity may be a video game (including audio/visual games), electronic board game, crossword puzzle or other word game, sports bet, card game, or any other activity or combination of activities, and may be performed against the seller, a pre-programmed software opponent, a computer opponent, another buyer competing for the same or a different product, a player participating as a player only and not as a buyer, or anyone or anything else. The actual range may be a scaled set of prices (e.g., $1000.00, $1100.00, $1200.00, etc.), or it may be simply a single price, such as a discounted price, for which the buyer will either "win" the contract or "lose", and not be entitled to the product at the specified price, or it may even include a lower boundary of $0.00, such that the product or service might be attainable for free if the buyer can achieve a certain performance level while participating in the PDA.

Sellers are able to attract buyers using the marketing incentive that buyers can reduce the price of the offered product or service by performing well at the specified activity. Sellers are willing to put forth the initial offer of a certain price range, in hopes that the average price of the product over time will be a profitable price within the range, based upon the average performance of potential buyers that is expected to occur.

Buyers, on the other hand, are willing to accept the possibility of paying the highest price within the range, in exchange for the opportunity to pay the lowest price (or any lower price) within the range if they can achieve a certain level of performance at the specified activity. Buyers also receive a side benefit of the entertainment value of the activity, during which they are attempting to lower the price of a product or service.

Thus, one aspect of the present invention involves a method of doing business over a global communications network comprising the steps of: communicating to a buyer via the global communications network, a description of a product; accepting a first request from the buyer to buy the product for a price to be determined within a price range; accepting a second request from the buyer to allow the price to be determined based upon a performance of the buyer

3

while participating in a Price-Determining-Activity (PDA) selected by the buyer; receiving data from the buyer over the global communications network, said data representing the performance of the buyer during the selected PDA; and determining the price of the product based at least partially upon the data received, said price being within the price range.

Another aspect of the present invention involves a method of determining a price of a product using a global communications network, comprising the steps: communicating to a buyer via the global communications network, data representing a plurality of products available, said plurality of products including a first product; accepting acknowledgement from the buyer representing an intent of the buyer to buy the first product at a price to be determined based upon a performance of the buyer while participating in a Price-Determining-Activity (PDA), said acknowledgement being communicated over the global communications network; determining the performance of the buyer; and assigning a price to the product, said price being dependent upon the performance of the buyer.

Another aspect of the present invention involves a system for conducting e-commerce over a global communications network, comprising: a computer server having access to the global communications network, and being programmed to communicate to a buyer via the global communications network, data representing a plurality of products, said plurality of products including a first product; and to accept acknowledgement from the buyer representing an intent of the buyer to buy the first product at a price to be determined dependent on a performance of the buyer while participating in a Price-Determining-Activity (PDA), said acknowledgement being communicated over the global communications network; and to determine the performance of the buyer based upon data received over the global communications network; and to assign a price to the product, said price being dependent upon the performance of the buyer.

Methods are thus described wherein buyers participate in selected activities, the outcomes of which are used to determine the ultimate price the buyer is to pay for a selected product or service. Other objects and advantages of the present invention will be apparent from the detailed description which follows, when read in conjunction with the associated drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a flow-chart illustrating the steps involved in a typical transaction performed in accordance with the concepts of the present invention.

FIG. 2 is a block diagram showing an embodiment of an operation controller as used in accordance with the present invention.

FIG. 3 is a block diagram showing one embodiment of a buyer or seller interface in accordance with the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention describes business systems and business models/processes for conducting business transactions wherein the buyer and seller agree to a price range at which a transaction will take place. Sellers offer their product/service within a specified price range, and buyers accept the offer, in exchange for the opportunity to close the transaction at the lowest price offered by achieving a high

4

score during a collateral activity. The ultimate price is within the agreed upon range, but is determined based upon the buyer's performance during the collateral PDA. The activity may be a video game, electronic board game, sports bet, card game, or any other activity, and may be performed against the seller, a pre-programmed software opponent, a computer opponent, another buyer competing for the same or a different product, a player participating as a player only and not as a buyer, a predetermined achievement level, or anyone or anything else. The activity may be conducted on-line, or off-line.

Application of the present invention is especially beneficial using a global communications network such as the Internet, because the massive numbers of buyers and sellers, combined with the ability to conduct transactions across time zones, makes the Internet especially suitable for practicing the present invention. A centralized server or controller may be implemented to manage all transactions, allowing access through various front-ends such as existing Internet portals or e-commerce sites. Such control would allow for efficient management of quality control, buyer-seller qualification screening, association of PDAs with corresponding products and services, and other database and e-commerce customer service and data control issues.

Turning to FIG. 1, a flow-chart is shown illustrating the steps involved in a typical transaction performed in accordance with the concepts of the present invention. At step 110, the buyer selects a desired product or service to be purchased. The selection may occur via a website managed by the seller or the seller's agent (e.g., a master controller), using typical selection techniques such as point-and-click, pop-up menus, etc. The website may offer the products or services as common offerings always available, auction items (e.g., like eBay.com), reverse auction items (e.g., like Priceline.com), or any other way. The present invention thus may be used independently of other business models, or in combination therewith, to form binding contracts. For example, using the auction or reverse auction models, the buyer may be entitled to a further discount of the auction or reverse auction price, which discount may be greater if the buyer performs well at the PDA, and not so great if the buyer performs poorly. The offerings of various products and services, and the associated PDAs, may be presented via a seller's website, or a host website acting as a front end to systems embodying the concepts described herein.

At step 120, the buyer selects a PDA from a set of those available. The available set of PDAs may be pre-set by the seller or seller's agent, and may be a subset of the actual set of activities in a PDA database. The PDAs available may vary depending upon many factors, such as the product/service being offered, the price range being offered, the quantity of products available, the demand for the product, etc. For example, a seller may allow a buyer to choose from any PDA in the PDA database, for a particular item that the seller wants to offload as a promotional item, and for which the seller is unconcerned as to the probabilities of receiving a specified average price over time for the product. On the other hand, for a popular product that is capable of commanding a full market price, the seller may wish to only allow certain PDAs to be associated with the product, where those PDAs will typically result in a higher sale price than other PDAs. The association of a particular PDA with any given product or service, any given seller, any given buyer or class of buyers, any given time period, any given source of entry to the website implementing the present invention, or to any other database, database entry, event, or other

EXHIBIT ___A___
PAGE ___30___

5

factor, or to any combination of the aforementioned, may be managed and controlled using well-known database management software.

After the buyer selects a PDA, the buyer may provide payment information, as seen at step 130. The information may be input and processed using well-known e-commerce financial software, taking advantage of integrated or independent encryption technology. Alternatively, the buyer may provide financial information via phone, regular mail, e-mail, or any other means, and may gain access to the seller's offers via a password or other secure identification method already associated with the buyer's financial information. This step, of course, may occur at any stage in the process, but preferably occurs prior to allowing the buyer to participate in the PDA.

Once the buyer selects the PDA at step 120 (and preferably after the buyer provides payment info at step 130), the PDA may begin, as seen at step 140. Actual start of the PDA may require additional input from the buyer, indicating he or she is ready to begin, and/or that he or she agrees to and understands that by beginning the PDA, he or she has entered into a binding contract. The PDA may be a video game, electronic board game, gambling game, sports bet, or any other activity, and may be single-player or multi-player, and may comprise computer-executable code sent to the buyer over a global communications network such as the Internet. Various PDAs are described in more detail herein.

When the PDA is complete as to the buyer (step 150) the actual price of the product or service at issue is determined (step 160), and if the contract is binding, the transaction may then be completed. If the contract is not binding, because e.g., the buyer was given the opportunity of engaging the PDA on a "no commitment basis", then at this point the buyer is asked if he or she wants to close the transaction at the determined price.

The following example will illustrate in more detail a buyer-seller transaction occurring using the flow-chart of FIG. 1. Buyer Bobby accesses the Internet using a typical PC with browser software. Bobby sends a request though his browser to link to a website implementing the concepts described in FIG. 1. For this example, we will call the website www.pdaportal.com (No such website is known to exist at this time). Bobby navigates the website, and finds that he can buy a Mark McGwire rookie card in mint condition, if he is willing to pay anywhere between $500.00 to $575.00. He decides to check it out, and clicks on the Mark McGwire image to proceed (step 110).

He is then presented with a pull-down menu of five different "games" (PDAs) to choose from, along with price determination rules explaining how each PDA will be used to determine the ultimate price of the McGwire card. The "games" are: 1) a bridge game where he would be dealer and North, and would be playing with three other individuals who have selected bridge as their PDA for other products offered by www.pdaportal.com; 2) a Mark McGwire trivia quiz of ten questions; 3) an offer to predict which major league baseball player will be the first to reach fifty home-runs this season; 4) a game of keno; and 5) a classic PacMan video arcade game. After browsing through each option, and learning what type of performance would be necessary from him to achieve a buying price of $500.00, he decides to go for the trivia quiz (step 120), in which he is informed that he only needs to answer 9 of 10 multiple choice questions correctly within a fifteen minute period to achieve the $500.00 price. Even if he only gets 5 out of 10 correct, he will get the card for $560.00, and he figures that isn't too bad.

6

He then sends his VISA card information to the pdaportal.com server (step 130), and is informed that he may begin the "game" by selecting "START", or by returning within 48 hours to pdaportal.com and entering code "MC5915432" into the "Active request?" field. He decides to go for it now, and clicks on the "START" button. The game begins (step 140). Bobby gets through the first 8 questions, and has them all right so far, but realizes he has only nine seconds remaining. He has no time to read the next two questions, so he simply guesses "b" for both of them. The clock runs out, and the game is over (step 150). Bobby is informed that the answer to number 9 was "c", but the answer to number 10 was "b". He gets 9 answers correct, and according to the predetermined algorithm as presented to him at the start of the game, his performance locks in the price at $500.00! (Step 160). The shipping, customer service, and other e-commerce details are handled by the www.pdaportal.com software, which is well-known in the art.

As previously mentioned, the transactions may be handled by a master operation controller or content server for efficient processing and marketability. FIG. 2 is a block diagram showing one embodiment of an operation controller 206 as used in accordance with the present invention. The operation controller may be a computer server which provides control to and manages a website implementing the concepts described herein. The buyer and seller interfaces (202 and 204 respectively) may comprise a PC 216 (see FIG. 3) connected to the master operation controller 206, and may each have browser software installed. The connection may be via an electronic network interface 207 and connection 208 to a modem or other communication device 210, which in turn is connected to the content server 206 via any Internet connection 212 such as phone lines, cable lines, ISDN, T-1, etc. The network interfaces 208 and connection 207 is shown for simplicity to be the same for the buyer and seller interfaces 202 and 204, but this is not required, and in most instances would not be the case. Connection to the master operation controller 206 may be directly via an Internet connection 212, and may occur via a hyperlink from another website acting as a front-end to the master operation controller.

The content server 206 has access to a database 214, which may be one physical database, or multiple physical databases, as is well-known in the art. Various physical or logical databases may include the following: a goods offered database 214a, a seller database 214b, a buyer database 214c, a payment info database 214d, a price acceptance database 214e, a PDA database 214f (containing data regarding the available PDAs), a price decisions database 214g, a seller account database 214h, a buyer account database 214i, a buyer history database 214j, and many others. The relationships between the various databases 214 may be programmed using well-known programming techniques. For example, relationships may be set up as previously described to associate specified PDAs with specified products offered by specified sellers during specified time periods. The databases may be organized and partitioned in any convenient manner, and the format shown in FIG. 2 is merely an example.

Turning now to FIG. 3, a sample configuration of the Buyer Interface is shown. (The same configuration may be used for a Seller Interface). As can be seen, the buyer interface 202 may comprise a PC 216 connected to the master operation controller 206, and may have browser software installed. The connection may be via an electronic network connection 207 to a modem or other communication device 210, which in turn is connected to the content

7

server 206 via any Internet connection 212 such as phone lines, cable lines, ISDN, T-1, etc. Connection to the master operation controller 206 may be directly via an Internet connection 212, and may occur via a hyperlink from another hosting website acting as a front-end to the master operation controller content. A monitor 218 or other output display device may be attached to the buyer's PC, as is well-known in the art. In an exemplary embodiment, a buyer interface 202 simply needs to have Internet access and browser software installed, to allow a buyer to navigate the Internet and access a website hosting content which implements the methods described herein. FIG. 3 is merely a simple example of such a configuration.

Turning now to the Price Determining Activities, or PDAs, the present invention contemplates a wide variety of PDAs to be used as described herein. It is to be understood, therefore, that various PDAs available, along with price determination rules explaining how the PDAs are used to determine the ultimate price of a specified product or service, may be pre-programmed and/or programmable, as needed. Thus, upon execution of a PDA in one case, a score of 100,000 may entitle the buyer to a $500.00 price, whereas the same PDA may entitle a different buyer to a price of only $525.00 for the same product.

PDAs may be added, modified, and/or deleted. The availability of any given PDA may also change and be set based upon any combination of the associated product or service offered, the identity of the seller, the time of the offer from the seller, the source of entry into the PDA's host website (e.g., special promotions may be offered to buyers accessing the PDA website through a Yahoo! link), the skill level of the buyer participant, the number of players involved in the PDA, the changing popularity of the PDA, and many other external factors. It is preferred that the price determination rules explaining how a particular PDA is used to determine the price of a given product or service, are communicated to the buyer prior to the buyer engaging the PDA. This will likely facilitate the creation of a binding contract upon the buyer.

A classic example of a PDA is a video game, wherein at the end of the game, the player has earned a certain point total or score. The score is then used to determine the price of the product or service at issue, in accordance with a mapping algorithm. Using the Mark McGwire card example described earlier, a score of less than 100,000 points may correspond to the $575.00 price; 100,000 to 199,999 may correspond to a $550.00 price; 200,000 to 299,999 may correspond to a $525.00 price; and a score of 300,000 or more may correlate to the lowest price available, $500.00. The various score ranges and corresponding resulting prices may of course be adjusted by the seller or seller's agent as needed.

Another example of a PDA involves a simulated investment in a stock market. A buyer may submit his or her prediction on the value of a certain stock, mutual fund, sample portfolio, index fund, either U.S. or foreign, at the close of a specified trading day. Or a buyer may be given a set amount of simulated "money" to "invest" in various public markets, his final portfolio value being compared to a raw score or the score of other players and/or buyers to determine the price he is entitled to pay for the specified product or service. The difference (either in percentage or raw points) between the buyer's prediction, and the actual closing price or value, may then be used to determine the price of the specified product or service.

Another example of a PDA involves sports wagering. A buyer may submit his or her wager or prediction on the

8

outcome of a sporting event, or a combination of sporting events, or individual or team achievements during the course of a sporting event. "Odds" may be posted which correspond to the price the buyer will be entitled to depending on the accuracy of his or her wager.

Other PDAs include electronic card games, such as bridge, cribbage, black jack, poker, or other card games, craps, roulette, and electronic board games such as chess, backgammon, checkers, or a proprietary game such as Trivial Pursuit, Monopoly, or other game. It is to be understood that a price determining algorithm associated with a PDA may involve considerations of the number of players or buyers involved, and the skill level of those players.

For example, a particular seller may have nine widgets available for sale, for which he desires to get an average of $100.00 each. He therefore configures his offer to extend to the first nine buyers interested in the widget, with a single PDA of a simulated horse race being the only PDA available. He configures the horse racing PDA to post "odds" such that three horses with the best times will receive the widget for only $75.00; numbers 4–6 will pay $100.00, and numbers 7–9 will pay $125.00, thus securing an average price of $100.00 per product for the seller.

In the horse race example, as in any multi-player situation, the simulated horse race may occur with all participants simultaneously, or it may occur at various times depending on when each buyer is available to participate. In the former case, participants may be notified by e-mail, audio or visual indication, or any other way as to the specific start time of the multi-player PDA. For example, a player may sign-up for the race, and await at his terminal for the trumpet noise, which he would then acknowledge. The server might actually sign-up twenty or more players, and send the trumpet noise to each one until nine players have acknowledged. Once the server has received nine acknowledgements, the ten second countdown could begin and the PDA would then occur. As for the other players who did not get the trumpet call, they could remain on the trumpet call wait list until the next trumpet call. Various algorithms may be employed to remove a player from a wait list after a predetermined amount of time has elapsed. In the case of asynchronous racing, each player may engage the PDA which will be programmed to have that player's designated horse compete against the remaining horses which would be electronic opponents, as opposed to actual players.

Another application of the present invention involves a scenario wherein a buyer may participate multiple times in the same or various PDAs, in an effort to accumulate points that correspond to various price levels. For example, a Gateway 2000 computer costs may retail for $3000.00. For each certain level or accumulation of certain amounts of points, the buyer would be entitled to reduce the price of the computer. The decrease in price can be in dollar amount or percentage points, and may or may not have a bottom limit. The actual transaction price between a buyer and a seller would be determined by the buyer, when he or she decides a price has been reached in his or her acceptable level.

The actual opponents of a buyer in a multi-player PDA may even be buyers for other products or services, offered by other sellers. Or the opponent may be a pre-programmed software opponent, as in the previous asynchronous horse racing example. The opponent may even be an independent computer, as in the case when a human buyer competes against a computer opponent in a chess game. The opponent or opponents may even be people who are not buyers, but are merely players, participating in the PDA merely for the inherent entertainment value thereof.

EXHIBIT A

PAGE 32

9

10

The players and/or buyers may be required to pay a fee based on their participation in the PDA. The fee may be based upon pay-per-play, or on a predetermined time-basis such as quarterly, annual, lifetime, etc. Trial participation may be available, allowing a buyer or player/non-buyer to try the PDA for free, or to a specified number of times. Similarly, sellers may be required to pay a fee to list their products and services for sale, or they may pay a percentage of their gross or net sales, or an amount based upon number of participants, etc.

While certain embodiments are illustrated in the drawings and are described herein, including preferred embodiments, it will be apparent to those skilled in the art that the specific embodiments described herein may be modified without departing from the inventive concepts described. For example, well-known e-commerce software for order processing, order fulfillment, shipping, billing, customer service, security, general ledger, and other applications may be integrated into an overall e-commerce application package to provide a complete e-commerce solution for a business desiring to capitalize on the concepts described herein. Additionally, software implementing the concepts and methods described herein may generally be programmed to allow escape or exit at any stage, so long as the appropriate request is provided by the buyer. Also, use of the word "product" in the appended claims is intended to include both products and services. Accordingly, the invention is not to be restricted except by the claims which follow.

What is claimed is:

1. A method of doing business over a global communications network comprising the steps:

   communicating to a buyer via the global communications network, a description of a product;

   accepting a first request from the buyer to buy the product for a price to be determined within a price range;

   accepting a second request from the buyer to allow the price to be determined based upon a performance of the buyer while participating in a Price-Determining-Activity (PDA);

   receiving data from the buyer over the global communications network, said data representing the performance of the buyer during the PDA; and

   determining the price of the product based at least partially upon the data received, said price being within the price range and scaled to the performance of the buyer.

2. The method of claim 1, further comprising the step of accepting payment information from the buyer over the global communications network.

3. The method of claim 1, further comprising the step of presenting to the buyer over the global communications network, a plurality of PDAs to choose from, said presentation of the plurality of PDAs occurring before accepting the second request from the buyer.

4. The method of claim 3, further comprising the step of presenting price determination rules to the buyer over the global communications network, said price determination rules being associated with the plurality of PDAs.

5. The method of claim 4, wherein the PDA is a video game.

6. The method of claim 1, further comprising the step of associating the PDA with the product based at least partially upon a number of participants required for execution of the PDA.

7. The method of claim 1, further comprising the step of sending price data to the buyer via the global communications network, said price data representing the price.

8. The method of claim 1, further comprising the step of accepting offer data from the seller representing an offer from the seller to sell the product within the price range.

9. The method of claim 1, wherein the PDA requires participation of at least one participant in addition to the buyer.

10. The method as in claim 9, further comprising the step of determining the price based at least partially upon a competition between the buyer and the at least one participant using the PDA.

11. The method as in claim 10, wherein the at least one participant is a second buyer, and further comprising the steps of accepting a second request from the second buyer to buy the product for a second price to be determined within the price range, and determining said second price based at least partially upon the competition.

12. The method of claim 1, wherein the steps of accepting the first request from the buyer, accepting the second request from the buyer, and receiving the performance data from the buyer, are performed by a master controller.

13. The method of claim 1, wherein the price is determined at least partially upon participation of the buyer in an auction.

14. The method of claim 1, wherein the global communications network is the Internet.

15. The method as in claim 1, wherein the price is determined at least partially upon an offer received from the buyer.

16. The method of claim 1, wherein the PDA is selected by the buyer.

17. The method of claim 1, wherein the PDA is a video game.

18. A method of determining a price of a product using a global communications network, comprising the steps:

   communicating to a buyer via the global communications network, data representing a plurality of products available, said plurality of products including a first product;

   accepting acknowledgement from the buyer representing an intent of the buyer to buy the first product at a price to be determined upon a performance of the buyer while participating in a Price-Determining-Activity (PDA), said acknowledgement being communicated over the global communications network;

   determining the performance of the buyer; and

   assigning a price to the product, said price being scaled to the performance of the buyer.

19. The method of claim 18, further comprising the step of receiving data over the global communications network representing an election of the buyer to select the PDA.

20. The method of claim 18, further comprising the step of accepting payment information from the buyer over the global communications network.

21. The method of claim 18 wherein the price is dependent at least partially upon a bid selected by the buyer.

22. The method as in claim 18, wherein the price is determined at least partially upon results of an auction.

23. The method as in claim 18, wherein the price is determined at least partially upon an offer received from the buyer.

24. The method of claim 18 wherein the PDA is selected by the buyer.

25. The method of claim 18, wherein the PDA is a video game.

26. The method of claim 18, further comprising the step of determining a price range prior to determining the per-

EXHIBIT A
PAGE 33

formance of the buyer, said price range having a lower limit associated with a best performance, and an upper limit associated with a worst performance, and wherein the price assigned to the product is within the price range.

27. The method of claim 26, wherein the PDA is adapted to accommodate participation of a second participant.

28. The method as in claim 27, further comprising the step of determining the price based at least partially upon a competition between the buyer and the second participant using the PDA.

29. The method of claim 26, wherein the PDA is a video game.

30. A system for conducting e-commerce over a global communications network, comprising:

a computer server having access to the global communications network, and being programmed to:

a) communicate to a buyer via the global communications network, data representing a plurality of products, said plurality of products including a first product;

b) accept acknowledgement from the buyer representing an intent of the buyer to buy the first product at a price to be determined dependent on a performance of the buyer while participating in a Price-Determining-Ac-

tivity (PDA), said acknowledgement being communicated over the global communications network;

c) determining the performance of the buyer based upon data received over the global communications network; and

d) assign a price to the product, said price being scaled to the performance of the buyer.

31. The system of claim 30, wherein the PDA comprises computer-executable code sent to the buyer over the global communications network.

32. The system of claim 31, wherein the server is further programmed to process payment information of the buyer communicated over the global communications network.

33. The system of claim 30, wherein the server is further programmed to determine a price range prior to determining the performance of the buyer, said price range having a lower limit associated with a best performance, and an upper limit associated with a worst performance, and wherein the server is further programmed to assign the price to the product within the price range.

* * * * *

EXHIBIT A
PAGE 34